Scott J. Fishwick (CA SBN 308661)
sfishwick@bakerlaw.com
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90025
Telephone: 310.820.8800
Facsimile: 310.820.8859

David B. Rivkin, Jr. (*pro hac vice*)
drivkin@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile: 202.861.1783

(additional counsel listed after caption)

*Attorneys for Claimant*
*PetroSaudi Oil Services (Venezuela) Ltd.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>ALL FUNDS HELD IN ESCROW BY CLYDE & CO. IN THE UNITED KINGDOM AS DAMAGES OR RESTITUTION IN *PETROSAUDI v. PDVSA* UNCITRAL ARBITRATION,<br><br>          Defendant. | Case No.: 2:20-cv-08466-DSF-PLA<br>Hon. Dale S. Fischer<br><br>**NOTICE OF DECISION RENDERED IN UK ACTION** |

OF COUNSEL:

Lee A. Casey (CA SBN 119568)
lcasey@bakerlaw.com
Mark W. DeLaquil
mdelaquil@bakerlaw.com
Kendall E. Wangsgard
kwangsgard@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone:   202.861.1500
Facsimile:    202.861.1783

Jonathan B. New (*pro hac vice*)
jnew@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:   212.589.4200
Facsimile:    212.549.4201

*Attorneys for Claimant*
*PetroSaudi Oil Services (Venezuela) Ltd.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

1       On February 22, 2021, the government filed a "Notice of Filing in Parallel

2  UK Action," ECF No. 47, therein providing a recent letter the government wrote to

3  the UK court. Also on February 22, 2021, Claimant filed a "Supplemental Notice of

4  Filing in UK Action," ECF No. 47, therein providing its response to the

5  government's letter. Both submissions were made in the interest of keeping the

6  Court apprised of developments in the UK proceedings.

7       Further to that goal, Claimant attaches here a Judgment recently handed

8  down by Mr. Justice Robert Miles of the High Court of Justice, Business and

9  Property Courts of England and Wales on February 26, 2021.

10       Claimant intends to pursue an appeal of the Judgment in the United

11  Kingdom.

12  DATE: March 3, 2021               Respectfully submitted,

14                               Baker & Hostetler LLP

15                               By: /s/ *David B. Rivkin, Jr.*

16                               SCOTT J. FISHWICK
                                 DAVID B. RIVKIN, JR.

18                               *Attorneys for Claimant*

19                               *PETROSAUDI OIL SERVICES*
                               *(VENEZUELA) LTD.*

21  OF COUNSEL:

22  Baker & Hostetler LLP
   LEE A. CASEY

23  MARK W. DELAQUIL

24  KENDALL E. WANGSGARD
   JONATHAN B. NEW

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that a true and correct copy of the foregoing and its attachment was

3   electronically filed on March 3, 2021 using the CM/ECF system, thereby sending a

4   notice of electronic filing to all counsel of record.

5                                                          /s/ *David B. Rivkin, Jr.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES



Neutral Citation Number: [2021] EWHC 444 (Ch)

Case No: PT-2020-000907

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**PROPERTY, TRUSTS AND PROBATE LIST (Ch D)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 26/02/2021

Before :

**MR JUSTICE MILES**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**PetroSaudi Oil Services (Venezuela) Limited**               **Claimant**

**- and -**

**Clyde & Co LLP**               **Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**David Allen QC** and **Jason Robinson** (instructed by **Kerman & Co**) for the **Claimant**
**Charles Dougherty QC** and **Luka Krsljanin** (instructed by **Clyde & Co LLP**) for the
**Defendant**

Hearing date: 5 February 2021
Written submissions: 16 and 22 February 2021
- - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**Covid-19 protocol**: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 2.00pm on 26 February 2021.

**Mr Justice Miles :**

**Introduction**

1.  This case is about some US$325m ("the Funds") held on trust by the Defendant firm ("Clyde") for the Claimant ("POS") in a dollar bank account in London. The Funds came under the control of Clyde as escrow agent in the course of an international arbitration between POS (a Bajan company) and PDVSA Servicios SA ("PDVSA") (a Venezuelan company). Clyde acted for POS as solicitors in the arbitration. They agreed to hold specified amounts as escrow agents (subject to information barriers separating those acting for POS and those acting as escrow agents) under the terms of a tri-partite agreement subject to the orders of the arbitral tribunal ("the escrow agreement"). The tribunal made a final award in favour of POS on 17 July 2020 for an amount greater than the monies then held in escrow and ordered Clyde to pay the net amounts after payment of escrow fees (i.e. the Funds) to POS.

2.  PDVSA then brought a claim in the English Court seeking to stop Clyde paying the Funds to POS pending a challenge to the final award in the French Courts. PDVSA obtained an interim injunction from Zacaroli J after an *ex parte* hearing, but Sir Alastair Norris discharged it after a full hearing. It is common ground between the parties to this application that the Funds are therefore payable to POS. Clyde wish if possible to pay POS and bring the escrow account arrangements to an end.

3.  That is not however the end of the story. There have been two sets of proceedings abroad in which it has been alleged that the Funds represent the proceeds of the well-known "1MDB" fraud. 1MDB was a wealth fund owned by the Malaysian state. The Malaysian government has alleged that huge amounts were looted from 1MDB and that the proceeds of the fraud were laundered. The scandal has spawned numerous proceedings around the world.

4.  On 16 July 2020 the Malaysian Court made an order at the suit of the Malaysian public prosecutor that the Funds be frozen, on the alleged basis that they represented the proceeds of the 1MDB fraud (something which POS strenuously denies). The order has never been served on Clyde or domesticated in the UK under the relevant legislative regime (which I shall describe more fully below).

5.  But in any event, as a result of a variation made on 19 August 2020, the Malaysian order provided for specified amounts to be paid by Clyde to the solicitors for POS to cover the claims of its creditors (c.$442,000 a month) and legal fees incurred by it in the defence of various proceedings ($600,000 a month). The same provisos had also been included in the terms of the interim order obtained by PDVSA in the English proceedings (as varied by Trower J on 11 August 2020).

6.  Those provisos would have allowed POS to meet its continuing obligations to its creditors and lawyers. But again things were not so simple. In September 2020 the US Government, acting by the Department of Justice ("the DOJ"), commenced an *in rem* Complaint in the District Court for the Central District of California ("the CDC") claiming that the Funds were liable to forfeiture under a Federal civil forfeiture statute (18 USC §981(a)(1)(A) and (C)). The US Government alleged that the Funds constituted the proceeds of fraud. On 21 September 2020 the DOJ made an unsuccessful *ex parte* application to the CDC for the issue of an arrest warrant in rem

against the Funds. That application was renewed and on 14 October 2020, Judge Fischer, a judge of the CDC, being satisfied to the standard of probable cause, authorised the issue of an *in rem* forfeiture warrant by the US Government ("the Warrant"). The *res* was described as "[a]ll funds held in escrow by Clyde & Co in the United Kingdom as damages or restitution in [POS] v PDVSA UNCITRAL Arbitration" (or, in other words, the Funds). The Warrant requires and directs US law enforcement officers to arrest and seize the Funds.

7.  The Warrant was served on Clyde in London. As explained in much more detail below, the DOJ contends that this gives the CDC forfeiture jurisdiction over the Funds and it has threatened Clyde with prosecution if it transfers the Funds to POS.

8.  Clyde took advice from US lawyers and concluded that parting with the Funds (including the monthly amounts allowed by the Malaysian order) would expose it to a real risk of criminal prosecution or civil liability in the US.  It has therefore not made any of the monthly payments since receiving the Warrant. POS pressed for payment. It pointed out that the DOJ had not sought a civil restraining order against Clyde from the CDC and that the Warrant had not been domesticated under the relevant UK legislation. Clyde disagreed and repeated that it would be at risk of prosecution if it made the payments sought.

9.  POS therefore commenced the current claim under CPR Pt. 8 on 17 November 2020. POS primarily sought an order against Clyde for the payment by Clyde to POS's solicitors of its monthly business and legal expenses. However by the time of the hearing before me POS was seeking only the alternative relief set out in the claim form, i.e., an order for payment of the Funds into the English Court with orders for (a) the immediate payment out of Court to its solicitors of (i) $2,212,425 as the unpaid monthly amounts for creditors since October 2020 and (ii) $2,568,833.07 for unpaid legal fees, and (b) a monthly payment of $1,1043,487 out of Court to its solicitors on the first day of the month until further order for creditors and legal fees. It does not, at this stage, seek an order for payment out of Court of the balance of the Funds.

