1  Scott J. Fishwick (CA SBN 308661)
   sfishwick@bakerlaw.com
2  BAKER & HOSTETLER LLP
   11601 Wilshire Blvd., Ste. 1400
3  Los Angeles, CA 90025
   Telephone:  310.820.8800
4  Facsimile:   310.820.8859

5  David B. Rivkin, Jr. (*pro hac vice*)
   drivkin@bakerlaw.com
6  BAKER & HOSTETLER LLP
   1050 Connecticut Avenue, NW
7  Washington, D.C. 20036
   Telephone:  202.861.1500
8  Facsimile:   202.861.1783

9  (additional counsel listed after caption)

10 *Attorneys for Claimant*
   *PetroSaudi Oil Services (Venezuela) Ltd.*

11

12            **IN THE UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14                  **LOS ANGELES DIVISION**

15 UNITED STATES OF AMERICA,            Case No.: 2:20-cv-08466-DSF-PLA
                                        Hon. Dale S. Fischer
16
              Plaintiff,
17                                      **CLAIMANT PETROSAUDI OIL**
    v.                                  **SERVICES (VENEZUELA)**
18                                      **LTD.'S NOTICE OF MOTION**
                                        **AND MOTION TO DISMISS**
19 ALL FUNDS HELD IN ESCROW BY          **VERIFIED SECOND AMENDED**
   CLYDE & CO. (OR SUCCESSOR            **COMPLAINT** *IN REM*;
20 INSTITUTION) IN THE UNITED           **MEMORANDUM OF POINTS**
   KINGDOM AS DAMAGES OR                **AND AUTHORITIES IN**
21 RESTITUTION IN *PETROSAUDI v.*       **SUPPORT**
   *PDVSA* UNCITRAL ARBITRATION,
22                                      Hearing Date: May 17, 2021
                                        Time: 1:30 p.m.
23            Defendant.                Judge: Hon. Dale S. Fischer
                                        Courtroom: 7D
24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  OF COUNSEL:

2  Lee A. Casey (CA SBN 119568)
   lcasey@bakerlaw.com
3  Mark W. DeLaquil
   mdelaquil@bakerlaw.com
4  Jonathan R. Barr (*pro hac vice*)
   jbarr@bakerlaw.com
5  Elizabeth Price Foley
   efoley@bakerlaw.com
6  Kendall E. Wangsgard
   kwangsgard@bakerlaw.com
7  BAKER & HOSTETLER LLP
   1050 Connecticut Avenue, NW
8  Washington, D.C. 20036
   Telephone:  202.861.1500
9  Facsimile:   202.861.1783

10 Jonathan B. New (*pro hac vice*)
   jnew@bakerlaw.com
11 BAKER & HOSTETLER LLP
   45 Rockefeller Plaza
12 New York, NY 10111
   Telephone:  212.589.4200
13 Facsimile:   212.549.4201

14 *Attorneys for Claimant*
   *PetroSaudi Oil Services (Venezuela) Ltd.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.......................................... 1

RELEVANT ALLEGATIONS ................................................................. 1

LEGAL STANDARD .......................................................................... 6

ARGUMENT.................................................................................... 7

    I.      THE COURT LACKS SUBJECT MATTER JURISDICTION .......... 7

          A.    The Prior Exclusive Jurisdiction Doctrine Controls................... 7

               1.    These Actions are "*In Rem*" ........................................... 8

               2.    28 U.S.C. § 1355(b) Did Not Displace the PEJ ............. 10

          B.    There is No Case or Controversy Without Control of the *Res*............................................................................... 10

    II.     PERSONAL JURISDICTION OVER PSOSVL............................... 12

    III.    THE SAC FAILS TO ALLEGE THAT THE *RES* IS TRACEABLE TO PROPERTY INVOLVED IN FRAUD OR MONEY LAUNDERING.................................................................. 13

          A.    The SAC Fails to Plead the Basic Facts Necessary to State a Claim...................................................................... 13

               1.    The SAC Fails to Adequately Allege a Connection Between Alleged Fraud and the *Saturn* Contract Arbitration ........................................................ 13

               2.    Allegations Relating to Mr. Obaid Do Not Save the SAC ................................................................ 18

          B.    Section 981(a)(1)(C) is not Satisfied as the FAC Fails to Allege Direct Tracing to an SUA ............................................. 19

          C.    Section 981(a)(1)(A) is not Satisfied as the SAC Fails to Allege Tracing to Property Involved in a Money Laundering Offense ..................................................................... 22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.    INTERNATIONAL COMITY WARRANTS DISMISSAL..............24

CONCLUSION....................................................................................25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

CLAIMANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT          2:20-CV-08466-DSF-PLA

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................................... 7, 23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................. 7

*Blantz v. Calif. Dep't of Corr. & Rehab.,*
  727 F.3d 917 (9th Cir. 2013) .......................................................... 7, 17

*BMA LLC v. HDR Glob. Trading Ltd.,*
  No. 20-cv-03345, 2021 WL 949371 (N.D. Cal. Mar. 12, 2021) ....................... 17

*Cetacean Comm. v. Bush,*
  386 F.3d 1169 (9th Cir. 2004) ........................................................ 11, 12

*Chapman v. Deutsche Bank Nat'l Trust Co.,*
  651 F.3d 1939 (9th Cir. 2011) ............................................................... 7

*Contents of Acct. No. 03001288 v. United States,*
  344 F.3d 399 (3d Cir. 2003) ................................................................. 11

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.,*
  960 F.3d 549 (9th Cir. 2020) ................................................................ 25

*Goncalves v. Rady Children's Hosp., San Diego,*
  865 F.3d 1237 (9th Cir. 2017) ............................................................ 7, 9

*Gonzales v. Gorsuch,*
  688 F.2d 1263 (9th Cir. 1982) .............................................................. 12

*Gonzales v. United States,*
  975 F.3d 788 (9th Cir. 2020) ................................................................ 10

*Greater Tampa Chamber of Comm. v. Goldschmidt,*
  627 F.2d 258 (D.C. Cir. 1980) .............................................................. 11

*HD Carrier, LLC v. AT&T Corp.,*
  No. 2:20-cv-06509, 2020 WL 7059202 (C.D. Cal. Dec. 2, 2020) ...................... 6

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

*Khoja v. Orexigen Therapeutics*,
    899 F.3d 988 (9th Cir. 2018) ................................................................. 4

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) .............................................................................. 6

*Leeson v. Transam. Disability Income Plan*,
    671 F.3d 969 (9th Cir. 2012) ............................................................... 12

*Levine v. United States*,
    383 U.S. 265 (1966) ............................................................................ 19

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................ 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 11

*Masimo Corp. v. Sotera Wireless*,
    No. 19-cv-0110, 2020 WL 7260660 (S.D. Cal. Dec. 9, 2020) .......... 19

*Mou v. SSC San Jose Operating Co.*,
    415 F. Supp. 3d 918 (N.D. Cal. 2019) ............................................... 18

*Mujica v. Airscan Inc.*,
    771 F.2d 580 (9th Cir. 2014) ........................................................ 24, 25

*Nayab v. Cap. One Bank (USA), N.A.*,
    942 F.3d 480 (9th Cir. 2019) ................................................................. 7

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) .................................................................. 17

*Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of
    Va.*,
    464 U.S. 30 (1983) .............................................................................. 10

*Princess Lida of Thurn and Taxis, et al. v. Thompson*,
    305 U.S. 456 (1939) .............................................................................. 8

*Puri v. Khalsa*,
    674 Fed. App'x 679 (9th Cir. 2017) .................................................... 17

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ............................................................ 12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

*Sisseton-Wahpeton Sioux Tribe v. United States*,
   90 F.3d 351 (9th Cir. 1996) ................................................................... 25

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ................................................... 7, 16, 21

*State Engineer of Nev. v. South Fork Band of the Te-Moak Tribe of W.
   Shoshone Indians*,
   339 F.3d 804 (9th Cir. 2003) ............................................................ 9, 10

