DEBORAH CONNOR, Chief
Money Laundering and Asset Recovery Section (MLARS)
JONATHAN BAUM, Senior Trial Attorney
BARBARA LEVY, Trial Attorney
JOSHUA L. SOHN, Trial Attorney (CBN: 250105)
Criminal Division
United States Department of Justice
    1400 New York Avenue, N.W., 10th Floor
    Washington, D.C. 20530
    Telephone: (202) 514-1263
    Email:  joshua.sohn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>              v.<br><br>ALL FUNDS HELD IN ESCROW BY<br>CLYDE & CO. (OR SUCCESSOR<br>INSTITUTION) IN THE UNITED<br>KINGDOM AS DAMAGES OR<br>RESTITUTION IN PETROSAUDI V.<br>PDVSA UNCITRAL ARBITRATION,<br><br>        Defendant. | No. 2:20-cv-8466 DSF (PLAx)<br><br>GOVERNMENT'S CONDITIONAL OPPOSITION TO MOTION TO DISMISS[1]<br><br>Date: May 17, 2021<br>Time: 1:30 p.m.<br>Ctrm: 7D<br>Before the Honorable District Judge Dale S. Fischer |

---

[1] On April 26, 2021 – the current deadline for the Government's Motion to Dismiss ("MTD") Opposition – the Government filed a motion to extend time for the MTD Opposition, paired with an attached document submitted as the Government's MTD Opposition in the event the Court denies the motion to extend time.  Dkts. 71, 71-1.  The Government files this conditional MTD Opposition on the new deadline requested in the motion to extend time, in the event the Court grants the motion to extend time.

# **Table of Contents**

I.    The Second Amended Complaint ("SAC") States a Claim for
      Forfeiture ................................................1

      A. The SAC Sufficiently Alleges that the Defendant Res Is
         Proceeds of a Business Project Funded with Money
         Fraudulently Obtained from 1MDB ......................1
      B. The Court's Dismissal Order Against the FAC Does Not
         Support Dismissal of the SAC. .......................15

II.   Claimant's Article III Position Is Meritless..............18

III.  Claimant's *Princess Lida* Position Is Meritless............19

IV.   Claimant's International Comity Position Is Meritless......23

V.    Conclusion ..............................................25

i

1

2

**Table of Authorities**

3

**CASES**

4

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549 (9th
    Cir. 2020)....................................................25

5

6

*Haroun v. Haroun*, No. CV-11-8132 RSWL-CWX, 2012 WL 424383 (C.D.
    Cal. Feb. 8, 2012)...........................................20

7

8

*In re Restraint of Bowman Gaskins Fin. Grp. Accounts,* 345
    F.Supp.2d 613 (E.D. Va. 2004)................................13

9

*McHale v. Silicon Valley L. Grp.*, No. C 10-04864 JW, 2011 WL
    6990187 (N.D. Cal. Dec. 14, 2011)............................12

10

11

*Mujica v. Airscan Inc.*, 771 F.3d 580 (9th Cir. 2014) ...............24

12

*Penn Gen. Cas. Co. v. Commonwealth of Pennsylvania ex rel.
    Schnader*, 294 U.S. 189 (1935)...............................22

13

*Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939)....22

14

*S.E.C. v. Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004
    WL 2753128, at *11 (C.D. Cal. Feb. 2, 2004)..................13

15

16

*S.E.C. v. Jenkins*, 718 F. Supp. 2d 1070, (D. Ariz. 2010)..........12

17

*Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017)) .............3, 4

18

*State Eng'r of State of Nevada v. S. Fork Band of Te-Moak Tribe
    of W. Shoshone Indians of Nevada*, 339 F.3d 804 (9th Cir.
    2003)........................................................22

19

20

*United States v. $776,670,* No. 2:13-4108, 2014 WL 1669929
    (D.N.J. Apr. 28, 2014).......................................13

21

22

*United States v. 630 Ardmore Dr.*, 178 F. Supp. 2d 572 (M.D.N.C.
    2001)........................................................13

23

*United States v. 99,337 Pieces of Counterfeit Native Am.
    Jewelry*, No. 16-1304, 2018 WL 1568725 (D.N.M. Mar. 27,
    2018)........................................................13

24

25

*United States v. All Assets Held at Bank Julius Baer & Co.,* 772
    F.Supp.2d 205, 210 n. 3 (D.D.C. 2011)........................24

26

27

*United States v. All Assets Held In Acct. No. XXXXXXXX*, 83 F.
    Supp. 3d 360 (D.D.C. 2015)...................................23

28

*United States v. Approx. $1.67 Million*, 513 F.3d 991(9th Cir.
    2008)......................................................23, 24

ii

*United States v. Coffman*, 859 F. Supp. 2d 871(E.D. Ky. 2012)...13, 15

*United States v. Eleven Vehicles,* 836 F.Supp. 1147, 1155-56
    (E.D. Pa. 1993).............................................13

*United States v. Farkas*, No. 1:10CR200 LMB, 2011 WL 5101752, at
    *3 (E.D. Va. Oct. 26, 2011).................................10

*United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248,
    252 (E.D. Va. 1993).....................................13, 15

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp.
    2d 1 (D.D.C. 2013).........................................24

*United States v. Park*, 825 F. Supp. 2d 644(D. Md. 2011)...........10

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)......8, 10, 13

*United States v. Zai*, 932 F. Supp. 2d 824 (N.D. Ohio 2013)........10

**STATUTES**

18 U.S.C. § 1956..................................................14

18 U.S.C. § 1956(a)(1)(B)(i)......................................15

18 U.S.C. § 1957.............................................14, 15

18 U.S.C. § 981(a)(1)(C)......................................9, 13

18 U.S.C. § 981(a)(2)(A)..................................9, 11, 12

18 U.S.C. § 982(a)(2).............................................9

18 U.S.C. § 983(c)(3)............................................14

28 U.S.C. § 1355(b)(2).......................................21, 22

Plaintiff United States ("the Government" or "the U.S. Government") respectfully opposes Claimant PetroSaudi Oil Services (Venezuela) Ltd.'s ("POSVL" or "Claimant") motion to dismiss the Second Amended Complaint in this case.

