DEBORAH CONNOR, Chief
Money Laundering and Asset Recovery Section (MLARS)
JONATHAN BAUM, Senior Trial Attorney
BARBARA LEVY, Trial Attorney
JOSHUA L. SOHN, Trial Attorney (CBN: 250105)
Criminal Division
United States Department of Justice
    1400 New York Avenue, N.W., 10th Floor
    Washington, D.C. 20530
    Telephone: (202) 514-1263
    Email:  joshua.sohn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>ALL FUNDS CONSTITUTING ARBITRATION AWARD IN PETROSAUDI V. PDVSA UNCITRAL ARBITRATION,<br><br>   Defendant. | No. 2:20-cv-8466 DSF (PLAx)<br><br>GOVERNMENT'S OPPOSITION TO CLAIMANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT<br><br>Date: September 13, 2021<br>Time: 1:30 p.m.<br>Ctrm: 7D<br>Before the Honorable District Judge Dale S. Fischer |

## **<u>Table of Contents</u>**

I.   Introduction................................................1

II.  The TAC Meets the Reasonable Belief Standard of Rule G and
     States a Claim for Forfeiture...........................3

     A. The Arbitration Award Is Forfeitable as Proceeds of a
        Project Funded with Fraudulently-Obtained 1MDB
        Money................................................4

                i. Obaid and Others Used His Companies To Defraud
                   1MDB......................................4
              ii. Obaid Used $179.6 Million of This
                   Fraudulently-Obtained Money to Fund the
                   Mariscal Sucre Drilling Project in
                   Venezuela.................................5
             iii. Obaid Leveraged the Fraudulently-Funded
                   Mariscal Sucre Project to Purchase the Saturn
                   Drillship.
                   .........................................7
              iv. POSVL Takes Over the Operation of the Mariscal
                   Sucre
                   Project..................................12
               v. The Foregoing Facts Render the Saturn's
                   Proceeds (the Arbitration Award)
                   Forfeitable..............................14
              vi. The SAC Dismissal Order and Claimant's Veil-
                   Piercing Arguments Do Not Negate the TAC's
                   Forfeitability Case......................17

     B. The Arbitration Award is Forfeitable as Property
        Traceable to One or More Money Laundering
        Transactions........................................22

III. Claimant's International Comity Position Is Meritless......23

IV.  Conclusion..............................................25

i

1

**<u>Table of Authorities</u>**

2

**<u>CASES</u>**

3

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)..........................3

4

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)...................3, 4

5

*Broughton v. Ohio Cas. Ins. Co.*, -- F. Supp.3d --, 2021 WL 1312747,

6

(N.D. Cal. Apr. 8, 2021).........................................25

7

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549 (9th Cir.

8

2020)............................................................24

9

*McHale v. Silicon Valley L. Grp.*, No. 10-04864, 2011 WL 6990187 (N.D.

10

Cal. Dec. 14, 2011) .........................................18, 21

11

*Mou v. SSC San Jose Operating Co. LP*, 415 F. Supp. 3d 918 (N.D. Cal.

12

2019) ...........................................................21

13

*N.M. State Inv. Council v. Ernest & Young*, 641 F.3d 1089 (9th Cir.

14

2011)............................................................3

15

*United States v. 630 Ardmore Dr.*, 178 F. Supp. 2d 572 (M.D.N.C. 2001)

16

.................................................................21

17

*United States v. Farkas*, No. 1:10CR200, 2011 WL 5101752 (E.D. Va.

18

Oct. 26, 2011)...................................................16

19

*United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002) .........4

20

*United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020) .............19

21

*United States v. Park*, 825 F. Supp. 2d 644 (D. Md. 2011) .........16

22

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)....14, 15, 16,

23

20

24

**<u>STATUTES</u>**

25

18 U.S.C. § 981(a)(1)(A) ....................................1, 22, 23

26

18 U.S.C. § 981(a)(1)(C)....................................2, 15, 17, 22

27

18 U.S.C. § 981(a)(2)(A)......................................15, 17

28

18 U.S.C. § 982(a)(2)............................................15

18 U.S.C. § 983(c)(3) .............................................23

18 U.S.C. § 1956 .................................................23

18 U.S.C. § 1957 .................................................23

**RULES**

Advisory Comm. Note Supp. Rule G ..................................4

**TREATISES**

3 Litigation of Int'l Disputes in U.S. Courts § 15:1 (June 2021 update) ...........................................................24

## I.    Introduction

As alleged by the Third Amended Complaint ("TAC"), 1MDB was defrauded of $1 billion by Tarek Obaid, several companies he controlled, Patrick Mahony, Low Taek Jho, and others.  Obaid and his companies used $179.6 million of this fraudulently-obtained money to fund a drilling project in Venezuela, known as the Mariscal Sucre project.  Obaid operated the project through Claimant PetroSaudi Oil Services (Venezuela) Ltd. ("POSVL"), a company he wholly controlled. POSVL performed drilling work on the project and an arbitral tribunal awarded POSVL $380 million as compensation for this work.  Thus, the $380 million arbitration award is derived from the 1MDB fraud that funded the Mariscal Sucre project, and is also traceable to property involved in the illicit transactions that capitalized the project with funds from the 1MDB fraud.  As property derived from criminal proceeds and property traceable to property involved in money laundering, the arbitration award is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 981(a)(1)(A).

Claimant makes two main attacks against this conclusion.  First, Claimant argues that POSVL was not the party who committed the underlying fraud on 1MDB.  Yet POSVL was wholly-controlled by Obaid and was intimately related to the other PetroSaudi entities that received and deployed the proceeds of the 1MDB fraud.  The caselaw is clear: when a business project is funded through illicit monies, proceeds of the project are forfeitable.  *See* Section II(A)(v), *infra*.  If bad actors could simply use captive companies to operate their projects, it would be comically easy for them to avoid this rule.  Here, Obaid controlled the company (POSVL) that operated the fraudulently-funded Mariscal Sucre project, and he also controlled

the accounts of the other PetroSaudi companies through which 1MDB's money was used to fund the project.  TAC at ¶¶ 1081-85, 1097-99.  The project's proceeds would be forfeitable had Obaid operated the project individually, and Obaid cannot avoid this rule by simply using a captive company to operate the project.

