DEBORAH CONNOR, Chief
Money Laundering and Asset Recovery Section (MLARS)
JONATHAN BAUM, Senior Trial Attorney
BARBARA LEVY, Trial Attorney
JOSHUA L. SOHN, Trial Attorney (CBN: 250105)
Criminal Division
United States Department of Justice
      1400 New York Avenue, N.W., 10th Floor
      Washington, D.C. 20530
      Telephone: (202) 514-1263
      Email:  joshua.sohn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:20-cv-8466 DSF (PLAx) |
|---|---|
| Plaintiff, | REPLY IN SUPPORT OF GOVERNMENT'S APPLICATION FOR ARREST WARRANT IN REM |
| v. | |
| ALL FUNDS CONSTITUTING ARBITRATION AWARD IN PETROSAUDI V. PDVSA UNCITRAL ARBITRATION, | |
| Defendant. | |

## TABLE OF CONTENTS

I.     The Court Should Issue an Arrest Warrant Because the Third Amended Complaint ("TAC") Establishes Probable Cause for Forfeiture.............................................................1

II.    Because the Probable Cause Standard Is Met, the Arrest Warrant Should Issue....................................7

     A. Claimant's Argument That the Arrest Warrant Must be Served on the UK High Court Is Incorrect..............7

     B. The Proposed Warrant Is Not a "General Warrant".......9

     C. The Court Does Not Need *In Personam* Jurisdiction Over Everyone Who Receives a Copy of the Warrant..........10

     D. Claimant Cannot Prevent Issuance of a Warrant by Positing a Conflict Between the Warrant and the UK Court Order................................................11

III.   Conclusion...........................................12

1

**TABLE OF AUTHORITIES**

2

3   **CASES**

4   *Curci Inv., LLC v. Baldwin*, 14 Cal. App. 5th 214 (4th Dist. 2017) ....6

5   *Greenlight Sys., LLC v. Breckenfelder*, No. 19-CV-06658-EMC, 2021
6        WL 265137 (N.D. Cal. June 28, 2021)..............................6

7   *In re Artimm, S.r.L.*, 335 B.R. 149 (Bankr. C.D. Cal. 2005).........5

8   *McHale v. Silicon Valley L. Grp.*, No. 10-04864, 2011 WL 6990187
        (N.D. Cal. Dec. 14, 2011)......................................4
9
    *Reebok Int'l v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995) ..........12
10
    *United States v. Approx. $1.67 Million*, 513 F.3d 991
11        (9th Cir. 2008) ..............................................12

12   *United States v. Assa Co., Ltd.,* 934 F. 3d 185 (2nd Cir. 2019) ......9

13   *United States v. Farkas*, No. 1:10CR200 LMB, 2011 WL 5101752
14        (E.D. Va. Oct. 26, 2011).......................................1, 2

15   *United States v. McLaughlin*, 565 Fed. App'x 470 (6th Cir. 2014) .....3

16   *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020)..............10

17   *United States v. Park*, 825 F. Supp. 2d 644 (D. Md. 2011).........1, 2

18   *United States v. Real Prop. Located at 475 Martin Lane*, 298 Fed
        App'x 545 (9th Cir. 2008) ....................................12
19
    *United States v. Real Prop. Located in Los Angeles*, No. 4:20-CV-
20        2524, 2020 WL 7212181 (S.D. Tex. Dec. 4, 2020)................10

21   *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)...........1, 2

22   **STATUTES**

23   18 U.S.C. § 981(a)(1)(A).........................................6, 7

24   18 U.S.C. § 981(a)(1)(C).........................................1, 6

25   18 U.S.C. § 1956..................................................6

26   18 U.S.C. § 1957..................................................6

27   28 U.S.C. § 1355(b)(2)...........................................10

28   **OTHER AUTHORITIES**

Supplemental Rule G(3)(b)(ii)................................7, 8, 12

Supplemental Rule G(3)(c)(iv)......................................8

I.   **The Court Should Issue an Arrest Warrant Because the Third Amended Complaint ("TAC") Establishes Probable Cause for Forfeiture**

Claimant's Opposition Brief tries to obfuscate a fairly straightforward question: is there probable cause to believe that Tarek Obaid's and his PetroSaudi companies' business venture in Venezuela was substantially funded through fraud?  If the answer is "yes," then the Defendant arbitration award is forfeitable as proceeds of the fraud, or at least proceeds "derived from" the fraud. 18 U.S.C. § 981(a)(1)(C); *United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010); *United States v. Farkas*, No. 1:10CR200 LMB, 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011); *United States v. Park*, 825 F. Supp. 2d 644, 648 (D. Md. 2011).

