1  Zoe M. Steinberg (CA SBN 324324)
   zsteinberg@bakerlaw.com
2  BAKER & HOSTETLER LLP
   11601 Wilshire Blvd., Ste. 1400
3  Los Angeles, CA 90025
   Telephone:  310.820.8800
4  Facsimile:  310.820.8859

5  David B. Rivkin, Jr. (*pro hac vice*)
   drivkin@bakerlaw.com
6  BAKER & HOSTETLER LLP
   1050 Connecticut Avenue, NW
7  Washington, D.C. 20036
   Telephone:  202.861.1500
8  Facsimile:  202.861.1783

9  (additional counsel listed after caption)

10 *Attorneys for Claimant*
   *PetroSaudi Oil Services (Venezuela) Ltd.*

11

12            **IN THE UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                   **LOS ANGELES DIVISION**

15 UNITED STATES OF AMERICA,          Case No.: 2:20-cv-08466-DSF-PLA
                                      Hon. Dale S. Fischer
16          Plaintiff,
                                      **CLAIMANT PETROSAUDI OIL**
17    v.                              **SERVICES (VENEZUELA)**
                                      **LTD.'S REPLY IN FURTHER**
18                                    **SUPPORT OF ITS MOTION TO**
   ALL FUNDS CONSTITUTING            **DISMISS VERIFIED THIRD**
19 ARBITRATION AWARD IN              **AMENDED COMPLAINT** *IN*
   *PETROSAUDI v. PDVSA* UNCITRAL    *REM*
20 ARBITRATION,
                                      Hearing Date: September 13, 2021
21          Defendant.                Time: 1:30 p.m.
                                      Judge: Hon. Dale S. Fischer
22                                    Courtroom: 7D

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  OF COUNSEL:

2  Lee A. Casey (CA SBN 119568)
   lcasey@bakerlaw.com
3  Mark W. DeLaquil
   mdelaquil@bakerlaw.com
4  Jonathan R. Barr (*pro hac vice*)
   jbarr@bakerlaw.com
5  Elizabeth Price Foley (*pro hac vice*)
   efoley@bakerlaw.com
6  Kendall E. Wangsgard
   kwangsgard@bakerlaw.com
7  BAKER & HOSTETLER LLP
   1050 Connecticut Avenue, NW
8  Washington, D.C. 20036
   Telephone:   202.861.1500
9  Facsimile:    202.861.1783

10 Jonathan B. New (*pro hac vice*)
   jnew@bakerlaw.com
11 BAKER & HOSTETLER LLP
   45 Rockefeller Plaza
12 New York, NY 10111
   Telephone:   212.589.4200
13 Facsimile:    212.549.4201

14 *Attorneys for Claimant*
   *PetroSaudi Oil Services (Venezuela) Ltd.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# **TABLE OF CONTENTS**

I.    THE OPPOSITION ASKS THE COURT TO IGNORE
      INCONSISTENT PLEADINGS AND FACIAL IMPLAUSIBILITY ........... 1

II.   THE TAC IMPLAUSIBLY CONFLATES SEPARATE
      ENTERPRISES INTO A SINGLE "MARISCAL SUCRE PROJECT" ........ 2

III.  THE GOVERNMENT'S POSITION WITH RESPECT TO THE
      *SATURN* BOND ISSUANCE REMAINS IMPLAUSIBLE .......................... 4

IV.   SHIFTING ALLEGATIONS ABOUT THE *SATURN* PURCHASE
      HIGHLIGHT THE ABSENCE OF ANY LINK TO JV FUNDS ................. 5

V.    THERE IS NO BASIS TO IGNORE THE CORPORATE
      SEPARATENESS OF, AND DISTINCTION AMONG, ENTITIES ........... 6

VI.   FOUNDATIONAL ALLEGATIONS OF FRAUD ARE
      IMPLAUSIBLE ........................................................................................ 9

VII.  COMITY AND THE HIGH COURT'S OWNERSHIP OF THE *RES* ........ 10

VIII. LEAVE TO AMEND IS NOT WARRANTED ......................................... 12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 2