10. POS brings its claim under the Court's supervisory jurisdiction over trusts.  POS says that the Court has a discretion, that it has a pressing need for the release of the monthly amounts, and that Clyde would not face a real risk of prosecution or liability if it complied with the orders of this court.

11. Clyde accepts that the Court has a supervisory jurisdiction over trusts but says before one reaches the court's discretion there is a prior question whether the application is barred by the terms of the escrow agreement. It says alternatively that the court should not make the orders sought as a matter of discretion. Clyde's overall position is that it would like to bring the escrow arrangement to an end and that it has no wish to obstruct POS from paying its business expenses or legal fees. But, while recognising POS's predicament, Clyde opposes the claimed relief: it says in short that transferring the Funds (including into Court pursuant to a mandatory order of the English Court) would expose it to a real and material risk of criminal prosecution or civil liability in the US.

**Factual background**

12.     In September 2010, POS and PDVSA entered into a 7-year drilling contract for the extraction of gas from the Mariscal Sucre basin offshore of Venezuela (the "Drilling Contract").   A standby letter of credit was issued in favour of POS to guarantee PDVSA's payments to POS under that contract (the "SBLC"). The Drilling Contract was governed by Venezuelan law with disputes subject to UNCITRAL arbitration. The SBLC was subject to English law and the jurisdiction of the English courts.

13.     PDVSA failed to pay POS's invoices from July 2012. POS demanded payment under the SBLC. PDVSA disputed POS's right to make demands.  That led to proceedings in England. In the end, on 25 January 2017, the Court of Appeal decided that the bank should pay under the SBLC. The Supreme Court refused PDVSA permission to appeal.

14.     PDVSA commenced an UNCITRAL arbitration (seated in Paris; subject to French Court supervision) in August 2015. PDVSA alleged various breaches of contract. POS counterclaimed for its unpaid invoices. Clyde acted as solicitors for POS in the arbitration.

15.     In the context of the arbitration an escrow regime was established to preserve assets out of which a final award might be satisfied.  The monies in the escrow account under the control of Clyde as escrow agent came from the third party bank as drawings under the SBLC.

16.     By Procedural Order 56, the tribunal directed that the parties should enter into a more formalised escrow arrangement "so as to regularise the terms on which Clyde acts as escrow agent and to provide a reasonable degree of protection and certainty to Clyde and to the Parties."

17.     By Procedural Order 62, dated 7 June 2019 and entitled "Agreed Terms Governing the Escrow Regime", the tribunal ordered that "[t]he escrow regime is governed by the agreed terms contained in Annex 1 to this Order."  The parties and Clyde were directed to sign that agreement by 14 June 2019.

18.     It is common ground that the escrow agreement is governed by English law.   It included the following clauses:

        "[1.3] Clyde will hold and administer any escrow monies in the escrow account in accordance with this Order.

        [5.11] Prior to giving any instructions to the bank for the transfer of any part of the balance of the escrow account, Clyde shall be entitled to be satisfied in connection with all applicable laws and regulations, including those relating to anti-money laundering, and require PDVSA and PetroSaudi to produce such documents and information as Clyde may reasonably require for such purpose or to satisfy the bank of the same.

        [6.1] Clyde's duties are administrative only and limited to instructing the bank to hold and deal with the escrow monies in accordance with the orders of this tribunal.

[6.2] Clyde shall not, to the fullest extent permissible by law, be liable to PDVSA or PetroSaudi or any other person for any loss, damage or liability arising out of the operation of the escrow account, except to the extent that such loss, damage or liability is caused by the fraud or wilful misconduct of Clyde.

[6.3] Each of PDVSA and PetroSaudi waives all rights it may have or acquire against Clyde arising out of or in connection with any of the arrangements referred to in or contemplated by this Order and shall jointly and severally indemnify Clyde on demand and hold it harmless against any and all claims, proceedings, costs (including legal costs), losses, damages and liabilities which Clyde may suffer or incur, or which may be brought against it, arising out of or in connection with any of the arrangements referred to in or contemplated by this Order, save and except only for any direct costs incurred by PDVSA or PetroSaudi as a direct result of the fraud or wilful misconduct of Clyde. For the avoidance of doubt, this indemnity applies to claims, proceedings, cost (including legal costs), losses, damages and liabilities already actually or potentially incurred at the date of this Order. Clyde's right to indemnity also includes, without limitation, a right to withhold payment of escrow monies due to PDVSA, PetroSaudi or any other person, so as to ensure the retention of funds sufficient to satisfy any potential claims under the indemnity, and a right to pay to itself out of the escrow monies the amount of crystallised claims under the indemnity.

[6.11] If Clyde is uncertain as to any of its duties, obligations or rights, it may procure legal advice from lawyers of its own choice with regard to such matters and / or seek directions from the tribunal. Clyde will have no liability for, and shall be indemnified and held harmless by PDVSA and PetroSaudi jointly and severally in respect of, (i) the cost to Clyde of procuring such legal advice or directions and (ii) any act or omission by Clyde made in accordance with such legal advice or directions.

[6.12] Clyde shall not be required to take any action if it determines, in its sole discretion, that such action would or might:

(a)    be contrary to the terms of this Order or any applicable law or regulation in any jurisdiction; or

(b)    render Clyde liable to any other person.

However, should Clyde refuse to take action, it must inform the parties and the tribunal of its decision and the reasons for that decision. In such a case, either PDVSA or PetroSaudi will be free to request that a new escrow agent be appointed by the tribunal."

19.    Procedural Order 62 also provided that regular payments were to be made (and were made) to POS from the escrowed funds to fund its legal costs and ordinary business expenses.

20.    The funds were placed in a client account for POS which was held by Clyde & Co and described in the escrow agreement as "the escrow account". This is a US Dollar account maintained by Clyde at NatWest in London.

21.   On 16 July 2020 the High Court of Kuala Lumpur made the freezing order against the Funds at the suit of the public prosecutor under Malaysian anti-money laundering legislation.

22.   The arbitral tribunal's Final Award was issued on 17 July 2020. The tribunal stated that PDVSA owed POS the sum of US$379,843,732 plus 12% interest from 10 July 2020 and instructed Clyde & Co "subject to its regulatory, statutory and legal obligations and other constraints - to transfer the balance currently remaining on the escrow account, to the order of said counsel for PetroSaudi Oil Services (Venezuela) Ltd", subject to payments of certain Escrow Agent's fees.

23.   On 22 July 2020 PDVSA lodged an appeal at the Parisian Cour d'Appel to seek the annulment of the Final Award. PDVSA provided no grounds or submissions in support of that application and still have not done so.

24.   On 4 August 2020 PDVSA applied *ex parte* against Clyde (and without joining POS) for and obtained an injunction from Zacaroli J preventing Clyde from paying the Funds to POS.  PDVSA claimed that it was a beneficiary of a trust created by the escrow arrangements and that it was entitled to protect the trust property pending all challenges to the final award.  Under the order Clyde was "permitted to distribute" $455,487 to POS a month in respect of its ordinary business expenses.

25.   POS applied to be joined to the proceedings and for variations of the amounts payable monthly (to include legal fees), and to make those payments mandatory rather than permissive. On 11 August 2020 Trower J varied the order. He permitted (though did not require) Clyde to pay (i) a lump sum of US$314,513.96 to POS's solicitors (as "the outstanding sums requested for payment by [POS] for its ordinary business and legal expenses"); and (ii) monthly sums of US$442,487 for ordinary business expenses and up to US$600,000 for legal costs and expenses incurred in respect of legal proceedings in England, Malaysia and France. The order required POS's solicitors to certify that they would pay sums to POS only in respect of those costs or expenses.

26.   On 14 August 2020 Trower J directed that there should be a further hearing on 21 August 2020.

27.   Also on 14 August 2020 POS applied to join the National Crime Agency ("the NCA") to proceedings. This application was issued in order to address the NCA's refusal of consent  in connection with the transfer of certain monies from the escrow account. The NCA had threatened to bring proceedings for a prohibition order under Article 141D of the Proceeds of Crime Act 2002 (External Requests and Orders) Order 2005 ("the 2005 Order") relating to the order of the Malaysian Court.