*United States v. $557,933.89, More or Less, in U.S. Funds*,
   287 F.3d 66 (2d Cir. 2002) ....................................................................... 6

*United States v. $73,943.35 in U.S. Currency*,
   No. 3:18-cv-213, 2018 WL 3956447 (N.D. Tex. Aug. 17, 2018) ................ 20

*United States v. All Funds in Account Nos. 747.034/278, 747.009/278,
   & 747.714/278 Banco Espanol*,
   295 F.3d 23 (D.C. Cir. 2002) ................................................................. 11

*United States v. Any & All Ownership Interest Held in the Name of
   Taub*,
   No. CV169158JMVJBC, 2020 WL 278762 (D.N.J. Jan. 16, 2020) ............. 20

*United States v. Approx. $1.67 Million (US) in Cash*,
   513 F.3d 991 (9th Cir. 2008) ........................................................... 11, 12

*United States v. Bank of N.Y. & Trust Co.*,
   296 U.S. 463 (1936) ........................................................................... 9, 10

*United States v. Batato*,
   833 F.3d 413 (4th Cir. 2016) ................................................................. 11

*United States v. Bornfield*,
   145 F.3d 1123 (10th Cir. 1998) ............................................................. 20

*United States v. Cruz*,
   127 F.3d 791 (9th Cir. 1997) ................................................................. 19

*United States v. Garcia*,
   497 F.3d 964 (9th Cir. 2007) ................................................................. 19

*United States v. Kaczynski*,
   551 F.3d 1120 (9th Cir. 2009) ............................................................... 11

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992) .......................................................... 19

*United States v. Obaid*,
  971 F.3d 1095 (9th Cir. 2020) ..................................................... 11, 12

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F. Supp. 2d 1 (D.D.C. 2013) ..................................................... 23

*United States v. One White Crystal Covered Bad Tour Glove and*
  *Other Michael Jackson Memorabilia*,
  No. cv 11-3582, 2012 WL 8455336 (C.D. Cal. Apr. 16, 2012) ............... 6, 7, 23

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ............................................................ 2

*United States v. Voigt*,
  89 F.3d 1050 (3d Cir. 1996) ............................................................ 20

*Wool v. Tandem Computers Inc.*,
  818 F.2d 1433 (9th Cir. 1987) ........................................................... 7

**Statutes**

18 U.S.C. § 981(a)(1)(B) ................................................................... 20

18 U.S.C. § 981(a)(2) ....................................................................... 19

18 U.S.C. § 983(c)(3) .................................................................. 22, 23

18 U.S.C. § 984 .............................................................................. 20

18 U.S.C. § 1956(a)(1)(B)(i) .............................................................. 22

**Other Authorities**

Adam Hayes, Bond Valuation, INVESTOPEDIA (updated Mar. 7, 2021)
  www.investopedia.com/terms/b/bond-valuation.asp .......................... 21

The Edge Markets, Jan. 22, 2010, "Jasper Investments unit sells
  drillship Neptune Discoverer for $210m" *available at*
  www.theedgemarkets.com/article/jasper-investments-unit-sells-
  drillship-neptune-discoverer-210m ................................................ 4

146 Cong. Rec. H2051 (daily ed. Apr. 11, 2000) ............................... 24

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Offshore Mag, Oct. 8, 2010, "Petrosaudi Receives Songa Drillship"
*available at* www.offshore-mag.com/rigs-
vessels/article/16795085/petrosaudi-receives-songa-drillship............................5

*Trace*, MERRIAM-WEBSTER DICTIONARY ONLINE, www.merriam-
webster.com/dictionary/trace.............................................................................20

CLAIMANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT          2:20-CV-08466-DSF-PLA

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on May 17, 2021, before the Hon. Dale S. Fischer, in Courtroom 7D, or as soon thereafter as the matter may be heard in the above-titled Court located at the First Street Courthouse, 350 West 1st Street, Los Angeles, CA, Claimant PetroSaudi Oil Services (Venezuela) Ltd. will and hereby does respectfully move this Court for an order dismissing this action.

This motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), and Supplemental Rule G. This motion is made concurrent with Claimant's opposition to the government's *ex parte* application for issuance of an arrest warrant *in rem*, ECF No. 54, and for judicial efficiency incorporates by reference those applicable portions of Claimant's opposition, including the Declaration of the Hon. James Lewis QC.

This motion is based on this Notice of Motion and Motion to Dismiss and the Memorandum of Points and Authorities attached hereto and such other papers and arguments as the Court may consider.

This motion is made following the conference of counsel, which took place telephonically between counsel for Claimant and counsel for the government on April 14, 2021 and via subsequent email exchange.

DATE: April 19, 2021                    Respectfully submitted,


                                        Baker & Hostetler LLP


                                        By: /s/ *David B. Rivkin, Jr.*
                                        SCOTT J. FISHWICK
                                        DAVID B. RIVKIN, JR.

                                        *Attorneys for Claimant*
                                        *PETROSAUDI OIL SERVICES*
                                        *(VENEZUELA) LTD.*

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2      This Court has twice found the government's allegations insufficient. *See*

3  Order Denying App. for Arrest Warrant, ECF No. 11; Order Granting Mot. to

4  Dismiss and Denying Mot. for Protective Order, ECF No. 52 (the "Dismissal

5  Order"). The Second Amended Complaint ("SAC") fares no better. As a threshold

6  matter, the Court lacks subject matter jurisdiction, particularly given developments

7  in the United Kingdom whereby the defendant *res* is now held in a UK court

8  registry. For that reason alone, dismissal is warranted on the basis of the Prior

9  Exclusive Jurisdiction Doctrine and a lack of Article III standing. In addition, the

10  newly added allegations do not cure the prior failure to state a claim. The SAC fails

11  to connect the independent *res* to any alleged SUA or money laundering. If the

12  government could link Claimant or the relevant drillship involved in the arbitration

13  to funds from 1MDB, it would. It does not because it cannot. Instead, the SAC

14  continues to rely on vague group pleading irreconcilable with common sense or

15  legal "plausibility." Finally, international comity warrants dismissal in light of

16  foreign interests and the actions of foreign sovereigns with respect to the *res*.

17      Across three complaints, it has become clear that the government can point to

18  no set of facts justifying forfeiture. Further amendment would only cause delay,

19  impose additional prejudicial costs on Claimant, and, most importantly, would be

20  futile. Dismissal of the SAC should be with prejudice.

21  **RELEVANT ALLEGATIONS**[1]

22      Plaintiff seeks civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C)

23  of a *res* (the "Defendant Funds") comprised of all funds held in the UK as damages

24  or restitution awarded in the arbitration between Claimant and PDVSA Servicios

25  S.A. ("PDVSA"). SAC ¶ 2. The government asserts that forfeiture is equally

26  permissible—and appropriate—independent of whether the funds are held by Clyde

27  & Co. or the High Court of Justice, Business and Property Courts of England and

28
_____

[1] Plausible, non-conclusory allegations are taken as true for purposes of Rule 12(b)(6) only.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Wales. *Id.*[2] The claimed basis for forfeiture is the same purported international conspiracy to launder money misappropriated from 1MDB that underlies the government's prior actions. *Id.* ¶ 5. However, when stripped of conclusory allegations, the SAC continues to detail wholly legitimate foreign business transactions, including between PetroSaudi International, Ltd. ("PSI") and 1MDB and, independently, between Claimant and PDVSA.

Notwithstanding the provision of legitimate drilling services, as alleged in the SAC, PDVSA "refused to honor [ ] drilling invoices" resulting in an arbitration that, in part, "adjudicate[d] the adequacy" of Claimant's performance and the "validity" of its drilling invoices. *Id.* ¶ 1094. Claimant prevailed in the arbitration and was awarded roughly $380 million as compensation for the services. *Id.*[3] These are funds "owed by PDVSA" to Claimant, *id.* ¶ 1095, as determined by the independent UNCITRAL arbitration tribunal (the "Tribunal").