## I. The Second Amended Complaint ("SAC") States a Claim for Forfeiture

### A. The SAC Sufficiently Alleges that the Defendant *Res* Is Proceeds of a Business Project Funded with Money Fraudulently Obtained from 1MDB

As alleged in the SAC, Tarek Obaid and two of the PetroSaudi companies he controlled (PSI and PetroSaudi Cayman) fraudulently induced 1MDB to contribute $1 billion to a Joint Venture in September 2009, by grossly misrepresenting the value and ownership of assets that the PetroSaudi companies would be contributing to the Joint Venture, among other things. SAC [Dkt. 53] ¶¶ 1071-79. Claimant does not dispute that the SAC adequately pleads this fraud.

From September 2009 through January 2010, Obaid routed $300 million of this fraudulently-obtained money through bank accounts that he controlled, titled in the name of various PetroSaudi companies for which he was a Director. *Id.* at ¶¶ 1082-1084. By January 2010, $185 million of this money was held by a PetroSaudi subsidiary called PetroSaudi Oil Services Limited ("PSOSL"). *Id.* at ¶ 1084. Obaid was a Director of PSOSL, was the sole authorized signatory for PSOL's bank account, and was listed in the account documents as the sole beneficial owner of the account's assets. *Id.* In January 2010, Obaid and PSOSL used $46.9 million of this fraudulently-obtained money to purchase the Neptune Discoverer drillship to start a drilling project in Venezuela with the Venezuelan oil company PDVSA. *Id.* at ¶ 1085. They used another $120

1

million of this fraudulently-obtained money to guarantee PDVSA's liabilities and obligations under the drilling project.  *Id.*

Claimant does not dispute the adequacy of these pled allegations either.  To the contrary, Claimant actually compliments the Government's tracing of this fraudulently-obtained money to start a drilling project in Venezuela.  Motion to Dismiss ("MTD") [Dkt. 61] at 15:11-17, 17:19-20.  Thus, there is no dispute that the SAC adequately pleads how Obaid and various PetroSaudi companies fraudulently induced 1MDB to part with $1 billion and then used $166.9 million of this money ($46.9 million for the Neptune + $120 million to PDVSA) to start a drilling project in Venezuela.

The SAC then explains how Obaid wished to expand the drilling project in the Summer of 2010.  SAC ¶ 1090.  Accordingly, he and PSOSL purchased a second drillship, the Saturn, in or about August 2010.  *Id.*  The Saturn was purchased in part with $13 million of the $185 million in fraudulently-obtained funds held by PSOSL.  *Id.*  It was also purchased in part with bonds, with the bond prospectus touting the pre-existing Venezuelan drilling project as the rationale and business case for the bonds.  *Id.* at ¶ 1088.  Thus, the Saturn was partially purchased with fraudulently-obtained 1MDB money and was partially purchased with bonds that were advertised via the drilling project established with fraudulently-obtained 1MDB money.

It is here that Claimant starts to attack the sufficiency of the SAC's allegations, though its attacks are meritless.  First, it alleges that the $13 million used to partially purchase the Saturn could not have been part of the money fraudulently obtained from 1MDB, because PSOSL had supposedly already exhausted that money to purchase the Neptune and guarantee PDVSA's liabilities and

obligations under the drilling project.  MTD at 16:7-11.  Simple arithmetic shows the error of this argument.  As alleged by the SAC, PSOSL possessed $185 million in fraudulently-obtained 1MDB money as of January 2010.  SAC ¶ 1084.  It spent $46.9 million of this money to purchase the Neptune and $120 million of this money to guarantee PDVSA's liabilities and obligations under the drilling project. *Id.* at ¶ 1085.  $46.9M + $120M = $166.9M, which is nearly $20 million less than the $185 million that PSOSL originally possessed.  Based on these figures, PSOSL would have had $13 million in 1MDB money left to partially purchase the Saturn in August 2010.

Claimant next complains that the SAC states "on information and belief" that the $13 million used to partially purchase the Saturn was 1MDB money, and then argues that this "information and belief" terminology dooms the Government's factual allegations.  MTD at 16:20-17:25.  More specifically, Claimant argues that "[p]leading upon information and belief occasionally may be permissible, but only if: (i) the information is *particularly* within the possession or control of the defendant; and (ii) the plaintiff pleads additional facts that give rise to the inference that those allegations are plausible."  MTD at 16:21-24 (citing *Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017)) (Claimant's emphasis).

Initially, Claimant misstates the applicable legal standard by placing an "and" instead of an "or" between its two listed criteria.  As *Soo Park* states, pleading upon information and belief is actually permissible "where the facts are peculiarly within the possession and control of the defendant **or** where the belief is based on factual information that makes the inference of culpability plausible."  *Soo Park*, 851 F.3d at 928  (emphasis added).

3

In any event, both disjunctive criteria are met here.  As to the first criterion, the precise inflows and outflows of PSOSL's bank account are peculiarly within the possession and control of PSOSL and Obaid.  The Government knows that $185 million of fraudulently-obtained 1MDB money went into the account in January 2010, and that $13 million went out of this account to partially purchase the Saturn in August 2010.  But the Government cannot yet state with legal certainty whether the $13 million was a subset of the $185 million, because the account details are within the control of PSOSL and Obaid.  Thus, the first disjunctive criterion for "information and belief" pleading is satisfied.