Second, Claimant argues that the arbitration award is not traceable to the fraud on 1MDB because the arbitration award stemmed from the activities of the Saturn drillship on the Mariscal Sucre project, and the TAC does not allege that the Saturn was directly bought with 1MDB money.  But this ignores how the Mariscal Sucre project was funded with fraudulently-obtained 1MDB money, and how the fraudulently-funded project was what allowed Obaid and his companies to purchase the Saturn and add it to the project.  The Saturn's bond prospectus and the arbitral opinion explicitly credit the project's prior operations as the thing that allowed for the Saturn's purchase and drilling contract.  Thus, the Saturn's revenues are traceable to the fraudulently-funded project and are therefore forfeitable.

The TAC also squarely addresses the deficiencies that the Court identified when it recently dismissed the Second Amended Complaint ("SAC").  Dkt. 89.  First, the Court found only a "thin[]" connection between the fraudulently-funded Mariscal Sucre project and the bonds used to purchase most of the Saturn.  *Id.* at 5.  The TAC addresses this concern by pleading in detail how the fraudulently-funded project was critical to both the bonds and the Saturn's drilling contract.  TAC at ¶¶ 1093-94.  Under 18 U.S.C. § 981(a)(1)(C), proceeds traceable to criminal violations and even property "derived from" such proceeds are forfeitable.  Here, fraud on 1MDB funded the Mariscal Sucre project, which allowed Obaid and his companies to

2

purchase the Saturn and add it to that very project.  The Saturn's revenues on the Mariscal Sucre project are thus proceeds of the fraud on 1MDB, or at least property "derived from" such proceeds.  This is all that is required for forfeitability.

Second, the Court was concerned about why POSVL's revenues should be forfeited when POSVL merely operated the fraudulently-funded project.  Dkt. 89 at 5.  The TAC addresses this concern by pleading in detail how POSVL was controlled by Obaid – the very person who defrauded 1MDB, routed the fraudulently-obtained money through PetroSaudi accounts he controlled, and funded the Mariscal Sucre project with this money.

Third, the Court found that the Government had not adequately pled the provenance of the $13 million used to complete the Saturn's purchase.  Dkt. 89 at 4-5.  The TAC addresses this concern by pleading how the $13 million is proceeds of the fraudulently-funded Mariscal Sucre project – and by using POSVL's own attorney statements to support this allegation.  TAC at ¶ 1092.

## II.   The TAC Meets the Reasonable Belief Standard of Rule G and States a Claim for Forfeiture

In deciding a motion to dismiss under Rule 12(b)(6), the Court must "take all of the factual allegations in the Complaint as true," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and "construe them in the light most favorable to plaintiffs," *N.M. State Inv. Council v. Ernest & Young*, 641 F.3d 1089, 1094 (9th Cir. 2011).  Indeed, Rule 12(b)(6) mandates that the Court accept the TAC's material factual allegations as true "even if doubtful in fact."  *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).  "A district court weighing a motion to dismiss asks not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims."  *Id.*

Additionally, under Supplemental Rule G(2)(f), a forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  This heightened pleading standard does not displace *Twombly* but requires that the forfeiture allegations be sufficiently detailed to permit the claimant "without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  *United States v. Mondragon*, 313 F.3d 862, 864 (4th Cir. 2002); *see also* Advisory Comm. Note Supp. Rule G (Rule G(2)(f) should be read consistent with *Mondragon*).

### A. The Arbitration Award Is Forfeitable as Proceeds of a Project Funded with Fraudulently-Obtained 1MDB Money

#### i. Obaid and Others Used His Companies To Defraud 1MDB

As alleged in the TAC, Tarek Obaid and two of the PetroSaudi companies he co-owned (PSI and PetroSaudi Cayman) fraudulently induced 1MDB to contribute $1 billion to a Joint Venture in September 2009.  They did so by grossly misrepresenting the value and ownership of assets that the PetroSaudi companies would be contributing to the Joint Venture, among other things.  TAC at ¶¶ 1070-80.

The Argument section of Claimant's Motion to Dismiss (MTD) does not address these fraud allegations.  Nonetheless, a footnote of the Background section erroneously asserts that the Government's fraud allegations are "implausible" because: (1) 1MDB was a sophisticated party, (2) the Joint Venture Agreement (JVA) supposedly provided "no warranties regarding the value of the assets contributed by PSI," and (3) 1MDB had the right to conduct its own valuation of these assets.

4

MTD at 4 fn. 6.  First, a sophisticated party can still be defrauded.
Second, Recital A of the JVA plainly states that the PSI Assets are
worth $2.7 billion – a statement that was fraudulent.  Dkt. 33-2 at
4.  Third, there is no rule saying that a party cannot be defrauded
just because the party might investigate the veracity of the
fraudulent statements.  But more importantly, 1MDB's right to conduct
its own *valuation* of the PSI Assets provided no check against Obaid's
fraudulent statements about the *ownership* of these assets.  Obaid
told 1MDB that the Turkmenistan Asset (which comprised 97% of the PSI
Assets) was owned by a PetroSaudi subsidiary, when it actually was
owned by a third-party called Buried Hill Energy.  TAC at ¶ 1074.[1]

### ii.   Obaid Used $179.6 Million of This Fraudulently-Obtained Money to Fund the Mariscal Sucre Drilling Project in Venezuela