Here, the arbitration award was indeed generated from a business venture that was substantially funded through fraud.  The TAC pleads in detail how Obaid and his companies funded the Mariscal Sucre drilling project with $179.6 million fraudulently obtained from 1MDB, combined $13 million in proceeds of the project with bond revenue raised by that same project to purchase a second drillship, used **both** drillships to guarantee the bonds, and transferred the project's operations to yet another legal entity they controlled.  TAC at ¶¶ 1081-1101.  Contrary to Claimant's assertions, these were not separate projects.  As the Saturn's bond prospectus stated: "The PetroSaudi Discoverer and, following its acquisition, the Saturn will each provide services to the PDVSA Group on four of its major gas fields as part of the Mariscal Sucre Project offshore Venezuela." *Id.* at ¶ 1093 (parens. deleted).  The bond prospectus also makes clear how the Mariscal Sucre project was crucial to raising the bonds that funded the lion's share of the Saturn's purchase price.  *Id.*

1

And the arbitral opinion held that the PetroSaudi companies were able to obtain the Saturn's no-bid contract because of this pre-existing, fraudulently-funded project.  *Id.* at ¶ 1094.  The Saturn then generated further proceeds in the same project.  These detailed allegations show that the Saturn's revenues are proceeds of the fraudulently-funded Mariscal Sucre project.[1]  The Saturn's revenues are thus forfeitable.  *Warshak*, 631 F.3d at 332; *Farkas*, 2011 WL 5101752 at *3; *Park*, 825 F. Supp. 2d at 648.

Claimant tries to distinguish *Warshak* by arguing that the "basis of forfeitability" in *Warshak* "extends only to situations where an entire business is fraudulent."  Opp. at 6:12-14.  This is a complete misreading of *Warshak*.  *Warshak* held that even the revenues of legitimate product sales at reputable outlets like GNC were forfeitable, and it reached this conclusion for two independent reasons.  First, there was some evidence that the company's initial fraudulent practices extended into the later era when those GNC sales occurred. *Warshak*, 631 F.3d at 332.  But second, the GNC sales revenues would be forfeitable even if they accrued after the earlier fraud had ceased, because they were at least indirectly traceable to the company's "fraudulent beginnings".  As the court explained:

---

[1] Claimant quotes this Court's dismissal order over the First Amended Complaint (FAC) for the proposition that the money used to fund the drilling project was "not stolen."  Opp. at 4:19 (quoting Dkt. 52 at 4).  This line from the FAC dismissal order simply pointed out that, of the original $1 billion, the money used to fund the drilling project did not come from the $700 million diverted to the dummy account controlled by Jho Low.  Dkt. 52 at 2, 4.  Yet the TAC pleads that the **entire** $1 billion was obtained through fraud.  Obaid and his companies lied about the value of the PSI Assets, lied about who even owned those assets, and thus fraudulently induced 1MDB to part with $1 billion.  TAC at ¶¶ 1070-80.  Because the entire $1 billion was obtained by fraud, it is immaterial that the $179.6 million portion used to fund the drilling project was distinct from the $700 million portion diverted to the Jho Low dummy account.

Any money generated through these potentially legitimate sales
is nonetheless subject to forfeiture, as the sales all resulted
"directly or indirectly" from a conspiracy to commit fraud. The
same can be said for any sales that occurred at retail because
those sales were the outgrowth of Berkeley's fraudulent
beginnings. Furthermore, it could be argued that any sales post-
dating the bank-fraud counts were proceeds resulting indirectly
from fraud, as Berkeley would have been unable to conduct
credit-card transactions if the chargeback-manipulation scheme
had never been implemented. As a consequence, forfeiture of
Berkeley's revenues, including money generated through
supposedly legitimate transactions, was appropriate.

*Id.* at 332-33 (internal citation omitted).