*Chan v. Soc'y Expeditions, Inc.*,
123 F.3d 1287 (9th Cir. 1997) ............................................................... 7

*City of Emeryville v. Robinson*,
621 F.3 1251 (9th Cir. 2010) ................................................................ 12

*Con. Edison Co. of N.Y., Inc. v. Bodman*,
445 F.3d 438 (D.C. Cir. 2006).............................................................. 11

*Cooper v. Tokyo Electric Power Holdings, Inc.*,
960 F.3d 549 (9th Cir. 2020) ......................................................... 10, 12

*Daewoo Elecs. Am. Inc. v. Opta Corp.*,
875 F.3d 1241 (9th Cir. 2017) ............................................................ 7, 8

*Houston v. United States*,
217 F. 852 (9th Cir. 1914)
*cert. denied*, 238 U.S. 613 (1915) ....................................................... 10

*Katzir's Floor & Home Design, Inc. v. M-MLS.com*,
394 F.3d 1143 (9th Cir. 2004)................................................................ 7

*Postal Instant Press, Inc. v. Kaswa Corp.*,
77 Cal. Rptr. 3d 96 (2008) ..................................................................... 7

*Smith v. Simmons*,
638 F. Supp. 2d 1180 (E.D. Cal. 2009)
*aff'd*, 409 Fed. App'x 88 (9th Cir. 2010) ............................................... 8

*United States v. Farkas*,
2011 WL 5101752 (E.D. Va. Oct. 26, 2011) ......................................... 3

*United States v. Green*,
594 F.2d 1227 (9th Cir. 1979) ............................................................. 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

*United States v. Kim,*
    806 F.3d 1161 (9th Cir. 2015) .................................................................. 7

*United States v. McLaughlin,*
    565 Fed. App'x 470 (6th Cir. 2014) ......................................................... 3

*United States v. Obaid,*
    971 F.3d 1095 (9th Cir. 2020) ............................................................... 10

*United States v. Park,*
    825 F. Supp. 2d 644 (D. Md. 2011) ......................................................... 3

*United States v. Tanke,*
    743 F.3d 1296 (9th Cir. 2014) ............................................................... 10

*United States v. Wood,*
    2016 WL 8131221 (E.D. Ky. Oct. 17, 2016) ............................................ 3

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 490 (1983) .............................................................................. 11

*United States v. Warshak,*
    631 F.3d 266 (6th Cir. 2010) .................................................................. 3

**Statutes**

28 U.S.C. § 1604 ............................................................................... 10, 11

**Other Sources**

MERRIAM-WEBSTER ("launch") .............................................................. 3

iii

1    Plaintiff still cannot overcome uncontroverted facts fatal to its case: the *res* is

2    held by a UK court, and was funded by a third-party bank unconnected to 1MDB,

3    as a result of an arbitral award based upon legitimate business services rendered by

4    Claimant. Further, the government has abandoned its position that $13 million used

5    for the *Saturn* purchase is traceable to funds invested by 1MDB in another

6    enterprise months prior. And for good reason, that was not true. The *res* remains

7    unconnected to any alleged SUA or money laundering.

8    In the face of this unbridgeable gap, the Opposition falsely attempts to

9    collapse separate entities, ships, operations, and contracts into a purported

10   "Mariscal Sucre project" to premise forfeiture on activities that were not relevant to

11   the arbitral award. The government also reverts to the implausible, and already

12   rejected, "but for" theory that the *Saturn* bond depended on the *Discoverer*

13   operations. The Opposition further submits that an alleged expenditure of $13

14   million (5% of the price) of *Discoverer* revenues for an entity other than Claimant

15   to purchase the *Saturn* somehow renders the independent revenue of Claimant

16   forfeitable. But this is not a case about forfeiting the *Saturn*, and the purchase of the

17   *Saturn* is multiple levels removed from the arbitral award. Finally, because

18   Claimant did not exist at the time of the alleged conspiracies, the Opposition is

19   forced to posit implausible allegations about Mr. Obaid to assert baselessly that