28.   POS applied for the NCA to be joined so that it might explain to the Court its position in respect of the Funds. One of POS's arguments was that the Court would be assisted by hearing from the NCA about the terms of any potential prohibition order sought under the 2005 Order. The NCA opposed the joinder application. It submitted (inter alia) that the issues on a potential application under the 2005 Order were not connected with the issues between PDVSA, POS and Clyde. It also contended that it was not the agent of the Malaysian authorities. Snowden J held in a judgment of 26 August 2020 that the NCA could not be joined to determine questions concerning a

potential prohibition order application as any such application was required by the 2005 Order to be brought in the Queen's Bench Division and did not resolve the remaining objections. In any event the NCA confirmed that if it did seek a prohibition order under the 2005 Order in support of the Malaysian court's order it would not seek an order more restrictive in terms of payment that than made by Trower J. Partly in the light of this Snowden J did not need to make a final decision about joinder of the NCA.

29.     On 19 August 2020 the Malaysian Order was varied to mirror that of Trower J. In fact it went further and required (rather than just permitting) Clyde to pay POS's solicitors the total of $1,042,487 per month, being $442,487 (for ordinary business) and $600,000 (to defend legal proceedings in other jurisdictions).

30.     By application notices of 18 and 21 August 2020 POS and Clyde applied to discharge the injunction granted by Zacaroli J on 4 August 2020 and for PDVSA's claim to be struck out.   After a hearing on 24-25 September 2020, on 23 October 2020 Sir Alastair Norris (sitting as a judge of the High Court) granted summary judgment against PDVSA and discharged the injunction.  His judgment is reported at [2020] EWHC 2819 (Ch). He recorded (at [24]) that the starting point was that the monies paid to POS under the SBLC were undoubtedly the property of POS alone. PDVSA had no proprietary interest in them at any stage. He then held that the escrow agreement did not create a trust in favour of PDVSA. The arrangement was contractual and fell to be construed under the usual principles. The contract required payment in accordance with the tribunal's final award and was not intended to provide any protection beyond that, including for any challenge by PDVSA to the final award.  Nor could a term be implied to give PDVSA any protection beyond the final award.  He also noted that the tribunal is functus officio and that there will be no further orders of the tribunal.

31.     He concluded at [47] that

> "By its Final Award and consequential Order the Tribunal instructed Clyde to transfer the balance currently remaining on the escrow account to POS. After delivering its Final Award and making that order giving effect to it the tribunal is (it is common ground) functus officio. There will be no further orders of the tribunal. […] The credit balance on the escrow account must be dealt with in accordance with that final order of the tribunal (as the parties have agreed it shall be) and the escrow account dependent upon a contingency has ceased to exist. The credit balance is confirmed as belonging to POS."

32.     At [54] he said:

> "In my judgment there is no argument with any real prospect of success that under PO62 and the Tripartite Agreement the escrow account survived the Final Award and can be dealt with otherwise than in accordance with the orders of the tribunal."

33.     Sir Alastair Norris refused PDVSA permission to appeal.  On 19 January 2021 PDVSA applied to the Court of Appeal for permission to appeal. POS and Clyde have opposed that application. No decision has yet been made on that application.

34.     In September 2020 the DOJ issued the original *in rem* Complaint. On 7 October 2020 the DOJ filed a "Verified First Amended Complaint for Forfeiture *In Rem*" in the CDC.

35.     On 15 October 2020 Judge Fischer issued the Warrant. (As already mentioned, there had been an earlier *ex parte* application for a warrant in September 2020 which had failed for lack of probable cause, but the DOJ renewed its application). The Warrant was placed on the public docket and was thereby brought to the attention of Clyde's US attorneys. The Warrant is addressed to and directed at the FBI, the US Marshal for the Central District of California "and/or any other duly authorised law enforcement officer". It is not addressed in terms to Clyde or POS.  As already set out, however, the Warrant refers to the Funds in the hands of Clyde as the *res*. The Warrant further provides notice to any person claiming an interest in the *res* to file a claim for them in the US Court.

36.     The Complaint and the Warrant were served in person on Clyde's General Counsel at its London office on 29 October 2020 by a representative of the NCA.

37.     On 2 November 2020 POS wrote to Clyde requesting payments to POS in respect of legal and business expenses. POS contended that the Warrant did not preclude such payments.

38.     On 3 November 2020 Clyde wrote to POS confirming that, having taken advice from specialist US lawyers, Clyde & Co did not consider it was able properly to make the requested payments. The letter also explained Clyde's understanding that as any payments in US$ had to be processed through a correspondent bank in New York, it was in any event likely that the monies would be caught in New York, as any New York Bank would probably refuse to complete the instruction, given the existence of the arrest warrant.

39.     On 13 November 2020 under US procedures POS submitted to the CDC a Statement of Interest and a Claim for the seized escrow funds.

40.     Clyde has communicated with the DOJ regarding the Warrant.  Its US attorney, Mr Roth, states the following in his witness statement.  He explains that the DOJ said that it considered that the Warrant had been properly served on Clyde and that the escrow funds that are the subject of the U.S. forfeiture action have been seized. An attorney from the DOJ, Mr Sohn, stated that it was the DOJ's position that Clyde would risk sanctions, including criminal sanctions, if it disbursed funds from the escrow account to POS without obtaining the consent of the CDC. The DOJ also said that it is unable to agree to the monies in the Escrow Account being paid into Court.

41.     On 7 December 2020 the DOJ issued an application for a 'protective order' against POS to the effect that "should [POS] obtain some or all of the defendant funds via its pending UK action… it must immediately tender these funds over to an account under this Court's control…". The DOJ contended that the present Pt. 8 claim is a collateral attack on the CDC's jurisdiction. That application remains pending and the CDC could issue its decision at any time.

42.     On 21 December 2020 POS submitted to the CDC a motion to dismiss the Warrant (and the Complaint underlying it) and a response to the DOJ's application for a

protective order. On 28 December 2020 the DOJ submitted a reply in support of its motion for a protective order. By a filing dated 11 January 2021 the DOJ opposed POS' motion to dismiss the Warrant (and the Complaint). Again a decision is awaited and could be given at any time.

**The US forfeiture proceedings and their legal status under English law**

43.    The Complaint was brought by the DOJ under the provisions of 18 USC §981(a)(1)(A) and (C).  It is an *in rem* proceeding.  In broad terms, the statute provides for civil forfeiture proceedings in respect of the proceeds of fraud.  In the Complaint the DOJ alleges (putting things broadly) that POS was used as a vehicle for laundering money stolen from 1MDB) and that therefore the revenue it earned from the drilling contract are the proceeds of fraud. The DOJ accepts that the Funds came from a bank under SBLC but contends that the statute is satisfied because POS's entire business was founded on a fraud on MDB1 and its income represents the fruits of the wrongdoing.

44.    POS strenuously denies this. It denies that its business was tainted by the alleged fraud and says that it acquired its assets (including the equipment used to perform the drilling contract) using its own resources. It says that the Funds represent untainted drawings from the third party bank under the SBLC. As explained above, it has filed a motion seeking the dismissal of the Complaint and the Warrant in the US proceedings. Neither party suggests however that I am in a position to reach any view on the merits of that dispute or the underlying allegations of fraud or money laundering.

45.    There are also issues in the US proceedings as to jurisdiction of the CDC under 18 USC §981(a)(1)(A) and (C).  In broad summary POS contends that the CDC cannot establish subject matter jurisdiction unless and until the relevant property has been seized, and that the CDC lacks personal jurisdiction over Clyde as the case concerns events outside the US. POS accepts that seizure of the property can happen actually or constructively, but that constructive seizure requires the relevant officers with proper authority to bring the property under their control.

46.    The DOJ disagrees. It says that *in rem* jurisdiction of the US Court is founded under 18 USC §981(a)(1)(A) and (C) where a US district court can establish that an act or omission giving rise to the forfeiture has occurred in the district of that court. It also says that the jurisdiction operates *in rem* and says that personal jurisdiction may be established where notice of a warrant is given to a person controlling the property (wherever located) and that this happened in the present case (at least) when Clyde was served with notice of the Warrant at its London offices. These are deep waters, and I was not invited to reach any conclusion about the rival contentions of the DOJ and POS.