The arbitration was commenced in August 2015, *id.* ¶ 1094, initiated *by* PDVSA as claimant *against* PSOSVL as respondent. PDVSA brought dozens of claims asserting breach of contract and PSOSVL counter-claimed for unpaid invoices. The contract between PSOSVL and PDVSA, which formed the basis for the arbitration, was guaranteed by a rolling standby letter of credit issued by Banco Espírito Santo (n/k/a Bank Novo Banco S.A.) on behalf of PDVSA and in favor of PSOSVL. During the arbitration PSOSVL made demand under the standby letter of credit and, by order dated March 31, 2017, the Tribunal created an escrow account into which the funds demanded were paid. The Tribunal's order followed a decision

---

[2] By order dated March 23, 2021—six days *before* the government filed the SAC—the High Court of Justice in the UK ordered that the funds be turned over to its Court Funds Office (the "March 23, 2021 Order"). Accordingly, the UK court has taken actual control and custody of the Defendant Funds. Further, upon issuance of that order, Clyde & Co.'s prior trusteeship and escrow management was terminated. *See* Notice of Order Filed in UK Action, ECF No. 57 and 57-1.

[3] The arbitral award is integral to the SAC and the Court may consider it on this motion to dismiss because "plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

by the Court of Appeal of England and Wales, which ordered full payment, and a denial by the Supreme Court of PDVSA's request for an appeal. Therefore, the funds originated from Novo Banco in accordance with orders by the Tribunal and a UK court. On July 17, 2020, the Tribunal delivered its 950-page final award: $379,843,732 in favor of PSOSVL. These are the Defendant Funds.

The SAC alleges that, as one of its first investments, 1MDB entered into an agreement with a PSI subsidiary to form a joint venture called 1MDB PetroSaudi Limited. SAC ¶ 43. The joint venture agreement ("JVA"), dated September 28, 2009, provided for 1MDB to purchase a 40% equity interest in the JV for $1 billion in cash. *Id.* ¶¶ 43, 56, 1072. The PSI subsidiary gave $2.7 billion in independently valued assets in exchange for the remaining 60% equity interest and the repayment of $700 million for its over-contribution of assets. The JVA provided that this $700 million loan would be repaid from 1MDB's $1 billion contribution to the JV. The objective of the JV was to "seek, explore, enter into and participate in business and economic opportunities within and outside of Malaysia; and . . . to enhance, strengthen and promote the future prosperity and economic development of Malaysia, to the extent that achievement of above-mentioned objectives would maximise the profits of the [JV]." *See* JVA at 5, cl. 2.[4] *See also* SAC ¶ 63.

Of the $1 billion representing 1MDB's investment in the JV, $700 million was allegedly misappropriated by Jho Low and unnamed associates. SAC ¶ 44. Although the SAC alleges diversion of these funds, 1MDB contemporaneously advised Deutsche Bank that the $700 million was an "advance [that's] owed to" PSI and that 1MDB did not "care" what PSI did with its own money. *Id.* ¶ 72. In any event, the SAC does not claim that the Defendant Funds are derived in any way from the $700 million that was allegedly misappropriated.

Rather, the relevant portions of the SAC are ostensibly concerned with a $300 million investment by 1MDB, which had been transferred directly into the

[4] Filed at ECF No. 34-2.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

JV's account at J.P. Morgan. *Id.* ¶¶ 76, 89, 1082. In other words, the SAC is focused on the "1MDB funds that made it to the joint venture [and] are the funds that were *not* stolen." Dismissal Order at 4; *see also* SAC ¶ 89 (identifying the JV account as receiving $300 million of the $1 billion 1MDB investment). Specifically, the SAC alleges that after the JV received $300 million pursuant to the JVA, the same amount was transferred from the JV to PSI in late December 2009 and early January 2010. SAC ¶ 1083. Then, on January 15, 2010, $185 million was allegedly transferred from PSI to a separate entity, PetroSaudi Oil Services Ltd. ("PSOSL"). *Id.* ¶ 1084. PSOSL allegedly "used this $185 million" to fund a nebulously defined "drilling project in Venezuela" with PDVSA. *Id.* ¶ 1085. In particular, $46.9 million was used to "purchase a drillship" called the Neptune *Discoverer* and $120 million was transferred to PDVSA. *Id.* In fact, however, the purchase price of the *Discoverer* was $150 million.[5] The SAC does not address this discrepancy, specifically how only $185 million was transferred to PSOSL, but the cost of the *Discoverer* plus the PDVSA transfers total $270 million. Allegedly, another entity—PSOSVL (*i.e.*, Claimant)—was newly "set up" by an unidentified person or persons "to operate the Neptune Discoverer" and "to receive the proceeds of its drilling operations." *Id*. ¶ 1086.[6]

The so called "Venezuelan drilling project" was then allegedly expanded in late summer 2010 with the purchase of a different drillship, the Songa *Saturn*. *Id.* ¶ 1090. The total purchase price for the *Saturn* and its contract with PDVSA was

---

[5] *See, e.g.,* The Edge Markets, Jan. 22, 2010, "Jasper Investments unit sells drillship Neptune Discoverer for $210m" *available at* www.theedgemarkets.com/article/jasper-investments-unit-sells-drillship-neptune-discoverer-210m. Judicial notice of matters of public record is permissible at the motion to dismiss stage. *Khoja v. Orexigen Therapeutics,* 899 F.3d 988, 994 (9th Cir. 2018). A court may take judicial notice when a fact "is not subject to reasonable dispute [because] it is generally known, or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* at 999 (citations omitted).

[6] Passive voice allegations occur at critical factual intersections throughout the SAC. *See, e.g.,* ¶¶ 1090, 1091, 1098.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

$260 million.[7] The government speculates that this purchase price was paid through "at least two income streams": (i) **upon information and belief**, PSOSL spent $13 million of the original $300 million that funded the JV; and (ii) the remaining $247 million was funded via bonds issued by a separate entity, PSOS Finance Limited. *Id.* ¶¶ 1088, 1090-91. The SAC further speculates that PSOS Finance would not have been able to "successfully raise bonds to purchase the rest of the Saturn" were it not for the fact that the *Discoverer* was already operating. *Id.* ¶¶ 1091, 1098.

Allegedly, the *Discoverer* and the *Saturn* were "participants" in the "same overall Venezuelan drilling project," although the government is forced to acknowledge that they were owned by different holding companies and had separate revenue streams from PDVSA in accordance with "separate drilling contracts." *Id.* ¶ 1093. Notwithstanding these important distinctions, the government insists that the *Saturn* contract was merely a "component" of a broader, but undefined, drilling project. *Id.* ¶ 1094.

The UNCITRAL arbitration arose from the *Saturn* contract alone. *Id.* ¶ 1093. Inconsistently, the government alleges that the "project" was "highly troubled," yet the Tribunal awarded PSOSVL $380 million in damages for non-payment by PDVSA, *id.* ¶ 1094, recognizing that legitimate, valuable services were provided. *See also id.* ¶ 1099 (the arbitration award corresponds to "revenues that the Saturn earned"). Importantly, the arbitration had nothing to do with the *Discoverer*. Only after 1MDB exited the JV in June 2010, *id.* ¶ 101, was the *Saturn* purchased with money that was almost entirely raised on the international bond market. PSOSVL operated the *Saturn* independently of PSOSL's *Discoverer* contract, and the Defendant Funds were tendered by Novo Banco pursuant to the standby letter of credit for the *Saturn* contract. The fundamental fact remains that the *Discoverer* and the *Saturn* were purchased months apart, by separate entities, with separate funds,

---

[7] *See* Offshore Mag, Oct. 8, 2010, "Petrosaudi Receives Songa Drillship" *available at* www.offshore-mag.com/rigs-vessels/article/16795085/petrosaudi-receives-songa-drillship

CLAIMANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT          2:20-CV-08466-DSF-PLA

and contracted to PDVSA under separate contracts.