The second criterion is also satisfied, even if it were necessary to satisfy such criterion.  Namely, based on the pled facts, it is highly plausible that the $13 million used to partially purchase the Saturn in August 2010 was indeed a subset of the $185 million in 1MDB funds that PSOSL obtained in January 2010.  Consider the numbers: of the original $185 million, PSOSL and Obaid spent $166.9 million to purchase the Neptune and pay out PDVSA in January 2010, leaving $18.1 million left.  That is not far off the $13 million that PSOSL used to partially purchase the Saturn in August 2010.  Given the seven-month gap between January 2010 and August 2010, even if some fraction of the $18.1 million was burned away through ordinary business expenses during the intervening months, it is highly likely that at least $13 million was left to partially purchase the Saturn by August 2010.[1]  In other words, it is

_____

[1] Claimant argues that "PSOSL reported net operating losses of tens of millions of dollars", and thus "the only plausible inference from the alleged facts is that no portion of the alleged $185 million transfer from PSI to PSOSL remained available to fund the Saturn

*(footnote cont'd on next page)*

4

reasonable to infer that the $13 million represented the remainder of PSOSL's original $185 million pot of 1MDB money, and that PSOSL spent those remaining funds to partially purchase the Saturn.

Moreover, there is no merit to Claimant's argument that the Government's "information and belief" pleading is defective merely because the Government did not use this terminology when discussing other money flows. *See* MTD at 17:18-25 (making this argument). The reason for the different treatment is that the time gap in the other money flows was much shorter, thus increasing the Government's certainty in the tracing analysis. As Claimant puts it, the "1MDB → JVA → PSI → PSOSL → *Discoverer*/PDVSA" money movement (*id.* at 17:20) occurred with gaps of just days or weeks between each step in the chain, thus allowing the Government to infer to a near-certainty that the same money was moving at each step of the chain. *See* SAC ¶¶ 182-85. By contrast, the PSOSL → *Saturn* money movement came with a seven-month gap between when the $185 million went into PSOSL and when the $13 million went from PSOSL to partially purchase the Saturn. *Id.* at ¶¶ 1084, 1090. Thus, while the Government has strong grounds to believe that the $13 million was a portion of the $185 million (as discussed above), and will in discovery be able to confirm this, it was perfectly acceptable – indeed, it was prudent and responsible – for the Government to make this allegation upon information and belief.

---

purchase." MTD at 16:15-19 (citing SAC ¶ 133). But the cited paragraph discusses PSOSL's operating losses in **2012**, after "PDVSA failed to make timely payments under the contracts and [] one of the ship's contracts with PDVSA had expired in June 2012." SAC ¶ 133. It does not address PSOSL's cash burn rate in 2010, when the drilling project was just underway.

Claimant next argues that it "makes no sense" for the SAC to say that Obaid and PSOS Finance Limited leveraged the pre-existing Venezuelan drilling project to raise the bonds that funded the rest of the Saturn purchase price.  MTD at 21:12.  Claimant argues that this allegation "makes no sense" because the drilling project was "highly troubled" and because, according to Claimant, "bonds are generally valued on the prospective cash flow of the bond issuer." *Id.* at 21:13-17.  But this argument makes little sense.  First, the bond prospectus touted the Venezuelan drilling project as the reason and business case for the bonds.  SAC ¶ 1088.  The Government is not merely speculating that the Venezuelan drilling project might have made the bonds more attractive – rather, the bond issuer affirmatively used the drilling project to advertise the bonds.  Second, while the drilling project was indeed "highly troubled" due to PDVSA's eventual refusal to pay drilling invoices – thus leading to the 2015 arbitration – this future event was unknown to prospective bond purchasers in the Summer of 2010, when the Saturn was purchased and the drilling project was just underway.  Third, even if Claimant were correct that "bonds are generally valued on the prospective cash flow of the bond issuer", the prospective cash flow of the Saturn was intrinsically linked to the Venezuelan drilling project involving the Neptune that the Saturn was slated to (and did) join.  SAC ¶ 1091.

Relatedly, the SAC and the bond prospectus also defeat Claimant's repeated argument that the Saturn and the Neptune were not part of the same drilling project.  *See* SAC ¶ 1091; Sohn Decl. Ex. A. As the bond prospectus stated: "The PetroSaudi [Neptune] Discoverer and, following its acquisition, the Saturn will each provide drilling

6

services to the PDVSA Group on four of its major gas fields as part of the Mariscal Sucre Project offshore Venezuela." Sohn Decl., Ex. A at 2 (internal parentheses omitted).[2]  In sum, both drillships were bought by PSOSL, using illicit 1MDB funds, for the same drilling project.  SAC ¶¶ 1085, 1090-91.

Thus, the SAC adequately pleads that the Venezuelan drilling project — including its Saturn component — was pervasively funded with fraudulently-obtained 1MDB money.  Obaid and PSOSL spent $166.9 million of fraudulently-obtained 1MDB money to launch the Venezuelan drilling project.  They used this drilling project to generate bonds used to purchase the bulk of another drillship (the Saturn) that was then added to the drilling project.  And they also spent $13 million of fraudulently-obtained 1MDB money for the balance of the Saturn's purchase price.

Having made this case, the SAC then explains the role of PetroSaudi Oil Services (Venezuela) Ltd. ("POSVL"), a PetroSaudi subsidiary that actually ran the drilling project (both its Neptune and Saturn components).  SAC ¶¶ 1086, 1093.  As alleged, POSVL was closely connected to Obaid, the individual who committed the original fraud on 1MDB.  Obaid was a Director of POSVL and was the beneficial co-owner of POSVL, by virtue of his 50 percent ownership of the parent company PSI.  *Id.* at ¶¶ 1073, 1086.  Furthermore, Obaid was the sole authorized signatory on the POSVL bank account set up to receive "all drilling contract receipts paid-in by PDVSA."  *Id.* at ¶ 1086.  (Notably, the fact that drilling income was paid to **POSVL** — not PSOSL — further supports the inference that the $13 million that

---

[2] Because the SAC references the bond prospectus, the Court may consider the bond prospectus in this Rule 12(b)(6) motion practice.