From September 2009 through January 2010, Obaid routed $300
million of this fraudulently-obtained money through bank accounts
that he controlled, titled in the name of various PetroSaudi
companies for which he was a Director.  *Id.* at ¶¶ 1081-83.  By
January 2010, $185 million of this money was held by a PetroSaudi
subsidiary, PSOSL.  *Id.* at ¶ 1083.  Obaid was a Director of PSOSL,
the sole authorized signatory for PSOSL's bank account, and was

---

[1] Claimant argues in a footnote that "the [TAC's] assertion that
1MDB did 'not see any return' on its [Joint Venture] investment is
misleading at best."  MTD at 7 fn. 9.  Not so.  1MBD's equity in the
Joint Venture was converted to Islamic debt notes, and then converted
to stock in PetroSaudi Oil Services Limited ("PSOSL"), and then
quickly converted to "Fund Units" in a sham fund with no assets other
than the very PSOSL stock that 1MDB had disposed of.  TAC at ¶¶ 100,
129-136.  There is no suggestion that 1MDB saw any return on these
"Fund Units".  And Claimant's suggestion that 1MDB received interest
payments for the brief time it held the Islamic debt notes is
unsupported by the TAC and violates basic principles of Islamic
finance, which prohibit paying interest.

listed in the account documents as the sole beneficial owner of the account's assets. *Id.*

In January 2010, Obaid and PSOSL used $46.9 million of this fraudulently-obtained money to purchase the Discoverer drillship for use in a Venezuelan drilling project with the Venezuelan oil company PDVSA. The project was known as the Mariscal Sucre project. *Id.* at ¶ 1084. They used another $120 million of this money to guarantee PDVSA's liabilities and obligations under the Mariscal Sucre project. *Id.* And they used another $12.78 million of this money to pay third-party vendors on the project. *Id.* In sum, Obaid fraudulently induced 1MDB to part with $1 billion and used $179.6 million of this money ($46.9 million for the Discoverer + $120 million to PDVSA + $12.78 million for the vendors) to fund the Mariscal Sucre project.

Claimant argues that the Government's math does not work because the TAC pleads that an additional $50 million went into Obaid's personal account in May 2010. MTD at 4:19-5:11; 11:8-10. Claimant reasons that $179.6 million to fund the Mariscal Sucre project + $50 million to Obaid exceeds the $185 million that PSOSL received in January 2010. But the TAC never alleges that the $50 million which Obaid received in May 2010 was a portion of the $185 million which PSOSL received in January 2010. Rather, the TAC pleads only that the $50 million Obaid received in May 2010 was a portion of the original $300 million. TAC at ¶ 1083 fn. 21. In other words, PSOSL received $185 million of the original $300 million in January 2010, and used nearly all this money ($179.6 million) to fund the Mariscal Sucre project. Obaid personally received a separate $50 million from the original $300 million in May 2010, but this was not part of the $185 million that went to PSOSL in January 2010. In any event, while

Obaid's receipt of another $50 million as part of the scheme shows his key role in orchestrating the fraud, the $50 million that went to Obaid in May 2010 is not central to the forfeitability case (which is why the Government relegated it to a footnote).  Instead, the forfeitability case here centers on the $179.6 million in stolen 1MDB money used to fund the Mariscal Sucre project in Jan.-Feb. 2010.  TAC at ¶¶ 1084-85.[2]

Claimant argues at numerous places that the Mariscal Sucre project was a PDVSA project that predated the PetroSaudi companies' involvement.  *See* MTD at 5:14-18; 6:2-4; 13:3-4.  The relevance of this argument is unclear.  The Government has always alleged that PDVSA was one of the parties to the Mariscal Sucre project, and it does not dispute that in prior versions of the project PDVSA worked with other, unrelated counterparties.  But Claimant admits that the other counterparties left the scene by early 2010, when Obaid and the PetroSaudi companies began operating the Mariscal Sucre project.  MTD at 5:22-6:1.  And they used $179.6 million of stolen 1MDB money to fund this version of the project.  It is irrelevant whether a prior version of the project existed with different parties.  The Government seeks to forfeit proceeds of the version funded in 2010 with $179.6 million of 1MDB money.

> ### iii.  Obaid Leveraged the Fraudulently-Funded Mariscal Sucre Project to Purchase the Saturn Drillship

---

[2]  The Government has identified one typo in the TAC, which should aver that the $50 million paid to Obaid went from PSI's JPM account (not PSOSL's JPM account), to PetroSaudi Holdings' JPM account, to Obaid's JPM account, all on May 5, 2010.  TAC at ¶ 1083 fn. 21.  Assuming this case proceeds, the Government will seek leave to fix this typo.

The TAC then details how Obaid and PSOSL purchased a second drillship, the Saturn, in August 2010 and added it to the Mariscal Sucre project. TAC at ¶ 1090. The Saturn was purchased using two funding streams: $13 million generated from the Discoverer's operations in the Mariscal Sucre project, plus proceeds of a bond issue generated by the project and secured by both drillships. *Id.*

The TAC explains in detail how the Mariscal Sucre project allowed Obaid and his companies to purchase the Saturn and contract to add the Saturn to the project. First, as noted above, $13 million of the Saturn's purchase price came directly from the Discoverer's income on the Mariscal Sucre project. Second, to successfully raise the bonds to fund the rest of the Saturn purchase, PSOS Finance Limited[3] relied heavily on the pre-existing Mariscal Sucre project. *Id.* at ¶ 1093. Specifically, the prospectus for the Saturn bonds highlighted that the Saturn had a certain future revenue stream because it was slated to join the Mariscal Sucre project. *Id.* As the bond prospectus stated: "The PetroSaudi Discoverer and, following its acquisition, the Saturn will each provide services to the PDVSA Group (as defined below) on four of its major gas fields (Dragon, Patao, Mejillones & Rio Caribe) as part of the Mariscal Sucre Project offshore Venezuela." *Id.* The bond prospectus further stated that one of the "Key Strengths" underlying the Saturn bond offering was that the PetroSaudi companies had pre-existing experience working with PDVSA in Venezuela as a result of the Discoverer's activities in the Mariscal Sucre project. *Id.* The bond prospectus further stated that the Saturn bonds were guaranteed by members of the PetroSaudi

---

[3] PSOS Finance Limited was another company in the PetroSaudi family, which was beneficially owned by Obaid. TAC at ¶¶ 1093, 1101.

corporate family, and that this guarantee was secured by the ship mortgages on the Saturn and Discoverer.  *Id.*  The Discoverer, of course, was the first drillship in the Mariscal Sucre project.