The same analysis applies here.  The Saturn and its drilling

contract are traceable to the Mariscal Sucre project's "fraudulent

beginnings," because the bond prospectus and arbitral opinion make

clear that the Saturn's purchase and contract were directly based on

the pre-existing, fraudulently-funded project.  Accordingly, the

Saturn's revenues constitute proceeds of the 1MDB fraud or property

derived from such proceeds.[2]

Notably, Claimant's own cited case of *United States v.*

*McLaughlin*, 565 Fed. App'x 470 (6th Cir. 2014) refutes Claimant's

crabbed reading of *Warshak*.  *McLaughlin* summarized *Warshak* as

follows: "In *Warshak,* this Court held that a corporation and its

owners and officers were altogether jointly and severally liable in

forfeiture for all of its revenues where that corporation's initial

outstanding success was due predominantly to fraudulently obtained

sales . . . even though there were some legitimate sales, all

corporate revenues were tainted by the initial sales".  *Id.* at 476.

---

[2] The link between the pre-existing Mariscal Sucre project and
the Saturn is not based on mere attenuated "but-for" causation (Opp.
at 1:21).  Rather, the bond prospectus and arbitral opinion
explicitly credit the pre-existing project as the reason why the
Saturn and its contract existed at all.  This shows a direct and
proximate link between the pre-existing project and the Saturn.

3

This standard manifestly does ***not*** require that "an entire business is fraudulent," as Claimant asserts.  Opp. at 6:14.

Claimant also has no convincing rebuttal to *Farkas* and *Park*, which are in line with *Warshak*.  Claimant argues that *Farkas* and *Park* are distinguishable because, unlike in those cases, "the government has never alleged [] or asserted that fraud enabled Claimant to remain in business."  Opp. at 7:21-22.  Initially, the proper inquiry is whether fraudulent proceeds enabled the Mariscal Sucre project to get off the ground.  And the TAC creates a strong basis to believe that the $179.6 million in fraudulently-obtained proceeds was indeed critical to the project.  Obaid and his co-conspirators committed crimes to get the funds and quickly started paying them out to meet obligations under the Mariscal Sucre project.  Without those funds, the project would have faced a $179.6 million hole.

In sum, the *prima face* forfeitability case asks whether the arbitration award is proceeds of a project that was substantially funded through fraud – and the answer to that question is "yes." Thus, to issue the Arrest Warrant *in Rem*, the Court need not consider Claimant's contention that it is an innocent owner.  But even if the Government did need to negate an innocent-owner defense at the arrest warrant stage, the pled facts here show that POSVL's innocent-owner defense will almost certainly fail.  After all, POSVL's sole Required Director was Tarek Obaid, the very person who committed the underlying fraud on 1MDB and funded the Mariscal Sucre project through corporate bank accounts that he controlled.  TAC at ¶¶ 1081-84, 1097-99.  As a matter of basic corporate law, POSVL is charged with the knowledge of its Required Director Obaid.  *See McHale v. Silicon Valley L. Grp.*, No. 10-04864, 2011 WL 6990187, at *5 (N.D.

4

Cal. Dec. 14, 2011) ("knowledge of a corporate officer acting within the scope of his duties is generally imputed to a corporation."). Indeed, the rule could hardly be otherwise, because a corporation like POSVL is not a natural person and does not have a brain.  The only way it can know **anything** is through the knowledge of its officers, directors, or other human representatives.

And to be clear, the conclusion that POSVL operated the Mariscal Sucre project with knowledge of its fraudulent beginnings does not require piercing the veil between POSVL and Obaid.  The law does not hold that a corporation is only charged with knowledge of its representatives when a court can pierce the corporate veil.  Thus, there is no need to pierce the veil in order to hold that POSVL operated the Mariscal Sucre project with knowledge that the project had been funded through fraud.