20   Claimant is his "captive." International comity also warrants dismissal.

21   **I.      THE OPPOSITION ASKS THE COURT TO IGNORE**

22   **INCONSISTENT PLEADINGS AND FACIAL IMPLAUSIBILITY**

23   The Opposition has no answer for the fact that *none* of the funds contributed

24   by 1MDB relate to the arbitral award. To sidestep this fatal deficiency, the

25   government seeks a lesser and erroneous pleading standard. Remarkably, the

26   Opposition expects the Court to ignore prior inconsistent allegations and accept

27   allegations that are wholly implausible. Indeed, the government asserts that the

28   Court *must* "accept the TAC's material factual allegations as true '**even if doubtful**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

**in fact**.'" Opp'n at 3 (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007)) (emphasis added). This remarkable position is a tacit admission that allegations in the *verified* complaint *are* likely "doubtful in fact." Yet, *Twombly* does not stand for mechanical acceptance of implausible allegations. Also, as discussed in the MTD, the <u>fourth</u> complaint is not taken in a vacuum. *See* ECF No. 94 at 8-9, 20-21. The Court should consider prior inconsistent/contradictory allegations. *Id.* The Opposition also contends that a court "asks not whether a plaintiff will ultimately prevail." Opp'n 3-4. Yet, this is *exactly* what Rule G requires a court to ask (*i.e.*, is it reasonably likely that government will be able to meet its burden at trial).

## II.   THE TAC IMPLAUSIBLY CONFLATES SEPARATE ENTERPRISES INTO A SINGLE "MARISCAL SUCRE PROJECT"

The government has repeatedly turned to wordplay to avoid the inescapable fact that the arbitral award stems solely from Claimant's operations with a leased ship, whose operations were unconnected to any alleged conspiracy. Initially, it was a collective definition to refer to multiple entities, *see* ECF No. 11 at 2, n.1, and the "umbrella term 'PetroSaudi' to refer to all members of the PetroSaudi family of companies." ECF No. 43 at 1, n.1. When such broad, undefined terms were found insufficient, the government switched to a nebulous "venture" or "Venezuelan drilling project" that did not exist in fact. Now, the government relies on the generalized term "Mariscal Sucre drilling project." But, the allegations of a monolithic venture remain implausible. ECF No. 94 at 5-7, 12-13.

The MTD noted that reference to "Mariscal Sucre" is, in fact, to PDVSA's own operation. ECF No. 94 at 5-6, 13. It was not a project that Mr. Obaid or anybody other than PDVSA could control or expand. The Opposition deems relevance of this fact "unclear" and states that the government "has always alleged that PDVSA was one of the parties to the Mariscal Sucre project, and . . . in prior versions of the project PDVSA worked with other, unrelated counterparties." Opp'n at 7. This is too cute by half. PDVSA's Mariscal Sucre project dates to at least 2007

2

and is ongoing. Yet, the TAC alleges that the Mariscal Sucre project was "launched" by Mr. Obaid. *See* TAC ¶¶ 1095, 1100, 1106. Elsewhere, it claims that he wished to "expand [its] scope." *Id.* ¶ 1090. Obviously, something cannot exist afore, yet be "put into operation or set into motion" later. *See* MERRIAM-WEBSTER ("launch"). Nor is any delineation of "versions" of the project found anywhere in the TAC. This is another attempt to bypass reality through artificial terminology.

The government does reveal why it continues with this failed stratagem: "the forfeitability case here **centers on the $179.6 million** . . . used to fund the Mariscal Sucre project **in Jan.-Feb. 2010**." Opp'n at 7 (emphasis added). In other words, because this case is not about forfeiture of the *Saturn* and *no* 1MDB money funded the *Saturn*, the government must engage in contortions to make it seem as though the *Saturn,* the *Discoverer*, and their separate contracts were a single enterprise.