47.    POS does however stress that the Warrant has not been domesticated into English law and it therefore has no legal effect under English law. It relies on *USA v Abacha* [2014] EWCA Civ 1291 [2015] for the following propositions (which were not contested before me). First, any order under 18 USC §98 would (under English private international law) constitute a foreign penal order. It would therefore be unenforceable in the United Kingdom in the absence of a statutory exception, leading to domestication of the order. Second, the relevant statutory scheme is exhaustively

contained in the 2005 Order made pursuant to s.444 of the Proceeds of Crime Act 2002 ("POCA"). Third, foreign authorities are not permitted to circumvent that exhaustive scheme by applying directly to the High Court for relief.  Only the NCA can apply to the English courts to "domesticate" a foreign order.  Fourth, the NCA is able to seek an (advance) prohibition order before the foreign agency has obtained a final order from the foreign court. The procedure requires the foreign agency to ask the Secretary of State (who has a discretion) to refer an external request to prohibit dealings with 1the relevant property to the NCA.  The NCA itself has a discretion whether to apply for a prohibition order. The English Court then has to consider whether to grant such an order. There are various statutory requirements before such an order may be made and the English Court has its own discretion.

48.     POS emphasises that the DOJ has not asked the NCA to domesticate the Warrant in the UK. The DOJ has known about the current proceedings since at least 3 November 2020 and the NCA has not made any application. Clyde confirmed that the NCA and the DOJ were aware of the hearing and had taken no steps to intervene.

**Evidence of US law and the risk of prosecution or claims**

49.     I turn to the evidence about US law. These are CPR Pt. 8 proceedings. Neither party applied for permission in advance of the trial to rely on expert evidence of foreign law. I was nonetheless provided with a substantial body of evidence concerning US law and the risks of prosecution.

50.     On 16 November 2020 POS served what was described as an expert report of David Rivkin. Mr Rivkin is one of the lead attorneys for POS in the proceedings before the CDC and his name appears on the documents filed by POS there. He is a partner in the Washington DC office of Baker Hostetler LLP. His report contained a declaration that he had set out his honest opinion and that he understood that he had a duty to the court which overrode any duty to his client, POS. His report (and his later reports) did not state that he had read Part 35 of the CPR or its accompanying Practice Direction. POS did not explain why it had served a report from its own US trial lawyer.

51.     Clyde responded by serving a report dated 16 December 2020 from a retired judge, John Gleeson. Judge Gleeson is independent of Clyde and POS and provided the declarations required by CPR Part 35.

52.     There then followed a second report of Mr Rivkin of 13 January 2021, a second report of Judge Gleeson of 28 January 2021 and a third report of Mr Rivkin of 3 February 2021.

53.     Neither party applied for cross-examination. I therefore did not have the benefit of focused questioning of the witnesses or the opportunity to explore the nuances of their evidence. Both parties said that the court could not reach final conclusions about the US law evidence. But I have to reach some provisional views in order fairly to address the arguments. In doing so I shall follow the approach summarised by the Court of Appeal in *Bank Mellat v HM Treasury* [2019] EWCA 449 to evidence of foreign law at [53], including that (a) the burden is on the party who asserts a proposition of foreign law, (b) the court is not entitled to reject uncontradicted evidence on the basis of its own research, but (c) the court may use its own intelligence and common sense when scrutinising evidence of foreign law.

54. Some general comments may be made about the evidence and reports placed before me. First, Judge Gleeson is independent, while Mr Rivkin is not. Mr Rivkin has no doubt sought to provide a sincere and genuine legal opinion, but experience shows that it is extremely hard for a lawyer engaged in current litigation to provide the detachment and objectivity expected of expert evidence. Some of the points made in his report echo arguments already advanced by POS in the filings in the US proceedings: that is bound to have affected his independence and objectivity. I also note that POS is seeking payment of outstanding legal fees, including more than $2m to its US lawyers. Mr Rivkin's firm therefore has a financial interest in the outcome of this application.

55. Second, Mr Rivkin's close engagement in the litigation is reflected in the contents of his reports and his mode of expression. As to content, Mr Rivkin's first report did not mention the specific provision which creates criminal liability for undermining the forfeiture jurisdiction of the US courts (USC §2232(b)). I found this a surprising omission. It is also striking that he made the unqualified assertion that the CDC lacked *in rem* jurisdiction in respect of the Funds because they had not been brought under the control of the US Court. That seems (at most) an arguable point and it should not have been presented dogmatically. As to expression, Mr Rivkin was at times inclined to resort to advocacy and to state broad, categorical, conclusions. Judge Gleeson's reports are more measured and nuanced. His conclusions are put in terms of risks, not certainties.

56. Third, it appears to me that on the key issue (of the risk of the DOJ bringing a criminal prosecution or proceedings) Judge Gleeson is extremely well qualified. He has worked at the DOJ, as prosecuting Assistant US Attorney, as a US Federal District Judge for over 20 years, and as a lecturer in Complex Federal Investigations at Harvard Law School and Sentencing at New York University School of Law. Mr Rivkin has extensive experience of litigation, but he is not a criminal law specialist and does not appear to me to have the same experience or insight as Judge Gleeson into the prospects of the DOJ bringing criminal or other proceedings against Clyde.

57. I do not think I should take a sweeping approach and prefer Judge Gleeson's evidence to Mr Rivkin's across the board, but these general considerations are nonetheless relevant to my assessment of the reports.

58. The parties agreed that the essential issue for the Court concerning US law is the real risk of prosecution or civil proceedings by the DOJ; not a theoretical risk of a breach of US law (see, by analogy, *Bank Mellat* at [63(iv)]). It is also important to frame the issue properly. The question is not whether a voluntary payment by Clyde carries a real risk of prosecution or proceedings; it is whether payment by Clyde under a compulsory order of the English court (made against Clyde's opposition) carries such a risk.

59. It is necessary to start though by understanding the nature of the in rem forfeiture proceedings under 18 USC §981. The categories of property subject to forfeiture include property deriving from specified criminal offences and property involved in transactions in violation of money laundering statutes or the traceable proceeds of such property. The Amended Complaint of 7 October 2020 alleges that the Funds are "forfeitable as fraud proceeds and because they constitute funds involved in the laundering of the proceeds of funds misappropriated from 1MDB." The Complaint

alleges that acts and omissions giving rise to the forfeiture took place in the Central District of California.

60.  Judge Gleeson advances a number of propositions about the *in rem* proceedings in the CDC:

    i)     The *in rem* jurisdiction is the court's power to adjudicate rights over property.

    ii)    The court's *in rem* jurisdiction depends on the arrest of the property.

    iii)   Service of process is the mechanism by which the court acquires jurisdiction over the *res*.

    iv)   Under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, "[i]f executing a warrant on property outside the United States is required, the warrant may be transmitted to an appropriate authority for serving process where the property is located." In the present case the Warrant was served on Clyde by the NCA as the appropriate authority.

    v)    The subject matter jurisdiction of US federal courts over civil forfeiture proceedings is provided by 28 USC § 1355. This includes at § 1355(b) that federal district courts may adjudicate forfeiture claims over property located in foreign countries. An action may be brought in any district in which any of the acts or omissions giving rise to the forfeiture occurred.

    vi)   It follows that control of the funds, whether or actual constructive, is not necessary to a US Court's *in rem* jurisdiction. Mr Rivkin had suggested in his first report that this was a jurisdictional requirement. He relied on the decision of the Supreme Court case in *Republic Nat'l Bank of Miami v United States,* 506 US 80, 84 (1992). However that case was commenced in 1988, four years before Congress amended 28 USC § 1355 to provide for *in rem* jurisdiction based on acts or omissions occurring in the district, regardless of the location of the *res*.

    vii)  The constitutional limitations that attend the exercise of *in personam* or personal jurisdiction over individuals or other legal persons (such as minimum contacts with the jurisdiction) are therefore inapplicable (see the recent Ninth Circuit decision in *United States v Obaid*, 971 F.3d 1095 (2020)).

61.  Mr Rivkin takes issue with some of this analysis. He contends (in summary) that it is contrary to Constitutional due process protections for courts to assume jurisdiction over a foreign *res* where it would not be able to satisfy the requirements for personal jurisdiction. It seems to me that while there may be tenable arguments of the kind outlined by Mr Rivkin I am far from being able to conclude that they will prevail. Judge Gleeson refers to the recent decision of the Ninth Circuit (*Obaid*) that the constitutional requirements of minimum contacts with the forum were inapplicable to *in rem* forfeiture actions. I have concluded that it is (at least) well arguable that under US law the CDC has *in rem* jurisdiction over the Funds by reason of the service of the Warrant on Clyde by the NCA as the appropriate authority.