Finally, sprinkled throughout the SAC are conclusory allegations that PSI, PetroSaudi Cayman, PSOSL, PSOSVL, Tarek Obaid, and others were "co-conspirators." *Id.* ¶¶ 1092, 1097. A fair reading of the SAC, however, is that these entities operated a legitimate business providing *bona fide* drilling services to PDVSA, pursuant to arms-length contracts, over many years.

## LEGAL STANDARD

The SAC asserts three forfeiture counts under 18 U.S.C. § 981(a)(1)(C) (Count I) and 18 U.S.C. § 981(a)(1)(A) (Counts II-III). The purported basis for forfeiture is that the arbitration-awarded damages "constitute, and are derived from, proceeds traceable to" specified unlawful activity (Count I), or that the defendant property is "traceable to property involved in on or more" money laundering transactions in violation of 18 U.S.C. §§ 1956 and/or 1957 (Counts II-III).[8]

The government is the complainant and bears the "burden of establishing subject matter jurisdiction." *See HD Carrier, LLC v. AT&T Corp.*, No. 2:20-cv-06509, 2020 WL 7059202, *3 (C.D. Cal. Dec. 2, 2020) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). This is as true in the civil forfeiture context as in any other. *See United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 n.9 (2d Cir. 2002).

Rule G governs Plaintiff's pleading requirements in this case. Supp. R. A(1)(B). Plaintiff must, *inter alia*, "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). This is a "heightened pleading standard." *United States v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia*, No. cv 11-3582, 2012 WL 8455336 at *2 (C.D. Cal. Apr. 16, 2012)

---

[8] In Counts II-III, the government no longer alleges that the Defendant Funds were "involved in" the alleged money laundering transactions, but only that they are traceable to property that was. The government has also abandoned any claim based on alleged violation of 18 U.S.C. § 1956(a)(2)(B)—international money laundering.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

("*Jackson Memorabilia*"). At a minimum, Plaintiff must "plead specific allegations that specific instances of criminal activity took place." *Id.* at \*3. The complaint must also meet the familiar *Iqbal/Twombly* plausibility standard, to wit it must "contain sufficient factual matter, accepted a true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Well-pleaded facts are to be accepted as true for purposes of a motion to dismiss; however, the Court need not accept legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

Finally, allegations "based on information and belief may suffice" only "so long as the allegations are accompanied by a statement of facts upon which the belief is founded." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds* as recognized in *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494 (9th Cir. 2019). Permissible pleading "upon information and belief" requires two pre-conditions: (1) the information be peculiarly within the possession or control of the defendant; and (2) additional facts that give rise to an inference that those allegations are plausible. *See Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017); *see also Blantz v. Calif. Dep't of Corr. & Rehab.*, 727 F.3d 917 (9th Cir. 2013) (considering unsupported allegations made on information and belief to be "naked" and "conclusory" and patently insufficient).

## ARGUMENT

### I. THE COURT LACKS SUBJECT MATTER JURISDICTION

#### A. The Prior Exclusive Jurisdiction Doctrine Controls

This case is still controlled by the Prior Exclusive Jurisdiction Doctrine ("PEJ"), which the Ninth Circuit has made mandatory. *See Goncalves v. Rady Children's Hosp., San Diego*, 865 F.3d 1237, 1253 (9th Cir. 2017) ("The prior exclusive jurisdiction doctrine is a 'mandatory jurisdictional limitation' . . ."); *Chapman v. Deutsche Bank Nat'l Trust Co.*, 651 F.3d 1939, 1043 (9th Cir. 2011) ("Whether the doctrine is described as a rule of comity or subject matter jurisdiction

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

. . . courts in this circuit are bound to treat the doctrine as a mandatory rule, not a matter of judicial discretion.") (citations omitted).[9]

As noted above, in the March 23, 2021 Order, the UK court entered an order requiring Clyde & Co.: (1) to convert the Defendant Funds from U.S. dollars into British pounds sterling and; (2) immediately transfer those funds into the Court Funds Office. ECF No. 57-1 at 2. The court also terminated Clyde's role as escrow agent upon transfer of the funds, ordered payment of specific amounts to PSOSVL's London solicitors, and stated that PSOSVL was free to "apply for further Orders including to vary or amend the Orders requiring payment of funds into or out of the Court Funds office. *Id.* at 3. The March 23, 2021 Order predates the SAC, and it is that court that has both asserted jurisdiction and achieved control over the funds. As a result, the PEJ deprives this Court of jurisdiction.

### 1. These Actions are "*In Rem*"

There can be no question that the English proceedings are "*in rem*" for PEJ purposes. The March 23, 2021 Order was sought and issued pursuant to Practice Direction 64A-Estates, Trusts and Charities, Title 1 Claims Relating to the Administration of Estates and Trusts, para. 1(2)(a)(ii). This provision allows the English court to issue "an order requiring a trustee . . . to pay into court money which he holds in that capacity." Matters of trust administration are quintessential examples of *in rem* proceedings, particularly where the possession and disposition of the *res* are involved—as in this case. *See Princess Lida of Thurn and Taxis, et al. v. Thompson*, 305 U.S. 456, 466 (1939) (noting that PEJ applies both "where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property.").

---

[9] In addition, the Malaysian courts have also asserted their jurisdiction over the *res* through the order of August 19, 2020, prescribing what payments may be made from the Defendant Funds, also before the SAC was filed. *See* ECF No. 42-1, Supplemental Declaration of Mohd Yusof Bin HJ Zainal Abiden, ¶¶ 6-7 (Jan. 1, 2021).

1    However, even if the UK action were not a suit involving trust

2    administration, it would still be "*in rem*" for these purposes. Indeed, whether the

3    actions are labelled "*in rem*" is irrelevant. *See State Engineer of Nev. v. South Fork*

4    *Band of the Te-Moak Tribe of W. Shoshone Indians*, 339 F.3d 804, 814 (9th Cir.

5    2003) (in determining whether or not the PEJ applies in a given case, the formal

6    "style" of an action is not dispositive) ("*Te-Moak Tribe*"). The Ninth Circuit has, in

7    fact, adopted a very straightforward test for determining PEJ applicability. In

8    *Goncalves*, 865 F.3d at 1254, the court defined both "*in rem*" and "*in personam*"

9    for purposes of the PEJ. An *in rem* case determines disposition of particular

10   property (here the *res*). An *in personam* case, by contrast, adjudicates rights and

11   obligations of particular parties and any judgment secured can be executed not

12   merely against a single, identified asset, but against any of the defendant's assets.

13   Here, this Court, the UK Court, and the courts in Malaysia, have been asked

14   to determine the disposition of the Defendant Funds, not to enter judgment against

15   PSOSVL or anyone else that can be satisfied out of any other assets. In this

16   connection, *Goncalves* relied on *United States v. Bank of N.Y. & Trust Co.*, 296

17   U.S. 463 (1936), where the Court applied PEJ to adjudication of claims against

18   specific funds, which had originally belonged to Russian insurance companies,

19   doing business in New York, and expropriated by the Soviet government. New

20   York state courts consigned the funds to that state's insurance commissioner for

21   conservation and liquidation in accordance with the court's orders.

22   The United States asserted a claim against the assets based on an assignment

23   of interest from the Soviet government, executed as part of its recognition by the

24   United States. It brought suit in federal court for an accounting, raising the question

25   of the state court's prior jurisdiction and application of the PEJ. The government

26   argued that PEJ did not apply as its accounting actions were *in personam* in nature,

27   that would merely determine the rights in the property. The Supreme Court rejected

28   this claim, reasoning that "these suits are not to enforce a personal liability, but to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  obtain possession of the respective funds. The suits are not merely to establish a

2  debt or right to share in property, and thus to obtain an adjudication which might be

3  had without disturbing the control of the state court." *Id.* at 478. Rather, "the object

4  of the suits is to take the property from the depositaries and from the control of the

5  state court, and to vest the property in the United States to the exclusion of all other

6  whose claims are being adjudicated in the state proceedings." *Id.*

7      In this case, of course, the government does not merely seek adjudication of

8  interests, but to itself seize the property to the exclusion of all others. As a result,

9  the PEJ applies and this court must yield to the courts that have previously asserted

10  jurisdiction over the assets and which are currently in control of those assets.