PSOSL paid for the Saturn was 1MDB money, as opposed to drilling income).

As it turns out, PDVSA refused to voluntarily pay many of those drilling receipts, and POSVL had to seek compelled payment through arbitration.  *Id.* at ¶¶ 1093-95.  POSVL prevailed in this arbitration and was awarded $380 million as compensation for the drilling services provided through the Saturn.  *Id.* at ¶ 1095.  The bulk of this award – $329 million as of March 2021 – is the defendant *res*. Because it represents proceeds from the Venezuelan drilling project (proceeds that PDVSA was ordered to pay), it is forfeitable as proceeds of a scheme to fraudulently misappropriate 1MDB money and use this money for the Venezuelan drilling project.

Indeed, caselaw is clear that when a business venture is substantially funded with fraudulently-obtained money, even "legitimate" proceeds of that business venture are forfeitable as a result of the initial taint.  *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), helps illustrates this point.  In *Warshak*, defendants formed a company to sell herbal supplements.  *Id.* at 274. The genesis and early operations of the company were marked by significant fraud – defendants relied on fictitious doctor testimonials about the efficacy of their product, enrolled mail-order customers in an auto-renewal program without their consent, and cooked the books to deceive banks about how many customers contested their credit card charges for the product.  *Id.* at 277-81.  In post-conviction forfeiture proceedings, defendants argued that the Government should not be allowed to forfeit **all** of the company's revenues under a "proceeds of fraud" theory.  *Id.* at 331.  Among other things, Defendants argued that the company's later retail sales

(at reputable outlets such as GNC) were not tainted by the earlier fraudulent practices.  *Id.* at 331.  But the court rejected this argument, instead holding that all the company's proceeds were forfeitable.  *Id.* at 331-33.

To explain why, the court first noted that "[t]o demonstrate that certain property is subject to forfeiture under 18 U.S.C. § 982(a)(2), the government must show that the property constituted, or was derived from, 'proceeds the [defendant] obtained directly or indirectly, as the result of [certain illegal conduct or a conspiracy to commit certain illegal conduct].'  Similarly, under 18 U.S.C. § 981(a)(1)(C), the government must show that the property 'constitutes or is derived from proceeds traceable to [certain illegal conduct or a conspiracy to commit certain illegal conduct].'"  *Id.* at 332 (brackets in original).  Applying this legal framework, the court held that even "legitimate" sales at retail outlets like GNC were forfeitable because they stemmed (at least indirectly) from the company's fraudulent beginnings and its earlier fraudulent sales practices.  *Id.* ("the argument that certain sales were legitimate gains no traction.  Any money generated through these potentially legitimate sales is nonetheless subject to forfeiture, as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud.  The same can be said for any sales that occurred at retail because those sales were the outgrowth of Berkeley's fraudulent beginnings.") (internal citation omitted).[3]

---

[3] Claimant may argue that *Warshak* is distinguishable because it was a criminal case, not a civil case.  But *Warshak* explicitly relied on the civil forfeiture statute in its analysis.  *Id.* at 332 (discussing 18 U.S.C. § 981(a)(1)(C)).  Thus, *Warshak* is persuasive authority for the application of both the civil and criminal forfeiture statutes.  This is particularly true given how the two

*(footnote cont'd on next page)*

Other cases have reached similar conclusions.  *See, e.g., United States v. Farkas*, No. 1:10CR200 LMB, 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011) ("because fraudulent activity enabled TBW to remain in the business of obtaining mortgage funding, securitizing mortgages, and selling mortgage-backed securities, 'proceeds' must be interpreted sufficiently broadly to capture the defendant's gross receipts even if those receipts cannot be directly attributable to, for example, a particular fraudulent loan."); *United States v. Zai*, 932 F. Supp. 2d 824, 827 (N.D. Ohio 2013) ("the illegal loan proceeds were the sole source of funding for CIF at its inception. Accordingly, the Government has demonstrated that the revenue streams of UH and Flats East to CIF are proceeds of Zai's illegal conduct.") (emphasis deleted); *United States v. Park*, 825 F. Supp. 2d 644, 648 (D. Md. 2011) ("In the case of a business that would not have been solvent but for the infusion of illegally-obtained funds, the entire business may be subject to forfeiture as the proceeds of the offense . . . If a business is subject to forfeiture or restraint, then so are all of the assets of the business, including any funds in any account at a financial institution.").

The logic of these cases fully applies here.  Claimant cannot resist forfeiture by arguing that the arbitration award was a "legitimate" award to recover payment for "legitimate" drilling invoices.  Even if this were true, the award is still forfeitable because it is proceeds of the Venezuelan drilling project, which was established and launched with fraudulently-obtained 1MDB money.

---

statutes define "proceeds" in highly-similar ways.  *Compare* 18 U.S.C. § 981(a)(2)(A) *with* 18 U.S.C. § 982(a)(2).

Moreover, the civil forfeiture statute defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." 18 U.S.C. § 981(a)(2)(A). This broad definition is not limited to direct proceeds. Indeed, 18 U.S.C. § 981(a)(1)(C) allows forfeiture of property "derived from" proceeds traceable to criminal violations. Here, the fraud on 1MDB provided the capital for a Venezuelan drilling project, the proceeds of which constitute the arbitration award. Thus, the arbitration award fits within the broad definition of "proceeds" of the fraud (or at least property "derived from" such proceeds). To be sure, the arbitration award constitutes proceeds that PDVSA was compelled to pay through arbitration, but it is proceeds nonetheless. The SAC certainly alleges – and Claimant does not dispute – that the arbitration award constitutes monies that PDVSA owed POSVL as compensation for POSVL's work on the Venezuelan drilling project. SAC ¶ 1094.