Furthermore, the arbitral ruling that generated the arbitral award stated that POSVL was able to obtain a drilling contract for the Saturn by leveraging the Discoverer's pre-existing work in the Mariscal Sucre project.  As the arbitral ruling stated: "The direct award of the Contract to PetroSaudi, without going through a public tender process, was permitted under the applicable law (Art 76.1 LCP) and was justified in view of the urgency for PDVSA to replace the sunken semi-submersible Aban Pearl *and considering PDVSA's prior experience with another drillship of PetroSaudi in the Dragon field, i.e. the Discoverer*."  *Id.* at ¶ 1094 (emphasis in TAC).  In other words, Claimant was able to avoid a competitive bidding process and obtain the Saturn's contract to work on the Mariscal Sucre project **because of the Discoverer's prior work on that very project**.  There could hardly be a better or more authoritative statement tying the Saturn to the Discoverer's pre-existing work on the Mariscal Sucre project.  And it is telling that Claimant's 25-page MTD ignores this key statement altogether.

Claimant accuses the Government of a "stunning" "about-face" because a prior version of the Complaint alleged on information and belief that the $13 million portion of the Saturn's purchase price came from the $185 million stolen from 1MDB, while the TAC alleges that the $13 million came from the Discoverer's activities (which were **themselves** funded by the $185 million stolen from 1MDB).  *See* MTD at 11:1-27; 20:2-21:2. Claimant argues that "the TAC's allegations regarding the $13 million should not even carry a

presumption of truth" for this reason.  *Id.* at 20:15-16.  This attack
is long on rhetoric but short on substance.  After all, the TAC
explains how Claimant's own counsel stated that the $13 million came
from the Discoverer's activities.  TAC at ¶ 1092.  Lest there be any
doubt, the Government hereby attaches the filing where Claimant's
counsel made this statement.  Sohn Decl., Ex. A at ¶ 42(a).

As for the Government's "about-face" from the SAC to the TAC,
the SAC pled the provenance of the $13 million "upon information and
belief."  Dkt. 53 at ¶ 1090.  The Government was uncertain at the
time of the SAC about the provenance of the $13 million, and it
forthrightly signaled this uncertainty to the Court.  Claimant's
attempt to weaponize the Government's forthright, cautious pleading
in the SAC should be rejected.  And it is also irrelevant, because
Claimant's attacks on the SAC cannot affect the TAC's statements
about the provenance of the $13 million – statements that track what
Claimant's own counsel said.

In contrast to Claimant's attacks on the $13 million, Claimant
has relatively little to say about the connection between the
fraudulently-funded Mariscal Sucre project and the bonds that
financed the rest of the Saturn's purchase price.  Claimant first
argues that "there is no legitimate reason given to believe that the
Discoverer somehow influenced [the Saturn] bond investors."  MTD at
12:14-16.  This ignores the statements in the bond prospectus saying
that one of the "Key Strengths" of the bond offering was the
Discoverer's prior work on the Mariscal Sucre project.  TAC at ¶
1093.  It ignores how the Discoverer's mortgage was used to guarantee
the Saturn bonds.  *Id.*  It ignores how the bond prospectus boasted
that the Saturn, once purchased, would join the Discoverer in the

Mariscal Sucre project.  *Id.*  And it ignores how the arbitral opinion explicitly stated that the PetroSaudi companies were able to obtain the Saturn's drilling contract because of the Discoverer's prior work on the Mariscal Sucre project.  *Id.*  The Government agrees with Claimant that "bonds are generally valued on the prospective cash flow of the bond issuer."  MTD at 12:17-18.  But here, the prospective cash flow of the Saturn was built upon the Discoverer's work to spearhead the Mariscal Sucre project and create the business case for the Saturn.  And not in some attenuated or indirect way.  Rather, the bond prospectus and arbitral opinion explicitly credited the Discoverer's work as the reason why the Saturn's acquisition and drilling contract existed at all.

Claimant next argues that "the TAC's wordplay regarding the 'Mariscal Sucre' project is just that, wordplay."  MTD at 12:26-27. The easiest way to refute this argument is to again quote the bond prospectus: "The PetroSaudi Discoverer and, following its acquisition, the Saturn will each provide services to the PDVSA Group on four of its major gas fields as part of the Mariscal Sucre Project offshore Venezuela."  TAC at ¶ 1093 (parentheticals deleted).  The bond prospectus plainly stated that the Mariscal Sucre project was a single project that first involved the Discoverer and later included the Saturn.  Thus, again, the fraudulent funding of the project (including the purchase of the Discoverer with stolen 1MDB funds) was the proximate cause of the Saturn's purchase and the Saturn's contract to work on the project.

Relatedly, Claimant cavils at the TAC's statements that Obaid wished to expand the Mariscal Sucre project in the Summer of 2010. MTD at 12:27-13:5.  But the TAC alleges that Obaid controlled the

company (POSVL) that operated the Saturn in the Mariscal Sucre project, and that Obaid also controlled the bank account of the company (PSOSL) that purchased the Saturn.  TAC at ¶¶ 1083-84, 1097-99.  Thus, the Saturn could not have been purchased and added to the Mariscal Sucre project unless Obaid desired this outcome.