In any event, Claimant's (irrelevant) argument that the veil cannot be pierced rests on an incorrect legal analysis.  Claimant assumes that California law supplies the substantive veil-piercing standard, and then asserts that reverse-piercing from an owner to a company is not allowed under California law.  Opp. at 9.  But in this Federal-question case, California law does not even supply the choice-of-law rules, much less the substantive law.  *In re Artimm, S.r.L.*, 335 B.R. 149, 164 (Bankr. C.D. Cal. 2005) ("The Ninth Circuit directs us to apply federal choice of law rules, not those of the forum state, in federal question cases with exclusive jurisdiction in the federal courts").  Even if California choice-of-law rules did apply, these rules dictate that the veil-piercing standard is that of POSVL's state of formation (Barbados), because POSVL is a limited-liability company (the "L" in POSVL stands for "Ltd.").  *Greenlight*

*Sys., LLC v. Breckenfelder*, No. 19-CV-06658, 2021 WL 2651377, at *17 (N.D. Cal. June 28, 2021) (for a limited-liability company, California choice-of-law rules require applying the veil-piercing law of the company's state of formation).  Finally, even if California law supplied the substantive veil-piercing standard, California allows reverse-piercing of a limited-liability company.  *Curci Inv., LLC v. Baldwin*, 14 Cal. App. 5th 214, 222 (4th Dist. 2017).

But to circle back: veil-piercing is irrelevant because, even without piercing, Claimant operated the Mariscal Sucre project with knowledge that it was funded with $179.6 million of illicit money. The arbitration award is *prima facie* forfeitable because it is proceeds of a fraudulently-funded project, and Claimant's innocent-owner defense would fail because Claimant had knowledge of the project's fraudulent beginnings.  The pled facts therefore create probable cause that the arbitration award is forfeitable under 18 U.S.C. § 981(a)(1)(C) as proceeds of fraud, or at least proceeds "derived from" fraud.

The arbitration award is also forfeitable under 18 U.S.C. § 981(a)(1)(A) as traceable to property involved in money laundering. When Obaid spent illicit 1MDB money to fund the Mariscal Sucre project, those spending transactions were money laundering transactions under 18 U.S.C. §§ 1956 and/or 1957.[3]  Nonetheless, Claimant argues in conclusory fashion that the TAC does not connect the Defendant *res* to an SUA or money laundering.  Opp. at 4:24-25. Not so.  The TAC clearly alleges transactions in the United States

---

[3] Even before that, the TAC also alleges that Obaid and his co-conspirators caused the initial $300 million to be wired to the Joint Venture account using a U.S. correspondent account, in violation of 18 U.S.C. §§ 1956 and/or 1957. *See* TAC at ¶ 1081.

through which 1MDB fraud proceeds were used to fund the Mariscal Sucre project.  See, e.g., TAC at ¶ 1084.  Because the arbitration award is traceable to those transactions (as discussed above), the award is forfeitable under 18 U.S.C. § 981(a)(1)(A).

## II. Because the Probable Cause Standard Is Met, the Arrest Warrant Should Issue

Supplemental Rule G(3)(b)(ii) states: "the court—on finding probable cause—***must*** issue a warrant to arrest the property if it is not in the government's possession, custody, or control and is not subject to a judicial restraining order" (emphasis added).  While portions of the Defendant Assets are controlled by the UK High Court and are thus under a judicial restraining order, other portions are being released monthly to third-parties.  *See* Dkt. 57-1.  As to these released portions of the *res*, this Court "must" issue an arrest warrant upon a finding of probable cause.  This Court's analysis can and should end there.  Nonetheless, for the sake of completeness, the Government addresses Claimant's other arguments against issuance of an arrest warrant below.

### A. Claimant's Argument That the Arrest Warrant Must be Served on the UK High Court Is Incorrect

A significant portion of Claimant's Opposition brief is devoted to the following syllogism: (1) any arrest warrant must be served on the UK High Court that holds portions of the Defendant Assets; (2) the arrest warrant cannot be served on the UK High Court due to the Foreign Sovereign Immunities Act (FSIA); and (3) therefore this Court should not issue an arrest warrant in the first place.  Opp. at 15-18.  But premises (1) and (2) of Claimant's syllogism are both false.  The arrest warrant does not need to be served on the UK High Court for multiple reasons, and the FSIA is inapplicable.

7

First, as alluded to above, Supplemental Rule G(3)(b)(ii) states that no arrest warrant is required for defendant assets that are subject to a judicial restraining order.  Here, the portions of the Defendant Assets held by the UK High Court are subject to a judicial restraining order, so no arrest warrant is required for that subset of the Defendant Assets.  Indeed, the proposed warrant that the Government tendered to this Court expressly carves out that subset of the Defendant Assets from its scope.  Dkt. 93-1 at 2:16-18.