Attempting to consolidate disparate enterprises into a single "Mariscal Sucre project" is also the linchpin for the government's inapposite *Warshak* argument, *i.e.*, that the entire operation was "funded with" stolen money rendering legitimate proceeds subject to forfeiture. Opp'n at 14-17. *United States v. Warshak* upheld criminal forfeiture of legitimate sales because the company's entire operation was "permeated by fraud." 631 F.3d 266, 332 (6th Cir. 2010). Forfeitability on this basis, as *United States v. McLaughlin*, 565 Fed. App'x 470, 477 (6th Cir. 2014) elucidates, is permissible *only* where an entire business is fraudulent. Thus, *McLaughlin* rejected the government's attempt to invoke *Warshak* because the fraud was discrete. *Id*. at 478. *See also United States v. Wood*, 2016 WL 8131221, at *2 (E.D. Ky. Oct. 17, 2016). That premise is not remotely present here. Similarly, invocation of *United States v. Farkas*, 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011), and *United States v. Park*, 825 F. Supp. 2d 644, 648 (D. Md. 2011) is unavailing. The government does not allege that fraud enabled PSOSVL to remain in business or that it would be insolvent absent illegality. The government seeks an unprecedented expansion of existing forfeiture law.

3

### III.   THE GOVERNMENT'S POSITION WITH RESPECT TO THE *SATURN* BOND ISSUANCE REMAINS IMPLAUSIBLE

Continued insistence that the *Saturn* bond issue would not have been possible absent the *Discoverer*—a "thinner connection" which the Court was skeptical satisfies Rule G, ECF No. 89 at 5—remains an implausible "but for" theory. The TAC agrees that the future revenue of the *Saturn* underpinned the bond issue. TAC ¶ 1093. The PPM identified the foundational "key strength" for the bonds: "the Saturn Drilling Contract will generate approximately U.S. $103.5 million EBITDA annually." The Opposition ignores this. *See* Opp'n at 8. That PPM also made clear to investors that "all of the proceeds" from the bonds were solely for the purchase of the *Saturn*. This was a stand-alone opportunity, off the back of the $1.235 billion of projected revenues of the *Saturn*. Thus, the "business case" for the bonds remained the *Saturn* itself and the money it would generate.

The government also seizes on one out-of-context statement from the arbitral award to claim there "could hardly be a better or more authoritative statement tying the Saturn to the Discoverer's pre-existing work on the Mariscal Sucre project":

> The direct award. . . was justified in view of the urgency for PDVSA to replace the sunken semi-submersible Aban Pearl and considering PDVSA's prior experience with another drillship of PetroSaudi in the Dragon field, i.e. the Discoverer. . . . **PDVSA cannot subsequently rely on this circumstance, which it has itself authorised, in support of its allegations of fraud**.

*See* Opp'n at 9; TAC ¶ 1094. But the TAC omits the contextual language (in bold). The panel was addressing a collateral attack on the *Saturn* contract, in particular its direct award. The panel found the claims to be unsupported. The quote merely explains why PDVSA needed to, and legitimately did, expedite the process. The panel did not find that the *Discoverer* and the *Saturn* were a unified operation, and the panel's decision highlights precisely the fact that the *Saturn* contract was the basis for the award. Most importantly, because this is not a case about forfeiting the

4

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

*Saturn*, the bond and the other $13 million that funded its purchase are irrelevant.

## IV.   SHIFTING ALLEGATIONS ABOUT THE *SATURN* PURCHASE HIGHLIGHT THE ABSENCE OF ANY LINK TO JV FUNDS

The government continues to insist that expenditure of $13 million to purchase the *Saturn* (of $260 million) renders the arbitral award forfeitable. As noted above, it now admits that 1MDB was not the source of that $13 million. Also, the government does not seek, and has never sought, to forfeit the *Saturn*. Instead, the defendant *in rem* is an independent award for services performed when Claimant leased the *Saturn* on arms-length terms. The award is multiple levels removed. Thus, regardless of the origin of that $13 million, the government cannot establish a link between it and the arbitration award justifying forfeiture.