62.     Judge Gleeson's evidence concerning the risks to Clyde of a criminal prosecution concentrates primarily on USC §2232(b). He says that the DOJ could also potentially bring proceedings for obstruction of justice, criminal contempt, conversion or civil contempt. But since he does not appear to regard the chances of those other proceedings higher than the risk of a prosecution under §2232(b), a conclusion that the risk of prosecution under that provision was remote or merely hypothetical would also apply to the other candidate proceedings. I shall therefore focus on the risks of a prosecution under that provision.

63.     §2232(b) provides:

> "Whoever, knowing that property is subject to the in rem jurisdiction of a United States court for purposes of civil forfeiture under Federal law, knowingly and without authority from that court, … disposes of, transfers, or otherwise takes any action, or knowingly attempts to … dispose of, transfer, or otherwise take any action, for the purpose of impairing or defeating the court's continuing in rem jurisdiction over the property, shall be fined under this title or imprisoned for not more than 5 years, or both."

64.     Judge Gleeson says that there is a real risk of the DOJ seeking to prosecute Clyde under this provision. He refers to the actual threats of criminal prosecution made by the DOJ's attorneys to Clyde's attorneys in November 2020 (as recorded in Mr Roth's statement). He says that §2232(b) was specifically enacted to prohibit knowing disposal of property the subject of a forfeiture action (including civil forfeiture). He says that there is an unresolved debate about the extraterritorial reach of the provision but points to an earlier Ninth Circuit decision (*U.S. v Peterson*, 812 F.2d 486, 495 (9th Cir.1987)) which held that another part of §2232 was applicable to acts outside the US. He also refers to the extraterritorial application of other statutes in analogous statutory frameworks.

65.     Judge Gleeson says that an order of an English court requiring the payment of the monies into court might provide Clyde with legal and factual defences but that the position is not clear and that, in any case, there may still be a prosecution. A transfer of the Funds by Clyde into the English Court would arguably impair or defeat the CDC's jurisdiction over the *res* and if Clyde did that knowingly (and without authorisation from a US court) that would arguably fulfil the *mens rea* of the offence. He points out that the mere fact of prosecution for federal money laundering offences could be very damaging for a law firm. He also notes when considering the prospects of a prosecution that Clyde is a global practice. Judge Gleeson draws on his experience as a district judge and prosecutor and concludes that Clyde faces a real risk of prosecution if it transfers the money even including under compulsion of an order of an English court.

66.     The maximum sentence for a violation of §2232(b) is five years. Judge Gleeson says that the DOJ has a policy of prosecuting individuals, so that any person in Clyde responsible for effecting a transfer of the Funds would potentially be open to prosecution. The potential fine for a breach of the section is double any amounts paid to POS.

67.     Mr Rivkin says that there is no risk of a prosecution under the section. He points out that there appears to be no case (concerning an alleged domestic or international

infraction) in which the section has been addressed. He then says, more specifically: first, that the CDC has no jurisdiction over Clyde in respect of the forfeiture proceedings; secondly that §2232(b) is not extraterritorial in its reach; and, thirdly, that there is no prospect of Clyde having the necessary *mens rea* under the section if it pays the money into court under the compulsion of an order of a foreign court where the *res* is located.

68.     Mr Rivkin draws attention to the case of *Reebok int'l v McLaughlin,* 49 F.3d 1387 (9th Cir. 1995) where the US Court of Appeals for the Ninth Circuit held that a Luxembourg bank was not in contempt of a US restraint order freezing the assets of one of its customers where the Luxembourg court had ordered the bank to pay the customer. He says that the case shows that the US courts will not treat foreign third parties acting under orders of their local courts as breaching US laws.

69.     He also gives practical reasons for concluding that there is no real risk of a prosecution: prosecutors have an ethical obligation not to bring prosecutions without a proper foundation and that there are higher thresholds before the DOJ will prosecute lawyers.

70.     Judge Gleeson has responded to these points. He maintains his opinion that Clyde would face a real risk of prosecution or other proceedings if it parted with the Funds.

71.     I have already set out my provisional views about the *in rem* jurisdiction of the US courts.  In my view they show that it is (at least) seriously arguable that the US Court has jurisdiction over *in rem* forfeiture proceedings where the events said to give rise to the forfeiture claim arise within the district of the relevant court and the holder of the *res* (wherever that holder is located) is served with an arrest warrant; at that point the Court has jurisdiction over the person so notified. It is also (at least) well arguable that actual or constructive control of the *res* by the US Court is not required.

72.     As to the extraterritorial effect of §2232(b), Judge Gleeson has restated his view that the position is unresolved. There is no decision on the point, but he says that such authority as there is on related provisions (including other parts of §2232) suggests that the statute may well have effect in respect of acts outside the US.  I conclude again that the point is at least seriously arguable.

73.     There is then the *mens rea* requirement under §2232(b). As I have said, Mr Rivkin says that Clyde would not have the necessary *mens rea* if it acted under the compulsion of an English Court's order. Judge Gleeson says that an order of foreign court might provide Clyde with a defence but does not remove the prospects of a prosecution. His view (as I understand it) is that the *status quo* is that the US Court has (at least arguable) *in rem* jurisdiction over the Funds (by being identified in the Warrant and the Warrant being served on Clyde) and that its jurisdiction would (arguably) be impaired if Clyde transfers the Funds to any other person.  He says that an order of the English Court might provide Clyde with a defence but that would turn on the application of international comity. He refers to a number of statements in the US authorities showing, first, that the concept of comity is of uncertain application and, secondly, that it will not apply where it would cut across an important public policy of the US jurisdiction.  He concludes that payment in accordance with an order of the English court might provide Clyde with good defences but that it does not remove the risk of prosecution.

74.     Judge Gleeson notes that the decision in the *Reebok* case was that the Court lacked personal jurisdiction over the Luxembourg bank. It does not, he says, establish a general principle that obedience by a foreign national of an order of his local court will exempt him from suit. He also observes that *Reebok* was an application for contempt of a restraining order in civil proceedings and was not concerned with a criminal prosecution under §2232(b). He explains that the requirements for personal jurisdiction in civil proceedings do not apply to criminal prosecutions.

75.     It may also be observed that *Reebok* did not concern *in rem* proceedings.  I have already explained that I consider it is (at least) well arguable that jurisdiction in such cases does not engage the criteria needed to establish personal jurisdiction.

76.     As to the various practical factors, Judge Gleeson accepts that prosecutors are bound by ethical requirements and that the DOJ does not prosecute lawyers lightly. But he also refers to many cases of which he personally aware in which lawyers have been prosecuted.

77.     Mr Rivkin has produced a third report in which he takes issue with Judge Gleeson's evidence on each of the principal points. It is however in the nature of more argument. While it provides a forceful counterpoint to Judge's Gleeson's views, there are to my mind no conclusive points.

78.     POS submits that Judge Gleeson devotes the bulk of his reports to the risks to Clyde if it makes a voluntary payment to POS, rather than payment into the English Court pursuant to a mandatory order of the English Court. There is some force in that submission. But there is no doubt that Judge Gleeson appreciates the order POS now seeks, and he has maintained his view in his second report that any transfer of the Funds away from Clyde would create a risk of prosecution. Reading his evidence as a whole, Judge Gleeson's view is this: (a) the US Court claims jurisdiction over the Funds (by reason of the issue of the Warrant and its service through official agencies on Clyde); (b) any transfer by Clyde of the Funds would raise a real risk of prosecution under §2232(b) on the footing that the transfer would impair the jurisdiction of the US Court over the Funds; (c) the risk of prosecution by the DOJ might be reduced (by reason of comity), but would not be removed, by a mandatory order of the English Court, and (d) the risk would not be removed either by payment into Court as opposed to POS directly. Therefore, he says, even in this scenario (payment into court under a mandatory order) there remains a real risk of prosecution.