11              2.    <u>28 U.S.C. § 1355(b) Did Not Displace the PEJ</u>

12      28 U.S.C. § 1355(b) does not change this conclusion, as the government has

13  previously argued. In *Te-Moak Tribe*, the Ninth Circuit held that a statute does not

14  displace the PEJ "'unless the language of a statute be clear and explicit for this

15  purpose.'" *See* 339 F.3d at 814 (quoting *Norfolk Redev. & Hous. Auth. v.*

16  *Chesapeake & Potomac Tel. Co. of Va.,* 464 U.S. 30, 35-36 (1983)). There, the

17  court concluded that Congress's use of the word "jurisdiction" in the relevant

18  statute—43 U.S.C. § 666(a), addressing federal and state jurisdiction over water

19  rights—must be presumed to have included "'the cluster of ideas that were

20  attached' to th[at] word," including the PEJ. *Id.* at 814. Similarly, absent "clear and

21  explicit" language to the contrary, Congress's use of the term "jurisdiction" in

22  § 1355 must be presumed to have incorporated, rather than displaced, the PEJ.

23      **B.    There is No Case or Controversy Without Control of the *Res***

24      Further, as explained in Claimant's Opposition to the renewed Arrest

25  Warrant Application, because this Court's subject matter jurisdiction depends upon

26  the discretionary actions of a foreign government, the government cannot show a

27  "substantial likelihood" that its "injury" can be 'redressed by a favorable

28  decision.'" *Gonzales v. United States*, 975 F.3d 788, 800 (9th Cir. 2020) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (omitting alternations in original)); *see also Cetacean Comm. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit."). Because the *res* is now under the custody and control of a UK court, an independent sovereign not answerable to this Court, the government cannot establish a "substantial likelihood" of redressability.[10] As a result, there is no case or controversy to support the Court's jurisdiction here. *See Greater Tampa Chamber of Comm. v. Goldschmidt*, 627 F.2d 258, 263 (D.C. Cir. 1980) (complaint failed to "allege facts which give rise to a 'substantial likelihood' that, were a court to grant appellants the relief they request, their injury would be redressed" because that redress depended on the agreement of the British Government).[11]

28 U.S.C. § 1355 cannot make up this deficit.[12] With one exception, the Circuits suggesting that control is no longer required to establish *in rem* jurisdiction under §1355, including the Ninth Circuit in *United States v. Approx. $1.67 Million (US) in Cash*, 513 F.3d 991, 996 (9th Cir. 2008), did not address the constitutional implications of such a rule.[13] *See, e.g.*, *$1.67 Million*, 513 F.3d at 995; *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399, 402 (3d Cir. 2003); *United*

---

[10] Although the Court found a similar argument "unpersuasive" when raised by Claimant in its motion to dismiss the FAC, facts in the UK have since changed significantly.

[11] Similarly, because the enforceability of any order the Court issues depends upon the independent cooperation of the UK courts, any ruling also would constitute a forbidden advisory opinion. *See United States v. Batato*, 833 F.3d 413, 439 (4th Cir. 2016) (Floyd, J., dissenting) ("the court's judgment cannot bind the property but, instead, merely advises the foreign sovereign that does control the property as to how a United States court believes the rights in the property should be settled."). *See also United States v. Kaczynski*, 551 F.3d 1120 (9th Cir. 2009) ("The Constitution empowers federal courts to hear actual cases and not render advisory opinions.").

[12] This issue was not decided in *Obaid*, 971 F.3d at 1105-06. Subject matter jurisdiction was never before the court, and the court's discussion of § 1355 was limited to venue.

[13] The exception is *Batato*, where the court concluded that § 1355 was "jurisdictional," but nevertheless found the required redressability based on the "constructive control" established through foreign freezing orders. 833 F.3d at 422.

11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  *States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278*

2  *Banco Espanol*, 295 F.3d 23, 27 n.* (D.C. Cir. 2002). Having failed to confront

3  redressability, neither *Approx. $1.67 Million*, nor the cases on which it relied, can

4  be considered precedential on the point. *See Leeson v. Transam. Disability Income*

5  *Plan*, 671 F.3d 969, 975, 979 (9th Cir. 2012) ("We have also specifically noted that

6  drive-by jurisdictional rulings lack precedential force.") (citing cases).[14]

7        As a result, there is no "substantial likelihood" that any order by the Court

8  with respect to the *res* would be given effect in the UK, where those funds are

9  located. This case must be dismissed for lack of subject matter jurisdiction.[15]

10  **II.   PERSONAL JURISDICTION OVER PSOSVL**

11        Although the *Obaid* Court, 971 F.3d 1095 (9th Cir. 2020), ruled that personal

12  jurisdiction over the *res* owner is not required in a civil forfeiture action, if the

13  *International Shoe*/*Shaffer* requirements were applicable, PSOSVL could not be

14  found to have minimum contacts with this jurisdiction. The SAC has no allegations

15  supporting *any* contacts between PSOSVL and this jurisdiction. Nor does the SAC

16  allege facts to support an alter ego finding. Thus, any alleged contacts of Mr. Obaid

17  cannot be attributed to PSOSVL. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th

18  Cir. 2015). PSOSVL acknowledges that *United States v. Obaid* forecloses a

19  decision in its favor on this issue but maintains its position. PSOSVL filed its

20  Petition for a Writ of Certiorari with the Supreme Court, seeking review of the

21

22  [14] The term "drive-by" jurisdiction has broad application. *See Lewis v. Casey*, 518 U.S.

23  343, 352 n.2 (1996) (a standing case where the Court said "we have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect.").

24  [15] In any case, Congress cannot create a "case or controversy" out of whole cloth. *See*

25  *Gonzales v. Gorsuch*, 688 F.2d 1263, 1271 (9th Cir. 1982) (Congressional authority to expand standing limited only to the extent permitted by Art. III); *Cetacean Comm.* 386

26  F.3d at 1174 ("If a plaintiff lacks Article III standing, Congress may not confer standing on that plaintiff by statute."). Thus, even if § 1355 does create a form of statutory "*in rem*"

27  jurisdiction without control of the *res*, it does not and cannot serve to meet the Constitution's redressability requirements in the absence of the type of freeze orders

28  present in the cases discussed above.

*Obaid* Court's conclusions, on March 31, 2021. That petition is now pending.

### III.   THE SAC FAILS TO ALLEGE THAT THE *RES* IS TRACEABLE TO PROPERTY INVOLVED IN FRAUD OR MONEY LAUNDERING

The SAC continues to assert two baseless theories upon which the government seeks to forfeit the Defendant Funds: (1) direct forfeiture of alleged proceeds of specified unlawful activity; and (2) that the property is *traceable to property* involved in two types of money laundering transactions. As noted above, n.8, the second theory now adds an additional level of attenuation, namely that the *res* is "property traceable to property" involved in one or more money laundering offenses. SAC ¶¶ 5, 14, 1105, 1108. Each theory rests on allegations concerning alleged predicate criminal offenses—i.e., specified unlawful activity (SUA)—grounded in fraud that have no connection to the Defendant Funds. As set forth below, the SAC fails to adequately plead either basis for forfeiture.

### A.   The SAC Fails to Plead the Basic Facts Necessary to State a Claim

Even after multiple amendments, the SAC remains a bloated, confusing and recycled pleading that only lightly touches on the claims against the *specific* property in this case. The hundreds of pages of boilerplate allegations that have nothing to do with the *res* are seemingly intended to prejudice any claim and obfuscate the inescapable truth that the government has not pled, and cannot plead, a viable forfeiture claim against the *res.* Putting aside the hodgepodge of extraneous and immaterial allegations, the SAC falls well short, as a matter of law, of stating a claim for forfeiture of the Defendant Funds.