Claimant seeks to resist forfeiture by arguing that the entity who earned the arbitration award – POSVL – did not exist when Obaid and his co-conspirators committed the original underlying fraud on 1MDB. MTD at 19:8-22. But this is irrelevant. The SAC pleads a conspiracy to fraudulently obtain funds from 1MDB **and use those funds for a Venezuelan drilling project**. SAC ¶¶ 1080-92. POSVL was certainly involved in the latter stages of the conspiracy – the operation of the drilling project that was established and launched with fraudulently-obtained 1MDB funds. And Obaid, the conspirator who committed the underlying fraud in 1MDB, was a POSVL Director and the sole authorized signatory for the POSVL bank account set up to receive the drilling proceeds. *Id.* at ¶ 1086. Presumably Obaid

11

signed papers or took other actions to open this POSVL bank account, as befits a sole authorized signatory. In other words, a POSVL Director with full knowledge of the conspiracy (Obaid) took actions on POSVL's behalf in furtherance of the conspiracy.  Obaid's actions and knowledge are imputed to POSVL, meaning that POSVL was a culpable actor in the tainted drilling project.  *See McHale v. Silicon Valley L. Grp.*, No. C 10-04864 JW, 2011 WL 6990187, at *5 (N.D. Cal. Dec. 14, 2011) ("knowledge of a corporate officer acting within the scope of his duties is generally imputed to a corporation."); *S.E.C. v. Jenkins*, 718 F. Supp. 2d 1070, 1075 (D. Ariz. 2010) ("In general, a corporation acts through its officers, agents or employees and is liable for the actions of such persons acting within the scope of their agency."); *S.E.C. v. Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004 WL 2753128, at *11 (C.D. Cal. Feb. 2, 2004) ("CTI, as a corporation, was responsible for the acts of its employees, agents, directors, and officers performed within the scope of its authority").  Contrary to POSVL's suggestion (MTD at 18:13-21), there is no need to pierce the corporate veil, employ alter ego principles, or decide whether POSVL observed corporate formalities.  Rather, under basic *respondeat superior* principles, POSVL is responsible for the acts of its Director Obaid.

In any event, even if POSVL were not a member of the conspiracy (which it was), the arbitration award still constitutes proceeds of a drilling project established with tainted funds.  Thus, the arbitration award would still be *prima facie* forfeitable under the logic of *Warshak* and similar cases, as well as the language of 18 U.S.C. § 981(a)(2)(A).  If POSVL could prove that it was an innocent owner of the arbitration award, then POSVL could certainly raise the

innocent-owner defense to forfeiture.  But this is irrelevant to the sufficiency of the SAC, because an innocent-owner defense is the claimant's burden to prove and a civil forfeiture Complaint need not address innocent-owner issues at all.  *United States v. 99,337 Pieces of Counterfeit Native Am. Jewelry*, No. 16-1304, 2018 WL 1568725, \*2 (D.N.M. Mar. 27, 2018); *United States v. $776,670,* No. 2:13-4108, 2014 WL 1669929, \*4 (D.N.J. Apr. 28, 2014); *United States v. 630 Ardmore Dr.*, 178 F. Supp. 2d 572, 583 (M.D.N.C. 2001).

The foregoing discussion shows how the defendant *res* is forfeitable under a "proceeds of fraud" theory under 18 U.S.C. § 981(a)(1)(C).  But the defendant res is also forfeitable under a "proceeds of money laundering" theory under 18 U.S.C. § 981(a)(1)(A) (Counts II and III in the SAC).  Indeed, the fact that property such as the Saturn was purchased in part with illicit funds means that this property is forfeitable in its entirety as property involved in a money laundering transaction.  *See, e.g., United States v. Coffman*, 859 F. Supp. 2d 871, 881 (E.D. Ky. 2012) (vehicle purchased in part with tainted money is forfeitable in its entirety as property involved in a money laundering transaction); *United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (same).  And this mean that proceeds of the Saturn's operations – such as the arbitration award corresponding to the Saturn's drilling receipts – is also forfeitable.  *See In re Restraint of Bowman Gaskins Fin. Grp. Accounts,* 345 F.Supp.2d 613, 624 (E.D. Va. 2004) (because business was involved in a money laundering offense, property derived from the business was forfeitable as well, even if the business is not being forfeited); *United States v. Eleven Vehicles,* 836 F.Supp. 1147, 1155–56 (E.D. Pa. 1993) (forfeiture

extends to proceeds of property involved in money laundering offense and even properties acquired with such proceeds).

Claimant attacks Counts II and III by arguing that there is not a "substantial connection" between the arbitration award and the alleged money laundering transactions.  MTD at 22-24.  Initially, Claimant plays a shell game regarding what property must have the requisite "substantial connection."  The statutory section that Claimant relies on, 18 U.S.C. § 983(c)(3), states: "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  Here, the Government does not allege that the arbitration award itself was directly involved in the commission of a criminal offense.  Rather, the Government alleges that the spending of tainted funds to purchase the Neptune, the Saturn, and otherwise capitalize the drilling project[4] constituted money laundering transactions under 18 U.S.C. §§ 1956 and 1957, and that the arbitration award is **traceable** to those money laundering transactions.  *See* 18 U.S.C. § 981(a)(1)(A) ("The following property is subject to forfeiture to the United States: Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, **or any property traceable to such property**.") (emphasis added).  Thus, the property that was involved in the commission of the criminal offense was the property purchased with tainted funds, such as the Neptune

---

[4] *E.g.*, spending $120 million of tainted money to guarantee PDVSA's liabilities and obligations under the drilling project.  SAC ¶ 1085.