Claimant cites the Court's SAC dismissal order expressing skepticism about whether the Government could establish forfeiture based on the Discoverer's operations being key to the Saturn bond offering.  MTD at 12:2-7 (citing Dkt. 89 at 5).  Claimant says that the Court's prior skepticism is fatal to the TAC because "the government's bond argument remains substantively unchanged."  MTD at 12:6-7.  But the Government's bond argument is **not** "unchanged" from SAC to TAC.  The SAC contained no specific evidence for how the Discoverer's operations supported the Saturn bond offering (though MTD practice over the SAC did include the statement about how both drillships would be used in the Mariscal Sucre project).  By contrast, the TAC recites numerous pieces of specific evidence – from the bond prospectus and the arbitral opinion – showing how the Discoverer's operations in the Mariscal Sucre project were crucial to the Saturn's purchase and drilling contract.  TAC at ¶¶ 1093-94.  As discussed in subsection (v) below, proceeds of a business venture are forfeitable when they stem, at least indirectly, from the venture's fraudulent beginnings.  That test is met here, where the fraudulent funding of the Mariscal Sucre project was the direct and proximate cause of the Saturn's acquisition and drilling contract.

### iv. POSVL Takes Over the Operation of the Mariscal Sucre Project

On May 17, 2010, Obaid and PSOSL inserted a new PetroSaudi subsidiary company to take over the Discoverer contract from PSOSL

12

and operate the Discoverer in the Mariscal Sucre project.  TAC at ¶ 1096.  This company was POSVL.  *Id.*  POSVL also operated the Saturn after it was purchased in August 2010 and added to the drilling project the next month.  *Id.*  And, while PDVSA continued paying some drilling revenues into PSOSL's account, it began paying other drilling revenues into POSVL's account beginning in August 2010.  *Id.* In ongoing Malaysian litigation, POSVL's own attorney stated that POSVL's account was "the holding account for drilling contract receipts paid-in by PDVSA . . . ."  *Id.*

As was the case for PSOSL's account, Obaid was the sole authorized signatory on POSVL's account, and he also was the person who set up the account.  *Id.* at ¶ 1097.  Furthermore, in Form A of the account opening documents, Obaid was listed as the sole beneficial owner of all assets in the account.  *Id.*  Obaid was also the sole "Required Director" of POSVL.  *Id.* at ¶ 1098.  This meant that Obaid could sign documents binding the company without any other Director's co-signature, and none of the other Directors could sign such documents without Obaid's co-signature.  *Id.*  Likewise, no board-level decisions of POSVL could be made without Obaid's approval.  *Id.*  In short, by virtue of his status as Required Director, Obaid had full control over POSVL.  *Id.*

This fact answers Claimant's laundry list of rhetorical questions regarding what POSVL actions are attributable to Obaid. MTD at 15:6-9.  All of POSVL's significant actions are attributable to Obaid, because his status as Required Director made him the necessary and sufficient person for any board-level decisions of the company.  Additionally, his status as sole signatory of POSVL's bank account gave him full control over POSVL's revenues.

13

Under the Saturn's drilling contract, POSVL was to operate the Saturn and PDVSA was to pay POSVL for these drilling services.  TAC at ¶ 1103.  In 2015, the parties entered arbitration regarding POSVL's performance and the validity of POSVL's drilling invoices.  *Id.* at ¶ 1104.  POSVL prevailed in arbitration and was awarded roughly $380 million as compensation for the drilling services it had provided through the Saturn.  *Id.*  The arbitration award constitutes the Defendant Assets and represents proceeds of the Saturn's operations in the Mariscal Sucre project.

### v. The Foregoing Facts Render the Saturn's Proceeds (the Arbitration Award) Forfeitable

The foregoing pled facts render the arbitration award forfeitable.  Indeed, when a business project (such as the Mariscal Sucre project here) is substantially funded through illicit monies, proceeds of the project are forfeitable – even if the project is engaged in real and *otherwise*-legitimate business activities.  *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010).

In *Warshak*, defendants formed a company to sell herbal supplements.  *Id.* at 274.  The genesis and early operations of the company were marked by significant fraud – defendants relied on fictitious doctor testimonials about their product, enrolled customers in an auto-renewal program without their consent, and deceived banks about how many customers contested credit card charges for the product.  *Id.* at 277-81.  Defendants argued that the Government should not be allowed to forfeit *all* the company's revenues under a "proceeds of fraud" theory.  *Id.* at 331.  They argued that the company's later retail sales (at reputable outlets such as GNC) were not tainted by the earlier fraudulent practices.

14

*Id.* at 331.  But the court rejected this argument, instead holding that all the company's proceeds were forfeitable.  *Id.* at 331-33.

To explain why, the court first noted that "[t]o demonstrate that certain property is subject to forfeiture under 18 U.S.C. § 982(a)(2), the government must show that the property constituted, or was derived from, 'proceeds the [defendant] obtained directly or indirectly, as the result of [certain illegal conduct or a conspiracy to commit certain illegal conduct].'  Similarly, under 18 U.S.C. § 981(a)(1)(C), the government must show that the property 'constitutes or is derived from proceeds traceable to [certain illegal conduct or a conspiracy to commit certain illegal conduct].'"  *Id.* at 332 (brackets in original).  Applying this legal framework, the court held that even revenues from "legitimate" sales at retail outlets like GNC were forfeitable because they stemmed (at least indirectly) from the company's fraudulent beginnings and its earlier fraudulent sales practices.  *Id.* ("the argument that certain sales were legitimate gains no traction.  Any money generated through these potentially legitimate sales is nonetheless subject to forfeiture, as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud.  The same can be said for any sales that occurred at retail because those sales were the outgrowth of Berkeley's fraudulent beginnings.") (internal citation omitted).[4]

---

[4] Claimant may argue that *Warshak* is distinguishable because it was a criminal case, not a civil case.  But *Warshak* explicitly relied on the civil forfeiture statute in its analysis.  *Id.* at 332 (discussing 18 U.S.C. § 981(a)(1)(C)).  Given the similarities in how the civil and criminal forfeiture statutes define proceeds (*compare* 18 U.S.C. § 981(a)(2)(A) *with* 18 U.S.C. § 982(a)(2)), *Warshak* is persuasive authority.