Second, Supplemental Rule G(3)(c)(iv) states: "If executing a warrant on property outside the United States is required, the warrant may be transmitted to an appropriate authority for serving process where the property is located."  For any portions of the Defendant Assets located in the UK, that "appropriate authority" is the UK National Crime Agency (NCA), as Claimant admits.  Opp. at 15:1-3.  And as stated in the Declaration of NCA representative Jonathan Rainer, the NCA would not serve the warrant on the UK High Court, nor would it need to.  Mr. Rainer explains: "The warrant, if granted, would need to be served on PetroSaudi (not the UK High Court) as they are the only entity with a right to the funds as confirmed by the terms of the arbitral award . . . formal service is only applicable to and necessary for PetroSaudi."  Dkt. 70-2 at ¶ 6.[4]

Finally, the FSIA is not applicable here.  With certain exceptions, the FSIA immunizes foreign states from suit in U.S. courts.  But here, the United States has not filed suit against the UK courts, nor does it seek forfeiture of property belonging to the UK or its courts.  Indeed, POSVL contends that *it* is the owner of the

---

[4] Notably, Rule G(3)(c)(iv) "requires only that the warrant be transmitted to an appropriate authority."  Supp. R. G (3)(c) Advisory Committee Note (2006).

funds.  In any event, the FSIA does not preclude *in rem* civil

forfeiture actions brought under 28 U.S.C. §§ 1345 and 1355.  *United*

*States v. Assa Co., Ltd.,* 934 F. 3d 185, 190 (2nd Cir. 2019).

**B. The Proposed Warrant Is Not a "General Warrant"**

Claimant next argues that the proposed warrant is an improper

"general warrant" because it supposedly lacks specificity.  Opp. at

19-20.  Not so.  The proposed warrant clearly identifies the

Defendant Assets, explains how most of these assets are held by the

UK High Court, and specifically references the UK court order by

which defined quantities of the Defendant Assets are released to

private parties on a monthly basis.  *See* Dkt. 93-1 at 1-2.  This is

not a situation where the Government seeks "a warrant authorizing

seizure of 'evidence of a violation of' a particular statute" or

"seizure of an inchoate category of materials."  Opp. at 19:14;

19:21-23.  The Government instead seeks a warrant over portions of a

defined *res*.  The fact that portions of the *res* are held by different

parties does not transform the warrant into a "general warrant."

To be sure, if the Court required even more specificity to the

proposed warrant, the Government could provide it.  For example, the

party authorized to receive portions of the Defendant Assets from the

UK court is Armstrong Teasdale Ltd.  Dkt. 57-1 at ¶ 4.  Armstrong

Teasdale is authorized to receive defined quantities of the Defendant

Assets on the first banking day of every month, before doling this

money out to other third-parties.  *Id.*  Thus, the Government could

craft a proposed warrant specifically targeted to Armstrong Teasdale

and specifying the dates and amounts of monies received.  But given

that the existing proposed warrant describes a specific *res*, the

Government believes no further specificity is required.

9

**C. The Court Does Not Need *In Personam* Jurisdiction Over Everyone Who Receives a Copy of the Warrant**

Claimant next argues that the Court should not issue the warrant because the Court might not possess *in personam* jurisdiction over everyone "who will receive copies of the warrant." Opp. at 21:3-13. At the same time, Claimant argues that service of the warrant is critical to this Court's *in rem* jurisdiction. *Id.* at 12, 17:13-14, 18:11-12. Thus, Claimant seeks a rule that a court cannot adjudicate an *in rem* civil forfeiture case unless it possesses *in personam* jurisdiction over everyone "who will receive copies of the warrant."

*United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020) defeats this argument. *Obaid* held that jurisdiction over non-defendant third-parties is irrelevant in a civil forfeiture case. *Id.* at 1106 ("the district court did not err when it determined that the constitutional due process requirements set forth in *International Shoe* were inapplicable to this *in rem* action . . . In an *in rem* action, the focus for the jurisdictional inquiry is the res"). Thus, this Court does not need personal jurisdiction over persons "who will receive copies of the warrant." The Court's *in rem* jurisdiction over the *res* allows it to issue a warrant as to that *res*, and jurisdiction over the *res* depends solely on satisfying the test of 28 U.S.C. § 1355(b)(2) – which Claimant does not dispute is satisfied here. *See United States v. Real Prop. Located in Los Angeles*, No. 4:20-CV-2524, 2020 WL 7212181, at *4 (S.D. Tex. Dec. 4, 2020) ("the 'minimum contacts' test applies neither to the *res* nor to any claimants in a case like this one. Rather, the jurisdictional inquiry here begins and ends with § 1355(b)") (citing *Obaid*).