The Opposition curiously states that, in prior pleadings, the government was "uncertain at the time of the SAC about the provenance of the $13 million, and it forthrightly signaled this uncertainty to the Court." Opp'n at 10. However, there was nothing "forthright" or "cautious" about its prior assertions regarding the *Saturn* purchase. *See* MTD, § I(A)(1), ECF No. 94 at 10-11. Although the government included one "upon information and belief" hedge, it adamantly and unequivocally argued that the *Saturn* was purchased with 1MDB funds. This included at oral argument, in the initial complaint, FAC, SAC, and in various briefs.[1] Because analysis of the TAC is a "context-specific task" *Iqbal*, 556 U.S. at 679, the relevant context must necessarily include the government's shifting narrative. *See* ECF No. 94 at 20-21. With the TAC, at least, the parties agree on one point: the *Saturn* purchase was not funded with any of 1MDB's $300 million investment.[2] TAC ¶ 1090. Everything alleged regarding tracing of the $300 million and the $185 million is a distraction and is irrelevant to the arbitral award.

---

[1] As just one example: "The Saturn was purchased in part with $13 million of the $185 million in fraudulently obtained funds held by PSOSL." *See* ECF 71 at 2.

[2] There is no serious dispute regarding the government's math, either. The TAC alleges that $185 million went into the account of PSOSL, but $229.68 million came out. The

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

5

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Undaunted, the government posits a new "provenance" for a fraction of the

2   *Saturn* purchase funds. Opp'n at 10. Yet, this new theory, that *Discoverer* revenue

3   contributed to the *Saturn* purchase, remains a red herring. This case is not about

4   forfeitability of the *Saturn*, which was owned by a separate company that is neither

5   a claimant nor the recipient of the arbitral award. Nor is there any indication that

6   the *Saturn* acquisition would not have proceeded independent of any *Discoverer*

7   revenues. Simply, there are *no allegations* tracing "the partial purchase of the

8   *Saturn* . . . to the original $185 million," ECF No. 89 at 4, and nothing rebuts the

9   presumption of "a number of different ways that PetroSaudi could have funded the

10   drillship investment without 1MDB." ECF No. 52 at 5, n.3. The Court previously

11   dismissed in part on these grounds, and it should similarly dismiss the TAC.

12   **V.   THERE IS NO BASIS TO IGNORE THE CORPORATE**

13   **SEPARATENESS OF, AND DISTINCTION AMONG, ENTITIES**

14   Recognizing that Claimant has no connection to the 1MDB allegations, the

15   government seeks to buttress its forfeiture theory with implausible and conclusory

16   allegations that PSOSVL was a "captive" company, "wholly-controlled" by Mr.

17   Obaid. Opp'n at 17-22. This rests on the contention that he "was the necessary and

18   sufficient person for P[S]OSVL to take corporate actions" by virtue of being a

19   Required Director. Opp'n at 18. *See also* TAC ¶ 1098; Opp'n at 13.

20   The government is clear why it employs this "captive company" terminology

21   that is found nowhere in the TAC: it needs to paint Claimant as something other

22   than "innocent." *See* Opp'n at 17-22. Per the government, if Mr. Obaid is a "bad

23   actor" and Claimant a "captive company," then Claimant's innocent-owner defense

24   is somehow abrogated. *Id.* at 19. Yet, its assertion that "bad actors" should not be

25   able to "avoid" legal consequences by operation of the corporate form is a veil

26

27   government asserts this is irrelevant because of a "typo." Opp'n at 7, n.2. Regardless of

28   whether changing entirely the subject entity can be fairly characterized as a "typo," absence of any connection between the *Saturn* and the $185 million is unaffected.

6

piercing (*alter ego*) argument, the elements of which the government cannot satisfy.

First, the government's premise is contrary to California law. Under traditional application of alter ego theory, **corporate separateness** may be disregarded in order to hold an **owner** liable for corporate actions only when stringent criteria are met. *See Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1249 (9th Cir. 2017). Here, reversal of this concept—seeking to hold the corporation responsible for the alleged actions of the purported owner—runs headlong into California's rejection of "reverse piercing."[3] *United States v. Kim*, 806 F.3d 1161, 1168 (9th Cir. 2015). *See also Postal Instant Press, Inc. v. Kaswa Corp.*, 77 Cal. Rptr. 3d 96 (2008) ("[R]everse piercing is a radical and problematic change in standard alter ego law."). The government tacitly concedes this legal prohibition by not addressing it in the Opposition.