79.     In assessing the risk of a prosecution or other proceedings by the DOJ I have to consider the factual evidence too. The DOJ has threatened prosecution or proceedings against Clyde if it pays the Funds to POS. The DOJ has also said that it cannot consent to a payment into Court. As POS observes, Mr Roth's evidence does not specifically address what would happen if Clyde paid the money into Court under a compulsory order of the English Court.  POS submits that the threats are therefore irrelevant.  I would not go that far.  The threats were made at a stage when Clyde and the DOJ were discussing the prospect pf payment to POS.  But what the evidence shows is that the DOJ, as the prosecuting authority, regards the preservation of the Funds in the hands of Clyde as (a) justified by the Warrant it has served on Clyde and (b) as sufficiently serious to warrant a threat of prosecution. It is true that it has not specifically threatened Clyde if it pays the money into court under a court order, but I

still think that the DOJ's general threats of prosecution must be given some weight. I also take account of Clyde's position as a global firm with a presence in the US.

80.    I also note that the DOJ expressly referred to §2232(b) in its 7 December 2020 application against POS for a protective order.  The DOJ made that application as a response to the current proceedings (which seek mandatory orders against Clyde for payment of the Funds to POS or into court).  Hence the reference to §2232(b) was made in a context where the DOJ knew that any payment by Clyde would only be made pursuant to an order of this Court.

81.    I also have borne in mind Gross LJ's observation in *Bank Mellat* at [63(vi)] that considerations of comity potentially affect not just the decisions of the foreign Courts but also those of prosecutors.  However it is also the case that this court has no means of supervising or reviewing the decisions of the DOJ.

82.    As I have said, neither party asked me finally to resolve the differences between Mr Rivkin and Judge Gleeson. Indeed both parties argued that was not possible. I have nonetheless to reach a provisional view about the risk of prosecution or liability based on the totality of the evidence.

83.    POS submits that, if any conclusion is to be reached on the rival cases, Clyde has not discharged the burden of proving that it will be subject to sanction or penalty in the US by complying with an order to pay the Funds into Court. Clyde also notes that Judge Gleeson accepts that Clyde will have legal and factual arguments to deploy in its defence to any proceedings under §2232(b) but says that "there is no guarantee it will prevail on them". It submits that, equally, there is no guarantee it will not prevail on them and says that there is therefore no reason to believe Clyde faces a real risk of liability.

84.    I agree with POS that there is no guarantee that Clyde's defences will not prevail. However the question is not whether Clyde would be bound or even likely to defeat a prosecution; it is whether there is a real risk of a prosecution being brought. Clyde does not seek to show that "they will be subject to sanction or penalty in the US". What it seeks to show is that there is a real – i.e. actual – risk of prosecution in the US.

85.    I have concluded on the totality of the factual and expert evidence that while the risk of prosecution is perhaps not high, there is a real (as opposed to theoretical or remote) risk that the DOJ will prosecute Clyde if it parts with the Funds, even into the English Court under a compulsory order (the making of which Clyde has opposed). I am persuaded by the evidence of Judge Gleeson, who has great experience in this area, that there is a such a risk of prosecution. He says in essence (and I accept) that an order of the English Court for the sums to be paid into the English Court might dissuade the DOJ from prosecuting, or a court from convicting, but there remains a real risk of prosecution. I have also borne in mind throughout that Clyde has the onus of proof.

86.    In the light of this conclusion (and since Judge Gleeson appears to rank the risk of prosecution under §2232(b) as higher than that under the other heads) there is no need separately to consider the other heads of potential liability discussed in his reports.

**The financial position of POS**

87.    The evidence on this issue is given by Mr Kerman, POS's solicitor. He does not provide details of his sources of information (such as the directors or management of the company).

88.    Mr Kerman says POS remains active but is not trading.  It is not clear from the evidence when it ceased trading. Mr Kerman said in his first statement of 17 November 2020 that, without access to the Funds, it is unable to pay its necessary ongoing costs. He gives various heads of running costs including audit and accountancy fees, bank charges, establishment costs, labour, taxes, insurance, travel, compliance, and general legal fees. There is no breakdown of these costs, no information about the number of employees, and little to say what they are doing. In his first statement he says that Clyde's refusal to release payments for the running costs jeopardises POS's ability to remain solvent.  In his second statement of 3 February 2021 he says that if it is unable to pay its business expenses or its legal costs it will become insolvent and cease to exist. There is though no evidence about creditors taking or threatening legal or winding up proceedings against POS.

89.    Mr Kerman also says that POS is very substantially prejudiced by not being able to pay its legal fees to defend and vindicate its rights in the ongoing proceedings (including in France, Malaysia and the US).  He says that this puts it at risk of adverse judgments. In his second statement he puts the outstanding fees (up to 3 February 2021) at more than $2.5m.  He says that if an order is not made it will inevitably lead to the end of POS and would stifle its defences.

90.    On the basis of the evidence I conclude that POS has substantial unpaid creditors and that unless some part of the Funds are released it will not be able to pay those creditors.  I also conclude that it is likely to be prevented from defending or vindicating its rights in the various proceedings in which it is engaged.

**The powers of the English Court: general considerations**

91.    POS bases its claim on the jurisdiction of the Court over Clyde as a bare trustee. It seeks an order bringing the trust over the Funds to an end and requiring its payment into court; coupled with orders for payment out court of the amounts needed to meet its business expenses and legal fees.

92.    The claim form referred to various provisions of the Trustee Act 1925 but POS ultimately sought these orders under (a) the inherent supervisory jurisdiction of the Court over trusts and (b) the case management powers of the court to determine any question arising in the execution of a trust under CPR 64.2(a)(ii), including the specific powers to make an order requiring a trustee to pay money into court that it holds on trust (PD64 para 1(2)(a)(ii)) or to do any particular act (PD64 para 1(2)(a)(iii)). POS submits that the Court has a broad and flexible discretion under one or other head to make such order as it considered just. It argues that the court should follow the approach shown in *Bank Mellat*, where the risk of foreign prosecution or proceedings was one factor to weigh in the overall balance.

93.    Clyde accepts that it holds the Funds on trust for POS and that the Court has an inherent supervisory jurisdiction over trusts. It emphasises however that the terms on

which it held the Funds included the terms of the escrow agreement and that these terms provide an answer to the claim. It says in the alternative that, to the extent the matter falls under the court's inherent supervisory jurisdiction, the court should not order Clyde to pay the Funds into court.

**The escrow agreement**

94.     I start with the escrow agreement. Clyde submits that the agreement is either conclusive or at least highly material to the exercise of the discretion. POS submits that it has no continuing application or, if it does apply, should have little weight in the Court's discretion.

95.     I have already set out the relevant terms of the agreement. Clyde relies first on the protective provisions of (i) clause 5.11 (which allow it before ordering payments to be satisfied in connection with all applicable laws and regulations), and (ii) clause 6.12 (Clyde shall not be required to take any action if it determines, in its sole discretion, that such action would or might: (a) be contrary to any applicable law or regulation in any jurisdiction; or (b) render Clyde liable to any other person). It says (inter alia) that these provisions give Clyde a contractual right to refuse to make any payments if to do so would expose it to the risk of proceedings or prosecution.

96.     Clyde relies, second, on the exclusion of liability and POS's waiver of rights against Clyde contained in clauses 6.2 and 6.3 respectively. Clyde says specifically that by clause 6.3 POS has waived its right to apply to Court for relief, including that claimed in the present proceedings.  It says that the claim should be dismissed on this basis.

97.     POS submits: first, that the escrow agreement ceased to have any effect at the moment the tribunal issued its final award; secondly and alternatively, that the agreement does not preclude or prevent the present claim or the exercise of the court's inherent jurisdiction over trusts; and, thirdly, that the agreement has no material bearing on the exercise of the court's discretion.

98.     The first issue is whether the escrow agreement ceased to have effect when the tribunal issued its final award.  If it did there is no need to consider its detailed terms.

99.     POS emphasises that the escrow agreement was ordered by the tribunal. It was instituted for the purposes of the arbitration and Clyde was required to abide by any award made by the tribunal.  The agreement also said that its terms could be varied by the tribunal.  An arbitration tribunal becomes functus at the moment it issues its final award.  In that award it ruled that the escrow monies to be paid to POS.  There was nothing more to be done in the arbitration.

100.    POS says next that some of the terms of the agreement, including the tail-end of clause 6.12 cannot operate after the final award as they presuppose the continuing existence of the tribunal.  This shows, POS says, that the parties did not intend the agreement to persist beyond the final award.