#### 1.   The SAC Fails to Adequately Allege a Connection Between Alleged Fraud and the *Saturn* Contract Arbitration

The SAC continues to provide no basis to conclude that an arbitral award— that the government acknowledges is in favor of Claimant PSOSVL for operations that occurred after 1MDB left the JV—constitutes proceeds of any alleged fraud. The Court has twice recognized this fundamental stumbling block for the

government's theory of forfeiture. *See* Order Denying App. for Arrest Warrant, ECF No. 11; Dismissal Order (noting that the "1MDB funds that made it to the joint venture are the funds that were *not* stolen"). Yet, the new allegations in the SAC fail to fix this deficient narrative, to wit, the drilling contract was legitimate, the *Saturn* operations were legitimate, and the "money [was] awarded in the arbitration to an entity that is not the joint venture for services legitimately rendered to PDVSA." Dismissal Order at 4.

Because the SAC remains concerned with alleged 1MDB funds that were *not* stolen, the newly adduced allegations are simply a transparent, futile attempt to "plead around" the many deficiencies previously identified by the Court. These include that the government's theory rests on an "attenuated chain of events," its "theory appears to rely on purely but-for causation," "there are presumably a number of different ways that PetroSaudi could have funded the drillship investment without 1MDB," the tangential relationship between the *res* and the alleged fraud, and the seemingly intentional vagueness in treatment of various entities as well as in chronology. *Id.* at 4, 5 & n.3. The fact remains that the SAC is impermissibly vague, relies on group pleading, and is premised on conclusory allegations unsupported by well pled facts.

Ultimately, all the SAC really does is shift from one shell game to another. Whereas the FAC attempted to gloss over glaring deficiencies by attributing everything to "PetroSaudi," the newest vagary is the nebulous "drilling project." *See, e.g.*, SAC § WW.b, ¶¶ 1085, 1087-94, 1097-99.[16] PDVSA had two separate contracts, with two separate entities, entered into at two different times, for the operation of two separate drillships. *Id.* SAC ¶ 1090. The government is forced to admit this fact, briefly acknowledging that the *Discoverer* and *Saturn* were "governed by separate drilling contracts." *Id.* ¶ 1093. The corollary, of course, is that the UNCITRAL arbitration arises from *only* the *Saturn* contract, concerned

---

[16] The undefined monolith is also called the "drilling venture." *See* SAC ¶ 1080.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

*only* PSOSVL, and *only* dealt with work performed by the *Saturn*. In each of those respects, nothing has changed from the first amended complaint to the second.

Moreover, the allegations concerning the *Saturn* remain woefully deficient. The *res* here consists of funds awarded to PSOSVL (and sourced from Novo Banco) in connection with the *Saturn*, which has nothing to do with PSOSL or the *Discoverer*. Thus, the purchase of the *Saturn* is the *critical link* in the government's theory of forfeiture. However, the SAC fails to allege any specific and plausible facts about *what funds* were used to purchase that drillship and how those funds were traceable to any alleged fraud. Indeed, the SAC cannot connect the purchase of the *Saturn* to any money allegedly received by the JV from 1MDB.

Until paragraph 1090 of the SAC, the government alleges *affirmative* tracing with specific factual allegations as verified by Special Agent Fern. The SAC alleges that the JV obtained $300 million from 1MDB. *Id.* ¶ 1082. The SAC then says that PSI received all $300 million, *id.* ¶ 1083, but only $185 million was ultimately transferred to PSOSL. *Id.* ¶ 1084. PSOSL promptly spent $46.9 million to *partially* purchase the *Discoverer*, and transferred $120 million to PDVSA to "guarantee PDVSA's liabilities and obligations." *Id.* ¶ 1085.

Glaringly, in contrast to specific tracing allegations concerning the *Discoverer*, the SAC lacks any similar factual allegations related to the purchase of the *Saturn*. Rather, the SAC relies entirely "upon information and belief." *Id.* ¶ 1091. But the source of the funds used to purchase the *Saturn* and its associated contract is *the* linchpin of the theory of forfeiture. In the absence of specific factual allegations connecting the *Saturn* to any alleged crime, the claims fail.

The *Saturn* was purchased for a total of $260 million, approximately ninety-five percent of which was funded through an international bond offering (*i.e.*, $247 million).[17] *See* SAC ¶ 1091. The government well knows that the bond offering had

---

[17] Notably, the SAC is silent as to the total purchase price for the *Saturn* and its associated drilling contract. Nor does the SAC quantify the amount raised in the bond offering. These

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

*nothing* to do with 1MDB or the JV investment, so the *only* way it can arguably salvage its forfeiture claim is to somehow trace at least some portion of the funds used to purchase the *Saturn*, albeit small, to the original $300 million allegedly obtained by the JV from 1MDB. But, the SAC fails in this regard.

Without any factual or logical support, the SAC simply asserts that "upon information and belief . . . a portion of the original $300 million" amounting to approximately $13 million was used for the *Saturn* purchase. *See id.* ¶ 1090. This conclusory allegation cannot withstand the slightest scrutiny. First, as noted above, the total *Discoverer* and PDVSA outlay exceeded the $185 million that PSOSL allegedly received from PSI. Thus, none of those funds would have been available for the *Saturn* transaction. Second, the *Saturn* was purchased in August 2010, a full nine months after PSOSL allegedly received that $185 million. *See id.* ¶ 1090. The SAC is silent as to the income or expenses of PSOSL during that period of time, and as to the balances of the PSOSL bank account either at the time it allegedly received the $185 million or at the time of the *Saturn* purchase. Indeed, the SAC elsewhere alleges that PSOSL reported net operating losses of tens of millions of dollars. *See id.* ¶ 133. Thus, the only plausible inference from the alleged facts is that no portion of the alleged $185 million transfer from PSI to PSOSL remained available to fund the *Saturn* purchase.

Most importantly, the Court should give no weight to these pleadings "upon information and belief." Pleading upon information and belief occasionally may be permissible, but only if: (i) the information is *particularly* within the possession or control of the defendant; and (ii) the plaintiff pleads additional facts that give rise to the inference that those allegations are plausible. *See Soo Park*, 851 F.3d 910. The SAC satisfies neither requirement.

---

omissions are an obvious attempt to hide the fact that any cash paid for the purchase was a small fraction of the funds used in the transaction.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

First, the government makes no attempt to suggest how the information is particularly within the control of Claimant or some other party. The government has engaged in a years-long, document intensive investigation, aided by (at a minimum) Malaysia, the UK, and Switzerland. The government presumably has *precisely* the bank records or other information it needs. Indeed, as the government undoubtedly relied on bank statements and other financial records as a basis for the SAC's actual tracing of other alleged bank transfers, its inability to similarly allege facts about the source of this alleged $13 million dollar payment speaks volumes.

In any event, the government has provided "no explanation of the basis for such beliefs or facts that would make [its] allegations plausible." *BMA LLC v. HDR Glob. Trading Ltd.*, No. 20-cv-03345, 2021 WL 949371 at *1 (N.D. Cal. Mar. 12, 2021). *See also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *Puri v. Khalsa*, 674 Fed. App'x 679 (9th Cir. 2017); *Blantz*, 727 F.3d 917. It is pure speculation that the $13 million allegedly used for the *Saturn* purchase was derived from funds that originated from 1MDB as opposed to *any other* source. *See* Dismissal Order at 5 n.3 (noting "that there are presumably a number of different ways that PetroSaudi could have funded the drillship investment without 1MDB."). Finally, the detail that the SAC *is able* to include in tracing other amounts actually undercuts crediting this allegation. Specifically, the government is able to trace the funds from 1MDB→JVA→PSI→PSOSL→*Discoverer*/PDVSA. Thus, the absence of similar allegations regarding the purported $13 million transfer is fatal to any claims against the *res*. *See, e.g., BMA LLC*, 2021 WL 949371 at *8 (contrasting allegations supported with "detail" to those with "little to no information" and noting how the failure to provide a "similar level of specificity," is insufficient to make the allegations plausible).[18] The SAC must be dismissed.