14

and the Saturn or paying to guarantee PDVSA's liabilities.  Under 18 U.S.C. § 983(c)(3), it is **this** property that must have a substantial connection to the criminal offense.  And the substantial connection is clearly present here.  For example, when $13 million of tainted funds was used to purchase the Saturn in a money laundering transaction, clearly there is a substantial connection between that very transaction and the Saturn.  *Coffman*, 859 F. Supp. at 881; *Mercedes Benz*, 820 F. Supp. at 252.  And the arbitration award is nothing less than the revenue stream of the Saturn.

Finally, Claimant argues that Count III must be dismissed because there is no evidence that the money laundering transactions were part of a concealment scheme under 18 U.S.C. § 1956(a)(1)(B)(i), as opposed to an illicit-spending scheme under 18 U.S.C. § 1957.  MTD at 22:8-13.  Claimant is incorrect here as well.  As alleged by the SAC, Obaid and his co-conspirators fraudulently obtained hundreds of millions of dollars of 1MDB money, funneled this money through a complex network of PetroSaudi subsidiary companies, and ultimately placed this money into a drilling project half a world away.  This has all the "placement-layering-integration" hallmarks of a classic concealment money laundering scheme.  *See* 2A Internal Revenue Manual Abr. & Ann. § 4.26.1.2.1 (March 2021 update) (describing these three steps in concealment money laundering).

### B. The Court's Dismissal Order Against the FAC Does Not Support Dismissal of the SAC

At various points, Claimant tries to use the Court's Dismissal Order over the First Amended Complaint ("FAC") to support dismissal of the SAC.  But this line of attack is without merit, because the SAC is very different from the FAC and does not have the characteristics that caused the Court to dismiss the FAC.

15

As the Court's Dismissal Order summarized the FAC: "The government's theory seems to be that because $700 million was stolen and only $300 million made it to the joint venture, the altered (legitimate) operations of the joint venture all constitute proceeds traceable to the original fraud and the money derived from those operations is forfeitable . . . The government's theory appears to rely on purely but-for causation – if not for the theft of the $700 million, the drillships would not have been purchased and a whole long chain of events leading to the arbitral award would not have happened." Dkt. 52 at 4. "The government also argues that the joint venture was used to facilitate the theft of the $700 million and therefore was 'involved' in a money laundering transaction." *Id.*

By contrast, the forfeiture theory in the SAC is not based on facilitating the theft of the $700 million, nor is it based on the theory that the theft of the $700 million altered the operations of the Joint Venture. Indeed, it does not depend on the theft of the $700 million at all. Instead, it is much more simple and straightforward: Obaid and his co-conspirators lied about what assets the PetroSaudi companies would contribute to the Joint Venture, used those lies to obtain $1 billion from 1MDB, and used at least $179.9 million of this money[5] to fund a drilling project in Venezuela, the proceeds of which constitute the arbitration award. The fate of the *other* money – including the $700 million that troubled the Court – is unnecessary to the forfeiture theory in the SAC.

The Dismissal Order also stated that "[t]he government's position is not helped by its apparently intentional treatment of the

---

[5] $46.9 million for the Neptune, $13 million for the Saturn, and $120 million to guarantee PDVSA's liabilities and obligations under the project.  $46.9M + $13M + $120M = $179.9M.

various PetroSaudi entities as if they were one actor, its failure to separate the PetroSaudi entities from the joint venture in a clear and consistent way, and its vagueness as to time through much of the relevant portions of the FAC." Dkt. 52 at 5.  The SAC does not have these flaws: it is scrupulous about delineating the various entities, being precise as to timeframes, and outlining the role of co-conspirators like Obaid throughout.  *See generally* SAC ¶¶ 1071-1092.

One other portion of the Court's Dismissal Order warrants discussion.  Specifically, footnote 3 of the Dismissal Order states that "[a]nother problem with the allegations is that the government seems to assume that the drillship purchase and drilling contract occurred only because of 1MDB involvement . . . it is not clear that the government's 'but for' inference can be fairly drawn from the alleged facts given that there are presumably a number of different ways that PetroSaudi could have funded the drillship investment without 1MDB." Dkt. 52 at 4-5, fn. 3.  The Government does not read this statement to mean that, when a defendant *res* is traceable to illicit funds, the Government must show that the owner of the *res* could not have purchased the *res* but for the funds.  For example, in a plain-vanilla forfeiture case where an actor uses illicit funds to purchase a car, the Government does not need to show that the actor lacked the ability to purchase the car absent the infusion of illicit funds.  Rather, it is sufficient to show that the actor did in fact purchase the car with illicit funds.  Here too, the Government need not show that Obaid and the PetroSaudi companies lacked the ability to capitalize the Venezuelan drilling project but-for the illicit 1MBD funds.  Rather, it is sufficient that they did in fact capitalize the drilling project through illicit 1MDB funds.  Whether

they could have hypothetically capitalized the project through clean funds cannot be relevant to the forfeiture analysis.

## II.   Claimant's Article III Position Is Meritless

Claimant argues that the Court lacks Article III jurisdiction over this case.  However, the Court rejected this Article III argument in the prior round of MTD briefing.  When one considers the Court's reasoning, it is clear that the Court's prior holding still stands and there is no reason for a different holding now.

Specifically, the Court previously rejected Claimant's Article III argument on the grounds that: "First, Claimant has not established that the UK government will not cooperate in enforcing a forfeiture judgment in this case – its argument is based on speculation based on separate arguments made by separate litigants. Second, even if the UK government was not inclined to enforce a forfeiture judgment immediately, a judgment would still have potential effect on the ability to move and hold these funds in and through the United States banking system."  Dkt. 52 at 3.  Claimant now argues that "facts in the UK have since changed significantly" because the funds are now held by a UK court, not a UK private party. MTD at 11 and fn. 10.  But this obviously does not affect the second ground for the Court's prior Article III ruling.  Whether the funds are held by a UK court or a UK private party, a forfeiture judgment by this Court "would still have potential effect on the ability to move and hold these funds in and through the United States banking system."  And the funds' change in custody also does not affect the first ground for this Court's prior Article III ruling.  After all, even when the funds were held by a private party in the UK, the parties agreed that the UK government's assistance would be required

to enforce a forfeiture judgment against such funds.  Indeed, Claimant now concedes that the UK has both a treaty basis and the statutory authority to enforce a final forfeiture judgment that may be issued by this Court.  *See* Lewis Decl. [Dkt. 60-1] at ¶¶ 17-19 and 25-27).  Thus, the fact that the funds have moved from a private UK party to a UK court does not substantially change the analysis.