Other cases have made similar holdings. *E.g., United States v. Farkas*, No. 1:10CR200, 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011) ("because fraudulent activity enabled TBW to remain in the business of obtaining mortgage funding, securitizing mortgages, and selling mortgage-backed securities, 'proceeds' must be interpreted sufficiently broadly to capture the defendant's gross receipts even if those receipts cannot be directly attributable to, for example, a particular fraudulent loan."); *United States v. Park*, 825 F. Supp. 2d 644, 648 (D. Md. 2011) ("In the case of a business that would not have been solvent but for the infusion of illegally-obtained funds, the entire business may be subject to forfeiture as the proceeds of the offense . . . If a business is subject to forfeiture or restraint, then so are all of the assets of the business, including any funds in any account at a financial institution.").

The same logic applies here.  The arbitration award is forfeitable because it is proceeds of the Mariscal Sucre project, which was funded with $179.6 million of fraudulently-obtained 1MDB money.  Claimant's argument that "not a single penny" of 1MDB funds was directly used to purchase the Saturn rings hollow.  The *Warshak* defendants could equally argue that "not a single penny" of fraudulent funds were used in the later product sales at reputable outlets like GNC.  But the GNC sales proceeds were still forfeitable because they stemmed from the venture's fraudulent beginnings.  The same is true for the Saturn's proceeds here, particularly when the bond prospectus and the arbitral opinion both credit the fraudulently-funded Mariscal Sucre project as the *raison d'etre* for the Saturn's purchase and the Saturn's drilling contract.

Moreover, the civil forfeiture statute defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." 18 U.S.C. § 981(a)(2)(A). This broad definition is not limited to direct proceeds. Indeed, 18 U.S.C. § 981(a)(1)(C) even allows forfeiture of property "derived from" proceeds traceable to criminal violations. Here, the fraud on 1MDB provided the capital for the Mariscal Sucre project, the proceeds of which constitute the arbitration award. Thus, the arbitration award fits within the broad definition of "proceeds" of the fraud (or at least property "derived from" such proceeds).

**vi.  The SAC Dismissal Order and Claimant's Veil-Piercing Arguments Do Not Negate the TAC's Forfeitability Case**

In its prior order dismissing the SAC, the Court seemed troubled by the fact that POSVL was the party that operated the Saturn and earned the arbitration award, yet POSVL was not the party that committed the underlying fraud on 1MDB. As the Court analogized: "It seems undeniable that if Claimant were not a PetroSaudi-related company – for example, if Chevron had leased the Saturn for operations in Venezuela – the government would not have any reasonable basis to seek forfeiture of the arbitration award." Dkt. 89 at 5. The Court questioned why POSVL should be treated differently from Chevron in the posed hypothetical.

The TAC directly addresses the Court's concern, by pleading how Obaid had full operational and financial control over POSVL. TAC at ¶¶ 1097-99. Thus, POSVL was not an unrelated third-party like Chevron, but an entity controlled by Obaid and used to exploit the project that Obaid had funded with $179.6 million of 1MDB money.

17

In other words, the Court's Chevron hypothetical presumes that a third-party such as Chevron would be ***innocently*** operating the Saturn in the Mariscal Sucre project, unaware that the project had been funded through illicit 1MDB monies.  Under that hypothetical, the basic rule (*i.e.*, that proceeds of a fraudulently-funded venture are *prima facie* forfeitable) would still apply, but the innocent operator could assert the innocent-owner defense of 18 U.S.C. § 983(d)(3)(A) to block forfeiture.  But while a true third-party like Chevron might plausibly assert the innocent-owner defense, POSVL cannot plausibly assert this defense on the facts here.  After all, POSVL was wholly-controlled by Obaid, the very person who made the fraudulent representations to 1MDB.  *See* TAC at ¶¶ 1097-99.  As the sole person holding the Required Director position at POSVL, Obaid was the necessary and sufficient person for POSVL to take corporate actions. *Id.* at ¶ 1098.  He also controlled the POSVL bank account that received drilling proceeds, thus exerting a second layer of direct control over these proceeds.  *Id.* at ¶¶ 1097, 1099.  POSVL cannot claim that it was unaware of the 1MDB fraud or the resulting funding of the Mariscal Sucre project when its Required Director (Obaid) was the very person who committed the fraud and used the illicit proceeds to fund the project.  *McHale v. Silicon Valley L. Grp.*, No. 10-04864, 2011 WL 6990187, at *5 (N.D. Cal. Dec. 14, 2011) ("knowledge of a corporate officer acting within the scope of his duties is generally imputed to a corporation.").

Even if POSVL were not part of the conspiracy to steal 1MDB's money, POSVL would still be exploiting the Mariscal Sucre project with full knowledge that the project was funded through stolen 1MDB money.  Thus, the general rule (that proceeds of an illicitly-funded

project are forfeitable) would still apply, and POSVL could not assert the innocent-owner defense to block forfeiture.

Indeed, if bad actors could use captive companies to operate their business ventures, they could easily avoid the rule that proceeds of fraudulently-funded ventures are forfeitable.  Here, Obaid controlled the company (POSVL) that operated the fraudulently-funded Mariscal Sucre project.  The project's proceeds would be forfeitable had Obaid operated the project individually, and Obaid cannot avoid this rule by using a captive company to run the project.

Moreover, though establishing forfeitability does not require showing that POSVL was a member of the 1MDB misappropriation conspiracy,[5] the TAC does adequately plead that POSVL was part of the conspiracy.  This is because a conspiracy to misappropriate money does not end when the money is first stolen – rather, it includes later downstream acts to use or exploit that money by people who know the source of the funds was illegal.  The Ninth Circuit recognized this point in the related case of *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020), holding that the 1MDB conspiracy included such downstream actions as financing motion pictures with stolen 1MDB funds.  *Id.* at 1106.  If running a motion-picture business knowingly funded with stolen 1MDB money is part of the conspiracy, then running a drilling business knowingly funded with stolen 1MDB money is also part of the conspiracy.