10

**D. Claimant Cannot Prevent Issuance of a Warrant by Positing a Conflict Between the Warrant and the UK Court Order**

Claimant finally argues that a warrant from this Court could theoretically require private parties holding the *res* to act in ways at odds with the UK court order. Opp. at 23:3-5 ("to the extent that the government seeks a warrant purporting to bind entities and individuals in England who are acting in accordance with the legal orders of the English courts, it is also impermissible."). There are numerous flaws with this argument. First, while Claimant avoids the word "comity," Claimant essentially asks this Court to refrain from issuing a warrant out of deference to the UK court order. This is a request for abstention based on international adjudicative comity. Thus, the Government incorporates its recent MTD briefing (Dkt. 96 at 23-25) explaining why comity abstention is not proper here.

Second, Claimant is trying to take advantage of a hypothetical future conflict of its own making. After this Court dismissed the First Amended Complaint and recalled its original arrest warrant on March 9, 2021, Claimant rushed into the UK court less than two weeks later to seek and obtain the UK order at issue here. *See* Dkt. 57-1 at 1. Claimant knew that this Court had granted leave for the Government to file an amended Complaint within three weeks, and Claimant thus knew that a new warrant from this Court might issue. Under these circumstances, Claimant cannot complain that a new warrant might theoretically be in tension with the UK order that Claimant itself sought.

Finally, if Claimant (or any third-party) believes that this Court's warrant and the UK court order create irreconcilable directives, such party would be free to approach either court for

11

guidance on how to proceed.  Unlike Claimant's cited case of *Reebok Int'l v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995), the Government is not presently seeking sanctions against anyone.  The Government is merely seeking issuance of a warrant.  Any hypothetical conflict between such warrant and the UK order is speculative, could be navigated with the assistance of either court, and should not preclude the issuance of a warrant in the first place.

**III. Conclusion**

For the foregoing reasons, the Government respectfully requests that this Court issue the proposed arrest warrant *in rem*.  However, one final point should be made.  Specifically, Claimant argues that if the Court does ***not*** issue the warrant, the Court must dismiss this case for lack of jurisdiction.  Opp. at 12, 17:13-14, 18:11-12.  This argument is meritless.  A warrant is a means for this Court to assert control over the defendant property.  But under *United States v. Approx. $1.67 Million*, 513 F.3d 991, 998 (9th Cir. 2008), civil forfeiture jurisdiction does not require exercising control over the defendant *res*.  Notably, Claimant's "warrant is essential to jurisdiction" cases (Opp. at 12) pre-date *$1.67 Million*.  Moreover, shortly after *$1.67 Million* issued, the Ninth Circuit held that *$1.67 Million* "effectively precludes" any argument that failure to serve a warrant divests the court of jurisdiction.  *United States v. Real Prop. Located at 475 Martin Lane*, 298 Fed App'x 545, 549 (9th Cir. 2008).  Finally, as discussed above, Supplemental Rule G(3)(b)(ii) plainly holds that no warrant is required as to the portion of the Defendant Assets held by the UK court.  Thus, even if the Court were to deny the Government's arrest warrant application, it should reject Claimant's request to dismiss this case as a result.

Dated: August 30, 2021          Respectfully submitted,

                                DEBORAH CONNOR
                                Chief, MLARS

                                 /s/ *Joshua L. Sohn*
                                JONATHAN BAUM
                                Senior Trial Attorney, MLARS
                                BARBARA LEVY
                                JOSHUA L. SOHN
                                Trial Attorneys, MLARS

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

13

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed a copy of this document via CM/ECF, which will cause a copy to be served on all counsel of record.

/s/ Joshua L. Sohn
Joshua L. Sohn
Attorney for Plaintiff
United States of America