Moreover, contrary to the Opposition (at 20), the TAC fails to allege facts sufficient to pierce the corporate veil. As the government recognizes, the threshold for veil piercing is whether there exists "dominion and control so complete that the corporation has no separate mind." *Id.* (citation omitted). "The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004). Rather, "disregard of corporate separateness requires . . . total domination . . . to the extent that the subservient corporation manifests no separate corporate interests of its own." *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997). The government makes no serious effort to meet this arduous standard. The Opposition and TAC fail to identify any indicia of domination such as inadequate capitalization, commingling of funds and other assets, holding out by one entity that it is liable for the debts of the other, use of the same offices and employees, use of one as a mere conduit for the affairs of the

---

[3] Mr. Obaid is not even an owner of Claimant. As the TAC details, at the relevant time he was at most a 50% owner of a parent entity several layers removed. *See* TAC ¶ 1101.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

other, or disregard of corporate formalities, and lack of segregation of corporate records. *Daewoo Elecs.*, 875 F.3d at 1250 (citing *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1191 (E.D. Cal. 2009), *aff'd*, 409 Fed. App'x 88 (9th Cir. 2010)). Instead, the government largely relies on tautology by asserting that the "Required Director" moniker satisfies "all" relevant factors. Opp'n at 21. Its cursory application of the *alter ego* standard does not hold water.

In reality, PSOSVL was governed by a three-person Board of which Mr. Obaid was one director. TAC ¶ 1098. Moreover, the TAC does not allege that Mr. Obaid had any executive position at PSOSVL, because he did not. According to the company bylaws, any material corporate action required approval by a majority of directors. *See* Attached Declaration of David B. Rivkin, Jr. Ex. A ¶¶ 7.3 (quorum); 9.1 (majority resolutions); 20.1 (agreements requiring board resolution). Thus, the "Required Director" provision plainly does not establish that Mr. Obaid's approval was "sufficient" for PSOSVL to conduct business, let alone that he had "full control." *Id.* PSOSVL's corporate governance and the requirement of majority board approval—evident on the *face* of the bylaws—puts the lie to the conclusory argument that a single non-executive director could wholly control PSOSVL.

Perhaps recognizing its failure to meet the standard for traditional (or reverse) veil piercing, the government falls back on a policy argument. Opp'n at 19. However, that policy is exactly why, over hundreds of years, courts have developed a legal framework for the "alter ego" theory. The government cannot avoid well established law merely by using the term "captive."

For many of the same reasons, the government's imputation theory also fails. Opp'n at 21, n.6. First, the government still cannot point to specific actions Mr. Obaid supposedly took on behalf of PSOSVL. Indeed, one obvious example is the assertion that "the *Saturn* could not have been purchased . . . unless Obaid desired this outcome." Opp'n at 12. The theory that passively not preventing a corporate action is tantamount to actively causing it finds no support in law or common sense.

8

1  The government wrongly insists that by simply uttering "Required Director," it

2  answers the crucial question of what specific actions Mr. Obaid allegedly took on

3  behalf of PSOSVL. *Compare* ECF No. 94 at 15 *with* Opp'n at 13. But it does not.

4  The government has not alleged, and cannot show, that Mr. Obaid had personal

5  involvement in either the *Saturn* contract or the arbitration. What is more, the

6  government *knows* this, having attached as an exhibit a partial declaration of a

7  PSOSVL director that, among other things, states: (i) Mr. Obaid was not directly

8  involved in the operations of the business or the arbitration proceedings; and

9  (ii) PSOSVL operated successfully with almost no input from him.[4] Merely calling

10  PSOSVL an arm of Mr. Obaid does not make it so.

11  **VI.    FOUNDATIONAL ALLEGATIONS OF FRAUD ARE IMPLAUSIBLE**

12        The foundation of the TAC is a supposed fraud on 1MDB and a massive

13  conspiracy involving Mr. Obaid and every entity with a "PetroSaudi" name. This is

14  unsupported by the very documents the government relies on. First, the government

15  is reduced to arguing that contract terms in the JVA somehow constitute

16  misrepresentations by Mr. Obaid about the value of assets to be contributed by PSI.