101.    POS also relies on some passages in the judgment of Sir Alastair Norris.  At [47] and [54] he explained that the escrow account (which was dependent on the contingency of the final award) came to an end at the time of the final award.

102.    POS says that the tribunal deliberately catered in its final award for the fact that the protections given to Clyde in the escrow arrangement were coming to an end. This is why in the final award it instructed Clyde "subject to its regulatory, statutory and legal obligations and other constraints" - to transfer the balance to POS.

103.    Clyde submits that the escrow agreement survived the final award. I have taken its submissions into account in reaching the conclusions I have reached below.

104.    I cannot accept POS's submissions on this issue. In my view the escrow agreement continued in existence after the issue of the final award for seven reasons.

105.    First, Clyde was not a party to the arbitration and only became bound to act as escrow agent by agreement.

106.    Second, the language of the agreement requires acts to take place after the final award: most importantly payment of the sum to the winning party, which was bound to occur after the award was made. The question may be tested by supposing that the award had been made in favour of PDVSA. The tribunal would (as is common ground) have been functus. But it would not have been open to Clyde simply to ignore the agreement and pay the escrow account monies to POS (despite it providing the monies in the first place).

107.    Third, I can see no reason to read down the contractual protections contained in clauses 5.1 and 6.12 as applying only until the moment of the final award.  The words do not suggest any such limit and it would be commercially surprising if they did not operate at the time they were likely to be most material (i.e. when payment of the award was required).

108.    Fourth, the exclusion, waiver and indemnity provisions in clauses 6.2 and 6.3 are also naturally to be read as continuing after the issue of the final award.  This is perhaps clearest with the indemnity provision, which also affords Clyde a right of retention. It would be most surprising if that right of retention (which was included for Clyde's protection) should dissolve on the date of the final award.

109.    Fifth, the terms of the agreement that refer to the tribunal (e.g. clause 6.12) are still workable even after the tribunal has become functus.

110.    Sixth, the judgment of Sir Alastair Norris does not assist on this issue. In the relevant passages he was addressing the argument of PDVSA that the escrow arrangements should be read as continuing until the conclusion of all challenges to the final award or that a term should be implied to that effect.  He concluded that there was no room for that reading or implication.  He expressed that in shorthand by saying that the escrow account did not survive the final award. He did not suggest that the escrow agreement itself came to an end at that moment. He was not asked to address the issue whether the protections provided to Clyde under the escrow agreement terminated at that moment and there is nothing in the judgment to support POS's contentions that they did.

111.    Seventh, there is to my mind nothing in POS's argument that the wording of the final award superseded those contractual protections.  The wording of the final award was intended as a shorthand reference to those protections, not a replacement for them. In

any case the terms of the award cannot to my mind affect the interpretation of the (earlier) agreement.

112.     It follows that Clyde continues to have the benefit of the contractual protections in the escrow agreement. It is well-established that in a commercial context the obligations and rights of a trustee may be governed or conditioned by the contractual arrangements between the parties. Clyde submits and I accept that the protections contained in the escrow agreement are (at least) an important factor to take into account when it comes to the exercise of any discretion.

113.     Clyde goes further. It says that the terms of clause 6.3 of the escrow agreement preclude the present application to the court. It says that POS has waived its right to seek any relief against Clyde absent fraud or wilful misconduct on the part of Clyde. It says that clause 6.3 is in very broad terms (referring to "any rights") and that the clause must mean something more than liabilities as those are excluded by the previous clause. It says that one of the "rights" that has been waived is the right to apply to the court for an order for payment of the Funds.

114.     I am unable to accept this submission for two reasons. The first is that, if Clyde were correct, it would effectively be free from any obligations under the agreement. Clyde says that an outright refusal to perform would fall within the proviso for fraud or wilful misconduct. But on a natural reading of the clause the proviso is part of the indemnity, not the waiver of rights.

115.     Second, even if it were legally possible to oust the supervisory jurisdiction of the court over trusts (which must be doubtful), it would take very clear words to achieve that and, to my mind, they are lacking here. I do not think that a reasonable reader would give the clause such a broad interpretation.

116.     For these reasons I conclude that there is no conclusive contractual bar to POS making the present application. However, as I have said, the contractual protections that POS has agreed with Clyde are relevant to the exercise of the Court's discretion.

117.     I should also say something at this stage about the interpretation of the protective clauses. It appears to me that the clause of most relevance is clause 6.12 and I shall focus on that provision. It provides that Clyde shall not be required to take any action if it determines, in its sole discretion, that such action would or might: (a) be contrary to any applicable law or regulation in any jurisdiction; or (b) render Clyde liable to any other person. Clyde contended (and there was no contrary argument) that the clause gives it a discretion to reach a good faith determination as long as it did not act arbitrarily, capriciously, perversely or irrationally (see e.g. *Socimer International Bank Ltd v Standard Bank London Ltd (No 2)* [2008] EWCA Civ 116 at [66]). I agree with that reading.

**The Court's powers to remove Clyde and order payment into Court**

118.     I turn next to the powers of the court to remove Clyde as trustee and require it to pay the Funds into court. There was no dispute between the parties (other than Clyde's argument that there was the contractual bar) that the Court has jurisdiction to make such orders under its inherent jurisdiction and/or the provisions of the CPR 64. The parties referred in this regard to *Lewin on Trusts* at [14-1074], [39-007] to [39-079];

and [39-111] to [39-126].  They also referred to the discretion of the court to make case management orders such as disclosure orders where compliance with the order will give rise to a risk of prosecution under foreign law – as illustrated by *Bank Mellat* and the various authorities referred to by the Court of Appeal in that case.

119.    Those cases are concerned with procedural steps in English litigation, such as the disclosure of documents, where a party who would normally be required by the order under English procedural law (as the *lex fori*) seeks to resist the order on the grounds that to do so would or might lead to foreign prosecution. The issue is how far the procedures of the forum should accommodate the risk of foreign prosecution; with the ultimate touchstone being procedural fairness under the *lex fori*. The present case also invokes the powers of the Court (including those set out in CPR 64), but in my view the exercise of the powers invoked here must also recognise and pay proper weight to the substantive rights and obligation of the parties under English trust law.

120.    One such principle of trust law is that a trustee is not obliged to expose himself to a (real and not fanciful) risk of liability. He is not for instance required to distribute funds where there is a risk that he will fall under a liability to a third party creditor or claimant (see e.g. *Lewin* [24-038]).  Similarly, a trustee may make a retention out of trust assets sufficient to protect him against any prospective or contingent liability which he has incurred in trust, though only if the risk is more than merely fanciful (see e.g. *Lewin* [24]-039]).

121.    I turn to consider the exercise of the discretion. I should start with a point that POS describes as "key": namely that Clyde has indicated that it no longer wishes to act as trustee and wishes as soon as possible to be released from any continuing responsibilities. That is true so far as it goes but gives only part of the picture. Clyde accepts that it would prefer the arrangements to be brought to an end if it could also be absolved from all risk. It makes no claim to the Funds and has no wish to prevent POS paying its creditors or lawyers. It wants to see a solution. But it does not want the trust to come to an end in the way proposed by POS: namely transferring the Funds from its hands and thereby exposing Clyde to (what it says is) the risk of criminal prosecution or civil liability. Clyde is in a bind which it did not create and from which it would like to be released.  But that is to state its predicament, not provide the answer.

122.    The parties respectively rely on a number of discretionary factors.

123.    POS submits first that the Funds are held for it alone and (other things being equal) it is just and fair that it should have access to them. That is true, but the question is the weight to be given to the other things.

124.    POS submits next that it is on the brink of imminent of insolvency and that unless it is able to make the payment to its creditors and lawyers, it will cease to exist. I take this to mean that it will be wound up. I have addressed the evidence above. In summary, POS is not currently trading but has running costs and legal expenses. There is no evidence of creditors actually seeking to wind it up. On the other hand it has substantial unpaid creditors and outstanding legal fees. It has explained that it will be prevented from defending proceedings and that this may lead to adverse judgments. These considerations firmly favour the order being sought (other things being equal).

125.    The main counterbalancing factor is the risk to Clyde of parting with the Funds. I have already addressed the evidence in detail above. I have reached the conclusion that there is a real risk of prosecution if Clyde parts with the Funds (even under an order of this Court for payment into court).