---

[18] Notably, in paragraph 1090, the SAC makes the allegation "upon information and belief" but by paragraphs 1098 and 1100 this has morphed into a conclusory assertion of fact. *See* ¶ 1098 ("The *Saturn* itself was purchased partially through money

2.    <u>Allegations Relating to Mr. Obaid Do Not Save the SAC</u>

The government seeks to "plead around" the Court's prior order in another respect as well, namely the Court's recognition that "[a]t most . . . there are allegations that an individual at PetroSaudi was a conspirator in the fraud for his own personal benefit" but "there are no actual allegations that any PetroSaudi entity committed the fraud." Dismissal Order at 6-7. In conclusory fashion, the SAC now alleges that Mr. Obaid through his role at PSI "was able to (and did) exercise control of the PSI subsidiaries." SAC ¶ 19; *see also id.* ¶¶ 20-21. The SAC then jumps to allegations that Mr. Obaid was purporting to speak on behalf of various entities. *See, e.g., id.* ¶¶ 1074, 1081. The SAC includes little more than bald allegations of control on the basis of, intermittently, role, title, or ownership. More importantly, the government makes no allegations that corporate formalities were not observed. To the contrary, PSOSVL was governed by a three-person board of directors, which Mr. Obaid did not control. *Id.* ¶ 1086; *see also* ECF 33-7, Declaration of Anthony David Kerman, ¶¶ 5-7 (Dec. 21, 2020).

Tellingly, the SAC contains no specific allegations of any actions taken by Mr. Obaid on behalf of PSOSVL. Indeed, PSOSVL was an active business, with numerous employees and assets dedicated to carrying out international drilling operations. The government cannot plausibly support its conclusory and threadbare allegations that seem to variously sound in *alter ego*, veil piercing, and agency without meeting any of the required legal elements for those concepts. Nothing in the SAC provides a basis to ignore the doctrine of corporate separateness. Accordingly, the suggestion that Mr. Obaid and the entities should be treated interchangeably fares no better than the government's prior use of the "umbrella term 'PetroSaudi' for convenience . . . ." Opp'n to Mot. to Dismiss, ECF No. 43 at 21. *Cf. Mou v. SSC San Jose Operating Co.*, 415 F. Supp. 3d 918, 930 (N.D. Cal.

misappropriated from 1MDB."); ¶ 1100 ("By the same token, the purchase of the Saturn with $13 million in misappropriated 1MDB funds was a money laundering transaction").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

2019) ("Conclusory allegations of alter ego status are insufficient.") (citations omitted); *Masimo Corp. v. Sotera Wireless*, No. 19-cv-0110, 2020 WL 7260660 at *17 (S.D. Cal. Dec. 9, 2020) ("[A] bare allegation that two entities share officers and/or directors does not suffice to show any dissolution of the corporate structure warranting piercing of the corporate veil.").

### B. Section 981(a)(1)(C) is not Satisfied as the FAC Fails to Allege Direct Tracing to an SUA

The First Claim seeks to forfeit the Defendant Funds pursuant to 18 U.S.C. § 981(a)(1)(C) on the basis that they "constitute, and are derived from, proceeds traceable" to a specified criminal offense. In this respect, the SAC attempts—but fails—to link the defendant *res* to an SUA by the conclusory assertion that PSOSL and PSOSVL were co-conspirators in the alleged fraud against 1MDB. This is preposterous because, among other things, neither entity existed at the time of the JVA funding and alleged misuse of the $1 billion (*i.e.*, September 2009). Indeed, PSOSL was not incorporated until December 11, 2009, and PSOSVL not until March 31, 2010. It is both common sense and black-letter law that an alleged co-conspirator cannot be liable for acts of the conspiracy that occurred *before it joined*. *See, e.g., Levine v. United States*, 383 U.S. 265 (1966); *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992); *United States v. Garcia*, 497 F.3d 964, 967 (9th Cir. 2007); *United States v. Cruz*, 127 F.3d 791, 796 (9th Cir. 1997). An entity that did not exist could not have joined anything, and the SAC does not allege that either entity took any actions in furtherance of the alleged conspiracy.

Further, the theory that the Defendant Funds *constitute* "proceeds traceable" to fraud on 1MDB or are *derived* from "proceeds traceable" to fraud on 1MDB fails to establish the required nexus between the arbitral award and the purported fraud. "Proceeds" are defined, in relevant part, in 18 U.S.C. § 981(a)(2) as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." The modifier

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

19

"traceable to" in 981(a)(1)(C) connotes a requirement that the government identify the specific path of the "proceeds" from the specified unlawful activity to its present form or location. *Cf. United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir. 1996) (holding that "the term 'traceable to' means exactly what it says"); *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) ("[P]roperty 'traceable to' means property . . . the acquisition [of which] is attributable to the [offense] rather than from money obtained from untainted sources."). Indeed, "trace" means to "follow the footprints, track, or trail of" something. *Trace*, MERRIAM-WEBSTER DICTIONARY ONLINE, www.merriam-webster.com/dictionary/trace. Other statutory forfeiture provisions do not require the government to trace assets directly to the criminal offense, *see, e.g.* 18 U.S.C. § 984 (forfeiture of fungible property) and 18 U.S.C. § 981(a)(1)(B) (providing for forfeiture of "proceeds obtained directly or indirectly from an offense"), but the government is not relying on those.

The Defendant Funds all came from a third-party financial institution, Novo Banco. The financial institution deposited those funds at the express direction of an independent international arbitral tribunal. Thus, not a penny of the funds that the government seeks to forfeit is sourced from any of the persons or entities identified in the SAC as being involved in alleged criminal conduct. Moreover, the Defendant Funds have only recently become the property of PSOSVL by operation of an award by the same arbitral tribunal. Thus, the Defendant Funds are not traceable to any alleged SUA and the claims for forfeiture must be dismissed. *See, e.g. United States v. $73,943.35 in U.S. Currency*, No. 3:18-cv-213, 2018 WL 3956447, at *4 (N.D. Tex. Aug. 17, 2018); *United States v. Any & All Ownership Interest Held in the Name of Taub*, No. CV169158JMVJBC, 2020 WL 278762, at *11 (D.N.J. Jan. 16, 2020) ("the Government must at a minimum allege a plausible connection between the underlying offenses and the relevant property.") (unpublished slip op.)

Notwithstanding these clear and incontrovertible facts, the government seeks to forfeit the Defendant Funds using an extended and circuitous chain of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

speculative but for causation. However, as detailed above, the SAC fails to lay out any facts to support such tracing (and, in fact, purports to trace *other money*, but not the critical $13 million). Because the Court previously found the government's "but for" theory unavailing, *see* Dismissal Order at 4, n.3, it has avoided specifically invoking that phrase. While the SAC studiously avoids using those words, the allegations still sound in an untenable "but for" theory of causation. This is perhaps observed most clearly in paragraphs 1091 and 1098 of the SAC. The government alleges (emphasis added) that with respect to issuing bonds "PSOS Finance Limited would not have been able to successfully raise bonds to purchase the rest of the Saturn *were it not for* the pre-existing Venezuelan drilling project, SAC ¶ 1091, and "but these bonds could not have been raised *were it not for* the pre-existing Venezuelan drilling project." *Id.* ¶ 1098. The government's theory makes no sense. For one thing, the contention that the "drilling project" was the reason the company was able to raise funds through bond sales is contradicted by the allegation in the SAC that the project was "highly troubled." *Id.* ¶ 1094. For another, bonds are generally valued on the prospective cash flow of the bond issuer. *See* Adam Hayes, Bond Valuation, INVESTOPEDIA (updated Mar. 7, 2021) www.investopedia.com/terms/b/bond-valuation.asp. Thus, the purchasers of *Saturn* bonds would have relied upon the prospects and projected cash flow of the *Saturn* drilling contract, not on the past performance of the independent drilling conducted by the *Discoverer*. Even absent these fatal flaws, the allegations as to the bonds is made wholly on information and belief, without any factual underpinning, and should not be given credence. *See Soo Park*, 851 F.3d 910.