In fact, Claimant's Article III position is actually weaker now than it was the first time the issue was briefed.  Before, there was no direct evidence of the UK government's attitude towards this case.  Now, however, the UK government has submitted a Witness Statement stating that it is not opposed to this case.  Dkt. 70-2 at ¶ 6.  This strongly suggests that the UK government would indeed be willing to enforce a forfeiture judgment by this Court.  The UK Witness Statement also explains how the UK court has no interest in the funds, *id.* at ¶ 5, thus showing a strong likelihood that the UK court would not take any steps to resist enforcement by the UK government.

Finally, the UK court showed deference to this Court's prior arrest warrant, by ruling that it would not order Clyde & Co. to move the funds in defiance of the arrest warrant.  Dkt. 49.  This again shows that the UK court is in a cooperative posture towards this case, which further undercuts Claimant's Article III position.

Thus, there are no grounds for this Court to reverse itself on the issue of Article III jurisdiction.  Besides the points raised above, the Government respectfully incorporates the points and authorities that it raised when the Article III issue was previously briefed.  Dkt. 37 at 6-9, Dkt. 70 at 4-6.

**III. Claimant's *Princess Lida* Position Is Meritless**

19

1    Claimant argues that the Prior Exclusive Jurisdiction or
2    "*Princess Lida*" rule deprives this Court of jurisdiction because the
3    subject funds are under the control of a UK court or Malaysian
4    court.[6]  This argument fails for multiple reasons.  First and
5    foremost, the *Princess Lida* doctrine applies only when two courts
6    must exercise **control** over a given *res*, and states that the first
7    court to exercise control has exclusive jurisdiction.  *Princess Lida*
8    *of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) ("if the two
9    suits are in rem, or quasi in rem, so that the court, or its officer,
10   has possession or must have control of the property which is the
11   subject of the litigation in order to proceed with the cause and
12   grant the relief sought the jurisdiction of the one court must yield
13   to that of the other"); *Penn Gen. Cas. Co. v. Commonwealth of*
14   *Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935) (same);
15   *Haroun v. Haroun*, No. CV-11-8132 RSWL-CWX, 2012 WL 424383, at *2
16   (C.D. Cal. Feb. 8, 2012) (*Princess Lida* applies when "the relief
17   sought requires that the second court exercise control over the
18   property in dispute and such property is already under the control of
19   the first court.").  But under binding Ninth Circuit precedent, a
20   U.S. civil forfeiture court does **not** need to exercise control over
21   the subject *res*.  *United States v. Approx. $1.67 Million*, 513 F.3d
22   991, 998 (9th Cir. 2008) ("Congress intended § 1355 to lodge
23   jurisdiction in the district courts without reference to constructive
24   or actual control of the res.").  Thus, a predicate condition for
25   *Princess Lida* – namely, that both courts need to exercise control
26   over the *res* – is not met here.

27
28

_____

    [6] Claimant is ambiguous as to whether the UK or Malaysian court
is the operative court for purposes of this rule.  MTD at 8, fn. 9.

20

Claimant's *Princess Lida* argument also fails for another reason. Namely, the civil forfeiture statute expressly confers Federal court jurisdiction "whenever" the subject *res* "has been detained or seized pursuant to legal process or competent authority of a foreign government". 28 U.S.C. § 1355(b)(2). If *Princess Lida* **disabled** U.S. jurisdiction whenever the subject *res* was controlled by a foreign court or government, that would eviscerate the statutory mandate quoted above. A common-law rule like *Princess Lida* cannot overrule an express statutory command, including Section 1355(b)(2)'s command that a U.S. court can exercise jurisdiction "whenever" the subject property is held under legal process of a foreign government.

Seemingly sensitive to this point, Claimant fabricated a new rule in prior briefing to try to harmonize Section 1355(b)(2) and *Princess Lida*. Specifically, Claimant argued that Section 1355(b)(2) only establishes jurisdiction when a foreign sovereign has "cooperatively" detained the *res* at the request of the U.S. Government, while *Princess Lida* supposedly bars U.S. jurisdiction in all other instances of prior foreign detention. Dkt. 42 at 2:16-3:5. But Claimant's supposed rule founders on the plain text of Section 1355(b)(2), which establishes jurisdiction "whenever" the *res* has been detained or seized by a foreign government. Claimant's supposed rule also violates Ninth Circuit precedent, which makes clear that jurisdiction under Section 1355(b)(2) **does not** require an inquiry into how cooperative the relevant foreign sovereign is or is expected to be vis-à-vis the U.S. Government. *$1.67 Million*, 513 F.3d at 997-98 ("In *Banco Espanol,* the district court had relied on the cooperation between Spanish authorities and the district court to establish constructive control over the res. The D.C. Circuit

reasoned that Spain's cooperation had no relevance to the district court's jurisdiction . . . Mirroring the D.C. Circuit's reasoning, the Third Circuit rejected the idea that the cooperation of the United Arab Emirates in seizing the funds provided the district court with jurisdiction . . . ***We find ourselves in agreement with the analysis of the D.C. and Third Circuits.***") (emphasis added).