---

[5] As discussed above, the *prima facie* forfeitability case merely asks whether the arbitration award is proceeds of a project funded with illicit 1MDB money.  Even the affirmative defense of innocent ownership merely asks whether POSVL operated the project with knowledge that it was funded with illicit 1MDB money, not whether POSVL was a member of the conspiracy that committed the underlying fraud on 1MDB.  Moreover, innocent ownership is not at issue on a motion to dismiss – which tests the sufficiency of a complaint, not the strength of affirmative defenses.  *See* fn. 6, *infra*.

In sum, Obaid and his co-conspirators fraudulently obtained $1 billion from 1MDB.  TAC at ¶¶ 1070-80.  Obaid used $179.6 million of this money to fund the Mariscal Sucre project, through a bank account (PSOSL's account) that he wholly controlled.  *Id.* at ¶¶ 1083-85.  And he operated the fraudulently-funded project through a company (POSVL) that he wholly controlled.  *Id.* at ¶¶ 1096-99.  Thus, this case fits squarely into the caselaw holding that proceeds of a venture are forfeitable when the venture is funded with illicit money.  *Warshak*, 631 F.3d at 331-33; *Farkas*, 2011 WL 5101752 at *3; *Park*, 825 F. Supp. 2d at 648.  Obaid's use of multiple entities to effectuate the venture does not defeat forfeitability, particularly when Obaid was the controlling figure at the misappropriation, funding, and operation stages.

Claimant spends a significant portion of its brief arguing about veil-piercing and *respondeat superior* liability.  MTD at 13-15.  The response is twofold.  First, assuming *arguendo* that it were necessary to pierce the veil between POSVL and Obaid, the TAC makes a strong case for doing so.  "Courts will look closely at corporations wholly owned by an individual whenever it appears that justice and public policy might be violated if the corporate form is left impenetrable.  The factors courts consider when determining whether to pierce the corporate veil when one individual appears to exercise complete dominion and control over the corporation . . . may include (1) domination and control so complete that the corporation has no separate mind, will, or existence of its own; (2) use of this domination and control to commit fraud or wrong or any other dishonest or unjust act; and (3) injury or unjust loss resulting to the plaintiff from that control and wrong."  1 Fletcher Cyc. Corp. §

41.35 (Sept. 2020 update).  Courts may also look at whether there has been co-mingling of funds.  *Mou v. SSC San Jose Operating Co. LP*, 415 F. Supp. 3d 918, 930 (N.D. Cal. 2019).

All these factors are met here.  Obaid's status as Required Director of POSVL (and sole signatory of POSVL's bank account) gave him dominion and control over POSVL.  He used that control to commit a fraud or wrong – namely, to exploit a business venture that he knew was funded with stolen 1MDB funds.  The United States' public policy interests would be harmed if Obaid were allowed to run a fraudulently-funded venture with impunity, as the United States has a strong interest in not allowing wrongdoers to profit from illicit funds.  And Obaid co-mingled business and personal funds, by unilaterally directing that some project revenues be diverted into his personal accounts.  TAC at ¶ 1087.

Second, it is not even necessary to pierce the veil between POSVL and Obaid because this is an *in rem* action against the arbitration award itself, regardless of who owns it, and is not an *in personam* action against Obaid.  To survive a motion to dismiss, the TAC must only allege a reasonable basis to believe that the arbitration award is proceeds of a venture funded with illicit money. This does not require establishing personal liability against Obaid and thus does not require piercing the veil between POSVL and Obaid.[6]

---

[6] Nor does the Government need to allege facts to defeat an anticipated innocent ownership defense, which is an affirmative defense not relevant to a motion to dismiss.  *United States v. 630 Ardmore Dr.*, 178 F. Supp. 2d 572, 583 (M.D.N.C. 2001).  Nonetheless, even the innocent-owner question asks only whether the arbitration award's owner (POSVL) knew or had reason to know that the venture was funded with illicit money.  Basic corporate law charges POSVL with the knowledge of its Required Director Obaid.  *McHale*, 2011 WL 6990187 at *5.  Indeed, the only way a corporation like POSVL can know **anything** is through the knowledge of its officers, directors, or
*(footnote cont'd on next page)*

Finally, just as there is no need to pierce the veil between Obaid and POSVL, there is no need to pierce the veil between PSOSL and POSVL.  Obaid funded the Mariscal Sucre project through one company (PSOSL) whose account he controlled, and he operated the project through another company (POSVL) that he controlled.  TAC at ¶¶ 1083-84, 1097-99.  Because the project was funded with illicit money, the project's proceeds are forfeitable.  Claimant offers no reason why the TAC must also show PSOSL and POSVL are alter egos of each other.

### B. The Arbitration Award is Forfeitable as Property Traceable to One or More Money Laundering Transactions

The foregoing discussion shows how the arbitration award is forfeitable under a "proceeds of fraud" theory under 18 U.S.C. § 981(a)(1)(C) (Count I in the TAC).  But the award is also forfeitable under a "proceeds of money laundering" theory under 18 U.S.C. § 981(a)(1)(A) (Counts II and III).  When Obaid spent $179.6 million of illicit 1MDB money to fund the Mariscal Sucre project, those spending transactions were money laundering transactions under 18 U.S.C. §§ 1956 and/or 1957.  Because the arbitration award is traceable to those transactions (for all the reasons discussed above), the arbitration award is forfeitable under 18 U.S.C. § 981(a)(1)(A).