17  But, the JVA does not include any such representation or warranty. Furthermore, it

18  does include an "entire agreement" clause where the parties confirm that they did

19  not enter into the JVA on the basis of any representation or warranty not expressly

20  incorporated therein. Further, the parties agreed that 1MDB would "engage

21  independent experts," to prepare a valuation report and it could terminate the

22  agreement if this valuation was not satisfactory. *See* ECF No. 34-2 at 7 (cl. 5.1-5.2).

23  The JVA made clear that 1MDB was to make its own determination of valuation.

24        Second, asserting that PSOSL and PSOSVL were co-conspirators in an

25  alleged fraud is preposterous because, among other things, neither existed at the

26  time. The government has no serious answer for black letter law that an alleged co-

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[4] The full document is attached as Exhibit B to the Rivkin Declaration.

CLAIMANT'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO.: 2:20-CV-08466-DSF-PLA

conspirator cannot be liable for acts of the conspiracy that occurred before it joined. *See* MTD at 16-17. Rather, the only retort is to misconstrue *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020), which dealt with venue and, only then, with respect to money laundering. The government provides absolutely nothing of substance to support the bald assertion that "a conspiracy to misappropriate money does not end when the money is first stolen." Opp'n at 19. To the contrary, a conspiracy typically concludes once its object is accomplished. *Cf. Houston v. United States*, 217 F. 852, 859 (9th Cir. 1914) *cert. denied*, 238 U.S. 613 (1915); *United States v. Green*, 594 F.2d 1227, 1229 (9th Cir. 1979); *United States v. Tanke*, 743 F.3d 1296, 1305 (9th Cir. 2014). Second, the government fails to identify any act by Claimant in furtherance of any conspiracy. Finally, and most importantly, the government acknowledges that the money laundering conspiracy ended with the purchase of the *Discoverer* **in February 2010**, Opp'n at 23, again before Claimant even existed.

## VII.   COMITY AND THE HIGH COURT'S OWNERSHIP OF THE *RES*

The arguments against application of international comity fail. The Ninth Circuit defines "adjudicative comity" as "'a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state.'" *Cooper v. Tokyo Electric Power Holdings, Inc.*, 960 F.3d 549, 566 (9th Cir. 2020). Application here is imperative. Subject matter jurisdiction over the *res* depends, at a minimum, upon the lawful service of an arrest warrant *in rem*. Service is impossible because the Defendant Assets are in the possession and under the control of the High Court of England and Wales. *See* ECF No. 95. Counsel has also learned that, under English law, the High Court holds indisputable legal title to the funds. *See* Decl. of James Lewis, QC ¶¶ 5, 14 ("Lewis Decl.") (filed herewith). The High Court, as an integral part of the British Crown, is immune from service under the under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604 ("FSIA"), whether by a U.S. Marshal or through the NCA. This is also the case under customary international law. Lewis Decl. ¶¶ 5-8.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1       The High Court's legal title to the *res* also means that, under FSIA, the Court

2  cannot entertain a suit seeking to forfeit the legal property of the British sovereign.

3  This, along with the fact that any order made by this Court regarding the *res* would

4  be in direct conflict with the High Court's ownership and authority over the

5  Defendant Assets, which are present in England and have never been in this

6  District, also strongly supports application of international comity. It is also

7  noteworthy that the High Court only took possession of the Defendant Assets after

8  this Court had, properly, dismissed the SAC and withdrawn its unexecuted Warrant

9  of Arrest *in rem*. Thus, the High Court took possession of these funds at a time

10  when this Court had abandoned any claim to jurisdiction over the *res*. It did not

11  exercise jurisdiction over the *res* as a means of defeating this Court's jurisdiction.