126.    Clyde says that the risks it faces should be given great (it would say decisive) weight. It relies on the terms of the escrow agreement, which entitle Clyde not to act (including on an instruction to transfer the Funds) if it determines that there is a risk of breach of a law or of liability to any person. The agreement also provides Clyde with a right of retention against contingent liabilities.  It also relies on the general principle of trust law that a trustee is not required to do anything which would expose it to a real (as opposed to fanciful) risk of liability.  The risk here is of prosecution for a serious offence.

127.    In my judgment Clyde's rights as a trustee under the general law (as reflected in the escrow agreement) weigh heavily against the orders sought by POS. Clyde's predicament is not of its own making. The Court is (on my provisional findings about risk of prosecution) being asked to deprive a trustee of its general law rights (bolstered here by the contractual protections) and expose it to a real risk of prosecution for a serious offence. I find it hard to conceive of circumstances which would justify that course.

128.    POS says next that the Warrant is of no legal effect in the UK unless and until it is domesticated by the NCA. It is a matter for the NCA to apply to the Court under POCA and the 2005 Order. Even then, the Court does not automatically grant such applications. It must be satisfied that the property is the proceeds of crime and amounts to recoverable property. The NCA has taken no such steps.  Indeed at an earlier stage (in August 2020) it did not object to POS making payments for its legal fees and business expenses. This is all correct.  But it provides no comfort for Clyde. Clyde's predicament has nothing to do with the legal status or otherwise of the Warrant before this Court. It arises from the risk of prosecution by the DOJ in the United States. If there is a risk of prosecution it is not affected by the decision of the DOJ or NCA not to bring protective proceedings here.

129.    POS says next that there is no finding that the Funds are the proceeds of crime. Again, while that is so, it gives Clyde no comfort.

130.    POS submits that the statutory scheme in England and Wales in the POCA and 2005 Order is mandatory and exhaustive.  It says that the DOJ will effectively be able to circumvent the statutory regime by threatening Clyde with proceedings, and would, in effect, have achieved the domestication of the Warrant, without having complied with the necessary mechanisms for doing so in this jurisdiction. POS says that a refusal to make the order would amount to giving primacy to foreign law, which is anathema to English Courts (see *Brannigan v Davison* [1997] AC 238. I have sympathy with POS's frustration. DOJ has threatened Clyde with criminal process rather than taking the steps open to it to domesticate the Warrant under the statutory scheme (with all the protections for respondents in the position of POS that process entails). There is also force in POS's point that the DOJ is in practice achieving through the backdoor what it is unwilling to seek through the front. But the present question is whether to require Clyde to part with the Funds. This Court has no power of review over the

DOJ's decisions, and it cannot fully insulate Clyde from the risk of prosecution by making the order sought (or related declaratory relief).

131.    POS next observes that payment into Court with a mechanism to ensure monthly payments out to cover business and legal expenses would effectively reinstate the scheme in place prior to October 2020, pursuant to the Malaysian Order and order the Trower J. Again that may be so, but again it does not provide any protection to Clyde. The US authorities are not bound by the Malaysian order.

132.    POS says next that payment into Court would not prejudice anybody. It says that the DOJ or NCA are not prejudiced as they have decided not to domesticate the Warrant. It would be open to the NCA hereafter to seek to domesticate the Warrant by claiming the monies in the Court Funds Office. This again may be so, but Clyde's predicament arises from the risk of prosecution. I am not concerned with an application as between POS and the DOJ (or the NCA). I am dealing with an application to require Clyde to transfer the Funds.

133.    POS also submits that, by asking for its ordinary expenses and legal fees, it is not asking for anything out of the ordinary. It was granted by Trower J and in the (revised) Malaysian order. Maintenance payments of this sort are standard where, e.g., parties are subjected to freezing injunctions. Further, if the NCA successfully applied to domesticate the Warrant in this jurisdiction by way of a restraint order, the 2005 Order gives the Court a discretion to permit exceptions for reasonable living expenses and legal expenses, as well as sums required to enable that person "to carry on any trade, business, profession or occupation." Again, this is all correct. But again it does not provide protection to Clyde (for reasons I have already given and shall not repeat). What I shall repeat is that the exercise I am engaged with is not between POS and the DOJ or NCA. It is an application to require Clyde to part with the Funds.

134.    For its part, Clyde argues that it is open to POS to correspond directly with the DOJ and seek a variation of the Warrant (or a supplementary order of the CDC) which would entitle it to payments for maintenance and legal expenses. The DOJ has also stated in its briefings in the US proceedings that POS could make such an application. POS says that it would have to apply to the CDC, and that would run the risk of submitting to that Court's jurisdiction, so as to prejudice POS's reservation of personal jurisdictional rights.

135.    To my mind there is force in Clyde's submission for three reasons. First, I am not persuaded on the evidence that POS has taken all steps available to it to agree a way of making such an application while preserving its jurisdictional reservations. There is nothing to show that it has invited the DOJ to agree such a process. It may therefore be possible for POS to find a route to making such an application without losing its reserved personal jurisdictional rights. Secondly, it appears from POS's own filing in the US proceedings that it accepts that there is Ninth Circuit authority against its jurisdictional challenge (the *Obaid* case). Thirdly, and in any event, while POS would no doubt prefer to preserve all of its arguments including as to jurisdiction, the suggested procedure may provide a route (though imperfect) for it to procure the payment of its expenses and fees. It seems to me that if there is a price to be paid by any party it should fall on POS rather than Clyde.

136.    POS submitted that the existence of the power of the US court to allow the payment
of creditors costs and legal fees was a point in its favour: it said that it showed again
that there would be no prejudice to the DOJ if this court were to make an order
allowing for the payment of these expenses now.  I do not accept this submission.  As
I understand it the US court has a power but not an obligation to allow such payments;
whether they would actually be allowed would be a matter for the CDC on the
particular facts.

137.    I have to make an overall evaluation in the light of all the relevant factors. I have
reached the conclusion that I should not make the orders sought. I have sympathy for
POS's wish to pay its creditors and meet its outstanding legal fees. It will be very
seriously damaged by not being able to do so and may indeed be forced into
liquidation. But, as I have explained above, Clyde, as a trustee, is not required to
expose itself to (non-fanciful) risks of personal liability. I have concluded that there
would be a real, in the sense of actual, risk of criminal prosecution by the DOJ if
Clyde were to part with the *res* identified in the Warrant (including if ordered to pay
the property into Court). I do not think that the various factors relied on by POS
(including its financial predicament and the failure of the DOJ to domesticate the
Warrant) are sufficiently weighty to override the contractual and general law self-
protective rights of Clyde as the holder of the Funds. Nor am I satisfied that POS has
taken all the steps open to it to procure payment of its expenses and legal fees from
the CDC. I am not persuaded that it has fully explored the possibility of making an
application to the CDC without acceding to that court's jurisdiction. In any event if
one party or the other to this action should have to pay a price for the release of the
monies, it seems to me the it should be POS rather than Clyde.

138.    For these reasons I have decided that I should not, in the current state of affairs, grant
the relief claimed by POS.

139.    I add two end-notes. The first is that I considered whether it might be possible to
protect Clyde from the risk of prosecution by ordering the payments of the Funds into
court but giving the DOJ and the NCA an opportunity to make submissions before
any order was made for payment out of Court to POS. I invited written submissions
from the parties. Both parties opposed this course.  POS argued that its financial
position was precarious and that the DOJ/NCA has had every opportunity to intervene
already. It reiterated that the Warrant was of no legal effect under English law. It
repeated its arguments that Clyde did not face a real risk of prosecution. For its part,
Clyde submitted that the suggested course would not insulate it from the risk of
prosecution; it would still face substantially the same risks. It also said that the
DOJ/NCA knew of the proceedings and had not intervened in them. In the light of the
parties' submissions I have decided not to adopt this route.

140.    The second is that shortly before I was about to circulate this judgment to the parties
in draft I received a letter dated 18 February 2021 from Mr Sohn, an attorney at the
DOJ. He invited the Court to defer ruling on this matter pending the decisions of the
US Court on the various applications and made various other comments about this
application. POS objected in written submissions to the admission of the DOJ's letter.
It observed that the DOJ has not sought to become a party to this proceedings or
request assistance under the 2005 Order. Nor has the NCA sought to intervene in
these proceedings. In agreement with POS I have decided not to defer this judgment
pending the decision of the US court.