The simple fact remains that the *res* is property awarded by a legal tribunal to an innocent actor, from an independent source, for *bona fide* services, funded independently of any fraud, untraceable to 1MDB. The government, at best, relies on an attenuated and imagined chain of but for causation involving multiple entities

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

engaged in multiple commercial transactions over the course of many years. The facts alleged in the SAC with respect to tracing are insufficient.

### C. Section 981(a)(1)(A) is not Satisfied as the SAC Fails to Allege Tracing to Property Involved in a Money Laundering Offense

The Second and Third Claims seek to forfeit the Defendant Funds pursuant to 18 U.S.C. § 981(a)(1)(A) on the basis that they are traceable to property that was involved in a money laundering transaction prohibited by Section 1957 (Count II) or Section 1956(a)(1)(B)(i) (Count III). As an initial matter, the Third Claim must be dismissed for the simple reason that the SAC utterly fails to support the assertion that any of the relevant transactions were designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In the absence of any concealment allegations, the Third Claim must be dismissed.

In any event, both the Second and Third Claim must be dismissed because the government fails to establish that the *res* is traceable to any money laundering transaction. Because the government's theory of forfeiture is that the upstream property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, 18 U.S.C. § 983(c)(3) requires the government to show the existence of a "substantial connection" between the property the government seeks to forfeit and the underlying offense. This provision requires more than an incidental or fortuitous connection between the property and the alleged money laundering offense. Forfeiture thus is available only where property is tied to a *specific* transaction that meets the elements of a relevant money laundering statute. In this respect, the SAC identifies three possible candidates: the partial purchase of the *Discoverer*, the partial purchase of the *Saturn*, and other unspecified transactions "executed to establish the Venezuelan drilling project." SAC ¶ 1100. Thus, at bottom, the theory seems to be that the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

22

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Defendant Funds are "traceble [sic] to a commercial venture" which was "created" and "maintained" with fraudulently obtained funds. SAC ¶ 14.

To the extent that the government relies on the expenditure of $185 million that PSOSL received from PSI as a violation of 18 U.S.C. § 1957, the *res* cannot be traced to any such transaction, as thoroughly detailed above. In particular, the Defendant Funds cannot be traced to any funds used to purchase the *Discoverer*. Likewise, the wholesale inability to trace the $13 million allegedly used to purchase the *Saturn* to *any source* (tainted or untainted) logically and legally disqualifies that purchase from being characterized as a money laundering transaction.

That leaves the broad category of transactions "executed to establish the Venezuelan drilling project," SAC ¶ 1100—the same type of sweeping and conclusory allegation that was deficient in the FAC. There the government advanced a broad and undefined umbrella theory that the JV was a money laundering "vehicle." Now it is relying on allegations of a nebulous "venture," that similarly lack the required specificity and warrant dismissal. *See, e.g., Jackson Memorabilia*, 2012 WL 8455336 at *2; *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 15 (D.D.C. 2013); *see also Iqbal*, 556 U.S. at 678-79. This bald conclusion is belied by the legal status of the separate contracts, separate drillships and separate corporations.[19] Nor does the SAC identify any of the "other" transactions related to this so-called "Venezuelan drilling project" that could constitute money laundering.

Ultimately, and impermissibly, what the government continues to seek is precisely the type of overreach that section 983(c)(3) was intended to address:

---

[19] The absurdity of the SAC's grouping of separate entities is illustrated by a real-world example. Say a hotelier operates a location in Inglewood and a location in Santa Monica. If Inglewood burns down—and the operator goes to arbitration with its insurance company to collect on the policy—the arbitration-awarded funds are not suddenly forfeitable simply because the proprietor was in the "business of operating hotels" and the Santa Monica location was alleged to have been "involved in" the commission of crimes.

> Under H.R. 1658's substantial connection test, in order for an entire bank account composed of both tainted and untainted funds to be forfeitable, a primary purpose of its establishment or maintenance must be to disguise a money laundering scheme. This rule should also apply when the government seeks to forfeit an entire business because tainted funds were laundered in a firm bank account. For the business to be forfeitable, a primary purpose for the establishment or maintenance of the entire business must be to disguise a money laundering scheme.

146 Cong. Rec. H2051 (daily ed. Apr. 11, 2000). The government can show no substantial connection between the arbitration award and any money laundering scheme. Accordingly, the Second and Third Claims must be dismissed.

## IV.   INTERNATIONAL COMITY WARRANTS DISMISSAL

The SAC should be dismissed based on international "adjudicatory" comity principles. The Ninth Circuit articulated the principal considerations in determining whether adjudicatory comity applies in *Mujica v. Airscan Inc.*, 771 F.2d 580 (9th Cir. 2014). These include: "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the United States, and (5) any public policy interests." *Id.* at 604. Similarly, recognizing that "[f]oreign states, no less than the United States, have legitimate interests," the court noted that "proper analysis of foreign interests essentially mirrors the consideration of U.S. interests." *Id.* at 607.

The balance in this case clearly supports application of comity. The UK court has now exercised jurisdiction and control over the Defendant Funds. In particular, it has ordered the funds to be paid into the court, and that various disbursements be made from them. Any order made by this Court with respect to disposition of the funds would necessarily interfere with the UK court's jurisdiction over property physically located in the UK. In addition, any claims by Malaysia or the United States against the Defendant Funds are grounded in the same alleged fraud against 1MDB. Based on the government's own allegations, the vast majority of the underlying alleged conduct was by non-U.S. nationals, with few if any connections

24

to the United States, and occurred outside of this country. Similarly, the alleged conduct at issue was directed principally against Malaysia, whose courts have also asserted jurisdiction over the Defendant Funds, and if there was any fraud Malaysia was its victim. Thus, although U.S. foreign and public policy interests may be involved those interests must be weighed against the paramount interests of the UK (in vindicating the authority of its courts within its own territory) and Malaysia (in recovering allegedly stolen state funds). And, of course, the jurisdictional claims of the UK and Malaysian courts both predate the government's filing of its SAC.

In the past the government relied on *Mujica* for the proposition that, once the United States files suit, the court is required to defer in any comity analysis to its articulation of U.S. foreign policy interests. This is not the case. The *Mujica* Court merely deferred to the U.S. position—as stated in an amici brief—that U.S. foreign policy interests favored dismissal of a civil case. It nevertheless exercised its discretion to uphold dismissal. And, as the Ninth Circuit recently found, there is no requirement that a United States District Court defer to the government's policy positions here: "[t]he plaintiffs point to no principle that requires district courts to defer to statements of interest from the United States." *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 569 (9th Cir. 2020). Exercising discretion and rubberstamping an Executive Branch action are two entirely different things, and an Article III court is not, and cannot be, required to resolve a particular case or controversy in whatever manner the Executive Branch dictates. Accordingly, the SAC should be dismissed on the basis of international comity.

## CONCLUSION

For the reasons discussed above, the Court should grant Claimant's motion and dismiss this action. Further, such dismissal should be with prejudice and without leave to amend. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996) (finding previous amendments and the futility of proposed amendment warranted denial of leave to amend).

DATE: April 19, 2021                    Respectfully submitted,


                                        Baker & Hostetler LLP

                                        By: /s/ *David B. Rivkin, Jr.*
                                        SCOTT J. FISHWICK
                                        DAVID B. RIVKIN, JR.

                                        *Attorneys for Claimant*
                                        *PETROSAUDI OIL SERVICES*
                                        *(VENEZUELA) LTD.*

OF COUNSEL:
Baker & Hostetler LLP
LEE A. CASEY
MARK W. DELAQUIL
JONATHAN R. BARR
ELIZABETH PRICE FOLEY
KENDALL E. WANGSGARD
JONATHAN B. NEW

1

## **CERTIFICATE OF SERVICE**

2  I hereby certify that a true and correct copy of the foregoing and its attachments

3  was electronically filed on April 19, 2021 using the CM/ECF system, thereby

4  sending a notice of electronic filing to all counsel of record.

5  /s/ *David B. Rivkin, Jr.*

6

7

8

9

10

11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1