Claimant now shifts tactics, arguing that the language of Section 1355(b)(2) is not "clear" or "explicit" enough to displace *Princess Lida*. MTD at 10:12-22. Not so. As noted above, Section 1355(b)(2) expressly states that a U.S. Federal court may exercise civil forfeiture jurisdiction "whenever" the subject *res* "has been detained or seized pursuant to legal process or competent authority of a foreign government". 28 U.S.C. § 1355(b)(2). This language is flatly irreconcilable with the notion that *Princess Lida* disables U.S. court jurisdiction when the subject *res* is under the control of a foreign court. Thus, the explicit terms of Section 1355(b)(2) clearly displace *Princess Lida* because that is the only way for the statutory grant in Section 1355(b)(2) to have any effect at all.

Claimant's cited case of *State Eng'r of State of Nevada v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nevada*, 339 F.3d 804 (9th Cir. 2003), is clearly distinguishable. In that case, the court was called upon to decide whether the McCarran Amendment (43 U.S.C. § 666(a)) displaced *Princess Lida*. As the court summarized, the McCarran Amendment "states only that the federal government waives the defense of sovereign immunity and submits itself like any ordinary defendant to 'the court having jurisdiction.'" *Id.* at 813-14. This statutory language says nothing at all about whether concurrent jurisdiction is allowed or forbidden, and thus the court

reasonably concluded that this statutory language did not displace *Princess Lida*. *Id.* at 814. By contrast, the statutory language in Section 1355(b)(2) explicitly states that dual U.S.-foreign jurisdiction is allowed, which precludes a *Princess Lida* argument that such dual jurisdiction is forbidden.

Thus, *Princess Lida* does not bar this case. In addition to the points raised above, the Government respectfully incorporates the points and authorities raised in its recent Reply in Support of Application for Arrest Warrant (Dkt. 70 at 6-10). This includes the points about how there is no conflict between this Court's adjudicatory jurisdiction and the UK court's "bank-like" jurisdiction, how *Princess Lida* has no mandatory application in the international context, how applying it here would frustrate U.S. treaty obligations, and how the relation-back doctrine puts this case ahead of the UK case for any possible application of *Princess Lida*.[7]

## IV. Claimant's International Comity Position Is Meritless

Finally, Claimant argues that the international comity doctrine bars this suit. But this suit is being brought by the U.S. Executive. International comity abstention is not warranted when the U.S. Executive is the party bringing suit, because the U.S. Executive has necessarily already done the balancing of foreign-policy interests that the international comity doctrine is designed to address. *See, e.g., United States v. All Assets Held In Acct. No. XXXXXXXX*, 83 F. Supp. 3d 360, 371-72 (D.D.C. 2015) ("Here, the Executive Branch, through the Department of Justice, has brought this forfeiture action against defendant properties involved in alleged

---

[7] Finally, the relevant Malaysian order relating to the funds is an *in personam* order (Dkt. 43-1 at ¶ 4), which renders *Princess Lida* wholly inapplicable to that order.

violations of United States criminal laws.  And as in *One Gulfstream,* '[b]ecause the Executive has already done the balancing in deciding to bring the case in the first place, the doctrine of international comity does not bar this lawsuit.'"); *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 10 (D.D.C. 2013) (same); *United States v. All Assets Held at Bank Julius Baer & Co.,* 772 F.Supp.2d 205, 210 n. 3 (D.D.C. 2011) ("[A] case in which the United States is the plaintiff would seem a particularly unsuitable candidate for abstention on international comity grounds. Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate.").

Furthermore, the interests of the relevant foreign governments also weigh against international comity abstention here.  *See Mujica v. Airscan Inc.*, 771 F.3d 580, 607-608 (9th Cir. 2014) (considering interests of relevant foreign government in the comity analysis). The Malaysian government, whose courts issued the initial order against the subject funds, supports this case and has submitted a declaration stating as much.  Dkt. 37-1, ¶¶ 9-12.  Similarly, the UK government provided a Witness Statement stating that it has no opposition to this case.  Dkt. 70-2 at ¶ 6.  Given that the central goal of international comity is "to promote cooperation and reciprocity with foreign lands", *All Assets Held In Account No. XXXXXXX*, 83 F. Supp. 3d at 371, it would be wholly inappropriate to dismiss this case on comity grounds when ***all three relevant governments*** (U.S., Malaysia, and UK) either affirmatively support this case or at least have stated their non-opposition to this case.

Claimant cites *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 569 (9th Cir. 2020) for the proposition that statements of interest by the United States are not dispositive in the comity analysis.  MTD at 25:14-18.  But *Cooper* is wildly dissimilar to this case and actually illustrates why comity-based abstention is not proper here.  In *Cooper*, the Ninth Circuit affirmed a district court's dismissal on comity grounds based on the interests of Japan, where the Japanese government "strongly objected to this case being litigated in the United States" while the U.S. Government "issued a careful, cautious statement" that "stopped well short of urging that California was the proper forum to exercise jurisdiction in this case."  *Id*. at 568-69.  Here, by contrast, the U.S. Government has issued the strongest possible statement of support for this U.S. case, by bringing this case to begin with.  The Malaysian government has also voiced support for this case, while the UK government has gone out of its way to submit a statement of non-opposition to this case – most likely to refute Claimant's false argument that this case infringes the UK's interests.  With all three governments arrayed in opposition to Claimant's comity position, Claimant does not have a plausible comity leg to stand on.

## V. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court deny Claimant's motion to dismiss.

Dated: April 30, 2021          Respectfully submitted,

DEBORAH CONNOR
Chief, MLARS

 /s/ *Joshua L. Sohn*
JONATHAN BAUM
Senior Trial Attorney, MLARS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARBARA LEVY
JOSHUA L. SOHN
Trial Attorneys, MLARS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed a copy of this document (and all attachments) via CM/ECF, which will cause a copy to be served on all counsel of record.

*/s/ Joshua L. Sohn*
Joshua L. Sohn
Attorney for Plaintiff
United States of America

27