Claimant attacks Counts II and III by arguing that there is not a "substantial connection" between the arbitration award and the alleged money laundering transactions.  MTD at 21-22.  Initially, Claimant plays a shell game regarding what property must have the requisite "substantial connection."  The statutory section that

_____

other human representatives.  Thus, even if innocent-ownership were properly addressed at the motion to dismiss stage, no veil-piercing is required to hold that POSVL knew or had reason to know that the Mariscal Sucre project was funded with stolen 1MDB funds.

Claimant relies on, 18 U.S.C. § 983(c)(3), states: "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  Here, the Government does not allege that the arbitration award itself was directly involved in the commission of a criminal offense.  Rather, the Government alleges that the spending of illicit funds to purchase the Discoverer and otherwise capitalize the Mariscal Sucre project constituted money laundering transactions under 18 U.S.C. §§ 1956 and 1957, and that the arbitration award is *traceable* to those transactions.  *See* 18 U.S.C. § 981(a)(1)(A) ("The following property is subject to forfeiture to the United States: Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.").  Thus, the property that was involved in the commission of the offense was the property purchased with illicit funds, such as the Discoverer, the $120 million PDVSA guarantee, and payments to vendors.  Under 18 U.S.C. § 983(c)(3), it is *this* property that must have a substantial connection to the offense.  And the substantial connection is present here.  For example, when $46.9 million of illicit funds was used to purchase the Discoverer in a money laundering transaction, there is a substantial connection between that very transaction and the Discoverer.

### III. Claimant's International Comity Position Is Meritless

Claimant argues that international comity bars this suit.  MTD at 22-23.  But comity abstention is not warranted when the U.S.

Executive brings suit, because the Executive has done the balancing of foreign-policy interests that the comity doctrine is designed to address.  Dkt. 78 at 23:23-24:13 (citing cases); 3 Litigation of Int'l Disputes in U.S. Courts § 15:1 (June 2021 update).  The Government is unaware of any cases granting comity abstention to a suit by the U.S. Executive, and Claimant does not cite any.

The interests of the relevant foreign governments also weigh against comity abstention.  The Malaysian government, whose courts issued the initial order relating to the funds, supports this case and has submitted a declaration stating so.  Dkt. 37-1 at ¶¶ 9-12. The UK government provided a Witness Statement stating that it has no opposition to this case.  Dkt. 70-2 at ¶ 6.  And the UK government provided its statement *after* the UK court order that Claimant relies on (MTD at 24:14-25), which greatly undermines Claimant's argument that the UK court order warrants comity abstention.

The UK court also did not decide ownership of the funds, but is merely holding them in a similar capacity to a bank.  Dkt. 57-1; Dkt. 70-2 at ¶¶ 3-5.  There is no conflict between the UK court holding the funds and this Court deciding ownership, which weighs against comity abstention.  The relevant conduct (fraud on 1MDB and funding of a Venezuelan drilling venture) also did not occur at all in the UK, which further weighs against comity abstention.

Claimant relies on *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 569 (9th Cir. 2020).  MTD at 23:1.  But *Cooper* actually illustrates why comity abstention is not proper here. *Cooper* affirmed comity-based dismissal of private litigation based on the interests of Japan, where the Japanese government "strongly objected to this case being litigated in the United States" while the

U.S. Government "issued a careful, cautious statement" that "stopped well short of urging that California was the proper forum to exercise jurisdiction in this case." *Id.* at 568-69.  Here, by contrast, the U.S. Government has provided the strongest possible support for this case by ***bringing*** the case.  The Malaysian government has also voiced support for this case, while the UK government has submitted an explicit statement of non-opposition to this case – most likely to refute Claimant's argument that this case infringes UK interests. With all three governments united in opposition to Claimant's comity position, Claimant does not have a plausible comity leg to stand on.

## IV.  Conclusion

For the foregoing reasons,[7] the Government respectfully requests that the Court deny Claimant's motion to dismiss.[8]

Dated: August 17, 2021          Respectfully submitted,

---

[7] Claimant briefly raises personal jurisdiction, Prior Exclusive Jurisdiction, and Article III jurisdiction.  MTD at 23-24.  However, Claimant admits that the Court already resolved these issues, and re-raises them merely for "Preservation of Jurisdictional Issues."  *Id.* at 23:3.  Thus, the Government incorporates its prior briefing on these issues (Dkt. 78 at 18-23) and does not re-argue them here.

[8] Claimant argues that, if the Court were to dismiss, it should dismiss with prejudice.  MTD at 24-25.  However, "[w]hen dismissing a case under Rule 12(b)(6), courts generally must give leave to amend unless it is 'determined that the pleading could not be cured by the allegation of other facts' and therefore amendment would be futile." *Broughton v. Ohio Cas. Ins. Co.*, -- F. Supp.3d --, 2021 WL 1312747, at *3 (N.D. Cal. Apr. 8, 2021).  Claimant cannot know the grounds for any hypothetical future dismissal, and thus Claimant cannot say whether such grounds would support an inference regarding futility of amendment.  Claimant also misleads the Court by saying that "[g]ranting leave to file more complaints will prejudice Claimant's ability to assert its rights in related proceedings in the United Kingdom . . . ."  MTD at 25:18-19.  The status quo in the UK (whereby a UK court holds the *res* and makes monthly payments to Claimant) is keyed off an order from a Malaysian court.  Dkt. 57-1 at ¶ 4(a-b); Dkt. 49 at ¶ 5.  This U.S. case would not affect the Malaysian order that is the basis for the UK status quo.

DEBORAH CONNOR
Chief, MLARS

 /s/ *Joshua L. Sohn*
JONATHAN BAUM
Senior Trial Attorney, MLARS
BARBARA LEVY
JOSHUA L. SOHN
Trial Attorneys, MLARS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

    I hereby certify that I electronically filed a copy of this document (and all attachments) via CM/ECF, which will cause a copy to be served on all counsel of record.

                              /s/ *Joshua L. Sohn*
                              Joshua L. Sohn
                              Attorney for Plaintiff
                              United States of America