12       The claim that there is no conflict because the High Court holds the

13  Defendant Assets "in a similar capacity to a bank," Opp'n at 24, is false.[5] It is based

14  entirely on views expressed by an investigator working for the NCA, who is a civil

15  servant without legal training or remit. *See* ECF No. 80-1 ¶ 3. As noted above, such

16  assertions are contrary to English law, which vests legal ownership of the

17  Defendant Assets in the High Court (through the Court Funds Office), as well as

18  the "exclusive authority to adjudicate any and all claims that might be brought

19  against the funds." *Id*. ¶¶ 7; 14-22.[6]

20       Consequently, any order made by this Court vis-à-vis the Defendant Assets

21  would directly conflict with the authority of the High Court and sovereign

---

23  [5] It also is unsupported by basic banking law. Bank customers do not own monies they
24  deposit but become the bank's creditors, retaining only a contractual right to recover their funds. *See* 5A Michie on Banks & Banking § 4 ("[A] bank . . . becomes the absolute owner of money deposited with it to the general credit of the depositor. . . .").

25  [6] Indeed, the High Court's possession of the *res*, let alone its legal title, would defeat the
26  Court's subject matter jurisdiction on sovereign immunity grounds. *See Con. Edison Co. of N.Y., Inc. v. Bodman*, 445 F.3d 438, (D.C. Cir. 2006) ("government possession of funds
27  is itself sufficient to establish sovereign immunity."). *See also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 490, 489 (1983) ("if the claim does not fall within one of the
28  exceptions [to FSIA] federal district courts lack subject-matter jurisdiction.").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

11

immunity of the UK. That immunity was not, and cannot, be waived by Mr. Rainer. The High Court is an arm of the British Crown and its sovereign immunity can be waived *only* by the British Ambassador to the United States or the Foreign Office. Lewis Decl. ¶¶ 5-12. The NCA is a non-ministerial department and cannot not speak or act for the British state. *Id*. ¶¶ 10-12. To emphasize, this case is unique. The Defendant Assets are not subject to a foreign freezing or similar order. They have passed into the possession of the High Court, which now holds legal title to the Defendant Assets. There would be a fundamental conflict between this Court's exercise of jurisdiction over those Assets and the High Court's possessory and ownership rights in the assets, which are located in England.

Finally, the government relies on its claim that comity is inapplicable because, by filing this forfeiture suit, the Executive Branch has done all the balancing needed to make that determination. But, the Ninth Circuit has rejected that logic, making clear that the Court cannot grant blind deference to the Executive Branch. *Cooper*, 960 F.3d at 569. The factual differences between *Cooper* and this case do not and cannot change this conclusion. As a result, application of international comity is fully and indisputably justified.

## VIII. LEAVE TO AMEND IS NOT WARRANTED

Dismissal should be *with prejudice*. The Opposition weakly seeks leave to amend for a fourth time, relegating this argument to a footnote. This is disfavored and sufficient to constitute waiver. *See, e.g., City of Emeryville v. Robinson*, 621 F.3 1251, 1262 n.10 (9th Cir. 2010). In any event, the substantive argument is that "Claimant cannot know the grounds for any hypothetical future dismissal, and thus Claimant cannot say whether such grounds would support an inference regarding futility of amendment." Opp'n at 25 n.8. This is not the standard. If the government is sitting on some set of undisclosed facts that support forfeiture it has had ample opportunity to plead them. Futility should be extrapolated from what has occurred in the *past*, namely four deficient complaints. *See* ECF No. 94 at 24-25.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1 | DATE: August 30, 2021

Respectfully submitted,

Baker & Hostetler LLP

By: /s/ *David B. Rivkin, Jr.*
ZOE M. STEINBERG
DAVID B. RIVKIN, JR.

*Attorneys for Claimant*
*PETROSAUDI OIL SERVICES*
*(VENEZUELA) LTD.*

OF COUNSEL:
Baker & Hostetler LLP
LEE A. CASEY
MARK W. DELAQUIL
JONATHAN R. BARR
ELIZABETH PRICE FOLEY
KENDALL E. WANGSGARD
JONATHAN B. NEW

CLAIMANT'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO.: 2:20-CV-08466-DSF-PLA

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing and its attachments was electronically filed on August 30, 2021 using the CM/ECF system, thereby sending a notice of electronic filing to all counsel of record.

/s/ *David B. Rivkin, Jr.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

CLAIMANT'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO.: 2:20-CV-08466-DSF-PLA